UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD MINNESOTA, NORTH DAKOTA, SOUTH DAKOTA, and CAROL E. BALL, M.D., | ) ) ) ) ) | CIV. 11-4071-KES |
| Plaintiffs, | ) ) | MEMORANDUM OPINION AND ORDER |
| vs. | ) ) ) | |
| DENNIS DAUGAARD, Governor, MARTY JACKLEY, Attorney General, DONEEN HOLLINGSWORTH, Secretary of Health, Department of Health, and ROBERT FERRELL, President, Board of Medical and Osteopathic Examiners, in their official capacities, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

Plaintiffs, Planned Parenthood Minnesota, North Dakota, South Dakota and Dr. Carol Ball, move for a preliminary injunction or temporary restraining order that would enjoin defendants, Governor Dennis Daugaard, Attorney General Marty Jackley, Secretary Doneen Hollingsworth, and Board President Robert Ferrell, in their official capacities, from enforcing South Dakota House Bill 1217 (hereinafter "the Act"), which takes effect on July 1, 2011.

## BACKGROUND

In 2005, the South Dakota Legislature amended SDCL 34-23A-10.1 to include various requirements to ensure a pregnant woman's voluntary and informed consent before she underwent an abortion. Some of those amendments were challenged by plaintiffs on the grounds that they violated the First and Fourteenth Amendments of the United States Constitution. *See generally Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724 (8th Cir. 2008) (en banc). That case is currently before the Eighth Circuit Court of Appeals.

In 2011, the South Dakota Legislature passed the Act at issue in this case. Plaintiffs challenge the constitutionality of the Act on the grounds that it violates the First Amendment's Free Speech Clause and the Fourteenth Amendment's Due Process Clause and Equal Protection Clause.[1] A hearing on plaintiffs' motion for preliminary injunction was held on June 27, 2011.

There are essentially four parts to the Act: (1) The Pregnancy Help Center Requirements; (2) The 72-Hour Requirement; (3) the Risk Factors Requirement; and (4) the Coercion Provisions. Generally, the Pregnancy Help Center Requirements require a pregnant woman to consult with a registered "pregnancy help center" before she is able to undergo an abortion. The 72-Hour

---

[1] In their brief in support of the motion for preliminary injunction, plaintiffs do not argue that certain provisions violate the Equal Protection Clause.

2

Requirement establishes at least a three-day waiting period between the pregnant woman's initial consultation with her physician and the abortion. The Coercion Provisions impose a duty on the physician to certify that the pregnant woman has not been "coerced" as defined in the Act. Finally, the Risk Factors Requirement establishes what information the physician must tell a pregnant woman with regard to the "complications associated with abortion."

Defendants acknowledge that no court has upheld a requirement that is similar to the Risk Factors Requirement. Defendants also acknowledge that no other state currently has requirements that are comparable to the Pregnancy Help Center Requirements, the 72-Hour Requirement, or the Coercion Provisions.

## DISCUSSION

### I.  Preliminary Injunction Standard

When ruling on a motion for a temporary restraining order or preliminary injunction the court must consider:  (1) the threat of irreparable harm to the moving party; (2) the balance of this harm with any injury a preliminary injunction would inflict on other parties; (3) the likelihood of success on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). *See also S.B. McLaughlin & Co. v. Tudor Oaks Condominium Project*, 877 F.2d 707, 708 (8th Cir. 1989) (noting that the trial court applied the same standard for a temporary restraining order

3

and the preliminary injunction). "Where a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute, [] district courts [must] make a threshold finding that a party is likely to prevail on the merits."[2] *Rounds*, 530 F.3d at 732-33.

## II.   Likelihood of Success on the Merits

Plaintiffs challenge the constitutionality of the Act as a whole[3] and several specific provisions in the Act. The court will first analyze the threshold issue of whether plaintiffs are likely to succeed on the merits with regard to each challenged provision.

### A.   The Pregnancy Help Center Requirements

Section 5 of the Act sets forth the requirements for maintaining a registry of pregnancy help centers and the requirements that a pregnancy help center must satisfy in order to be on the registry. Section 7 of the Act defines "pregnancy help center" as follows:

> any entity . . . that has as one of its principal missions to provide education, counseling, and other assistance to help a pregnant mother maintain her relationship with her unborn child and care for her unborn child, which entity has a medical director who is

---

[2] The "likely to prevail on the merits" standard is a "more rigorous standard for demonstrating a likelihood of success on the merits" than the "fair chance" standard that would otherwise apply. *Id.* at 733.

[3] Because the court finds that plaintiffs are likely to succeed on the merits of the narrower issue of the constitutionality of specific provisions of the Act, it will not address at this time the broader issue of the Act's constitutionality as a whole.

licensed to practice medicine in the state of South Dakota, or that
it has a collaborative agreement with a physician licensed in South
Dakota to practice medicine to whom women can be referred,
which entity does not perform abortions and is not affiliated with
any physician or entity that performs abortions, and does not now
refer pregnant mothers for abortions, and has not referred any
pregnant mother for abortions for the three-year period
immediately preceding July 1, 2011[.]

Subsection 3 of section 3 of the Act reads as follows with regard to the

requirements that pertain to pregnancy help centers:

During the initial consultation between the physician and the
pregnant mother, prior to scheduling a surgical or medical
abortion, the physician shall . . . [p]rovide the pregnant mother
with the names, addresses, and telephone numbers of all
pregnancy help centers that are registered with the South Dakota
Department of Health pursuant to this Act, and provide her with
written instructions that set forth the following:

    (a)    That prior to the day of any scheduled abortion the
pregnant mother must have a consultation at a
pregnancy help center at which the pregnancy help
center shall inform her about what education,
counseling, and other assistance is available to help
the pregnant mother keep and care for her child, and
have a private interview to discuss her circumstances
that may subject her decision to coercion;

    (b)    That prior to signing a consent to an abortion, the
physician shall first obtain from the pregnant mother,
a written statement that she obtained a consultation
with a pregnancy help center, which sets forth the
name and address of the pregnancy help center, the
date and time of the consultation, and the name of the
counselor at the pregnancy help center with whom she
consulted[.]

5

Section 6 of the Act then sets forth what the pregnancy help center is required and allowed to do during the required consultation. Specifically, section 6 states that a pregnancy help center:

> shall be permitted to interview the pregnant mother to determine whether the pregnant mother has been subject to any coercion to have an abortion, and shall be permitted to inform the pregnant mother in writing or orally, or both, what counseling, education, and assistance that is available to the pregnant mother to help her maintain her relationship with her unborn child and help her care for the child both through the pregnancy help center or any other organization, faith-based program, or governmental program. . . . Any written statement or summary of assessment prepared by the pregnancy help center as a result of counseling of a pregnant mother as a result of the procedures created by this Act, may be forwarded by the pregnancy help center, in its discretion, to the abortion physician. If forwarded to the physician, the written statement or summary of assessment shall be maintained as a permanent part of the pregnant mother's medical records. Other than forwarding such documents to the abortion physician, no information obtained by the pregnancy help center from the pregnant mother may be released, without the written signed consent of the pregnant mother or unless the release is in accordance with federal, state, or local law.

Section 4 of the Act then states that "no physician may take a consent for an abortion nor may the physician perform an abortion, unless the physician . . . first obtains from the pregnant mother, a written, signed statement setting forth all information required by subsection 3(b) of section 3[,]" which is set forth above.

Plaintiffs challenge these sections, hereinafter referred to as the Pregnancy Help Center Requirements, on six grounds: (1) they violate the patients' rights to obtain an abortion; (2) they violate the patients' right to free

6

speech; (3) they violate the patients' informational privacy rights; (4) they violate the patients' and plaintiffs' rights to equal protection of the laws; (5) they violate the Establishment Clause; and (6) they violate plaintiffs' right to free speech.[4]

### 1.    Compelled Speech (Patient) Analysis

"[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). In analyzing whether "state action violates the right not to speak, a court first determines whether the action implicates First Amendment protections." *Rounds*, 530 F.3d at 733 (citation omitted). "If it does, the court must determine whether the action is narrowly tailored to serve a compelling state interest." *Id.*

In *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988), the Supreme Court emphasized that the Free Speech Clause applies in instances of "compelled statements of 'fact[.]' " *Id.* at 797-98 ("These cases cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of 'fact': either form of compulsion burdens protected speech."). *See also Axson-Flynn v.*

_____

[4] At this stage of the proceedings, the court only addresses the undue burden and the patient free speech claim for purposes of determining whether plaintiffs are likely to succeed on the merits.

7

*Johnson*, 356 F.3d 1277, 1284 n.4 (10th Cir. 2004) ("The constitutional harm —and what the First Amendment prohibits—is being forced to speak rather than remain silent. . . . This harm occurs regardless of whether the speech is ideological." (citations omitted)). The First Amendment's protection against compelled speech with regard to factual statements was reaffirmed in *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), where the Court explained: "Despite . . . the public's interest in identifying the creator of a work of art, an author generally is free to decide whether or not to disclose his or her true identity. . . . Accordingly, an author's decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment." *Id.* at 341- 42. Thus, in determining whether the Pregnancy Help Center Requirements implicate First Amendment protections, the court is guided by the basic principle that the First Amendment protects "not only [] expressions of value, opinion, or endorsement, but . . . statements of fact the speaker would rather avoid[.]" *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 573-74 (1995) (citing *McIntyre*, 514 U.S. at 341-42; *Riley*, 487 U.S. at 797- 98).

The Eighth Circuit Court of Appeals has stated that "[a] First Amendment protection against compelled speech, however, has been found only in the context of governmental compulsion to disseminate a particular political or ideological message." *United States v. Sindel*, 53 F.3d 874, 878 (8th

8

Cir. 1995) (citing cases). The holding in *Sindel*, however, is a narrow one: "There is no right to refrain from speaking when 'essential operations of government may require it for the preservation of an orderly society, —as in the case of compulsion to give evidence in court.' " *Id.* at 878 (citation omitted).

Here, there are no "essential operations of government" that "require" the information "for preservation of an orderly society." *See id.* Indeed, the patients' compelled statements are given to a private entity and not the government. To the extent that *Sindel* might be construed beyond this narrow holding, the Supreme Court's decision in *Hurley* would seemingly abrogate any broader holding because *Hurley* was decided after *Sindel*.

Defendants argue that the patients' free speech rights are not implicated because a pregnant woman is only required to "speak" inasmuch as she is required to disclose that she is pregnant and that she has chosen to undergo an abortion. First, the plain language of the Pregnancy Help Center Requirements contradict defendants' construction. Subsection 3(a) of section 3 states that the "pregnant mother must . . . have a private interview to discuss her circumstances that may subject her decision to coercion." An interview necessarily requires questions ***and*** answers. And defendants offer no explanation on how an interview "to discuss her circumstances" could be done without the pregnant woman actually disclosing "her circumstances."

9

Second, and in the alternative, if the pregnant woman does not have to actually discuss her circumstances during an interview and she only has to disclose that she is pregnant and has chosen to undergo an abortion, the Pregnancy Help Center Requirements still implicate the patient's free speech rights. At the very least, the requirements on their face compel a patient to not only disclose that she is pregnant and is seeking an abortion, but also to disclose the name of her abortion physician so the pregnancy help center knows to whom to send the written statement or summary of assessment. *See* Section 6 of the Act (authorizing a pregnancy help center to forward "documents to the abortion physician"). This compelled disclosure necessarily reveals private factual information, such as she is pregnant, she is choosing to undergo an abortion, she has spoken with an abortion physician, and the name of her abortion physician. And she is being compelled to disclose this information to someone who is opposed[5] to her decision to undergo an abortion. Even these "limited" compelled disclosures implicate the protection afforded by the First Amendment's Free Speech Clause. *See Hurley*, 515 U.S. at 573-74 (citing *McIntyre*, 514 U.S. at 341-42; *Riley*, 487 U.S. at 797-98).

---

[5] Under section 5 of the Act, a pregnancy help center must certify that "one of its principal missions is to educate, counsel, and otherwise assist women to help them maintain their relationship with their unborn children," and it cannot have "referred any pregnant women for an abortion at any time in the three years immediately preceding July 1, 2011."

10

Defendants rely on *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006), to support their argument that the First Amendment does not apply with regard to the compelled speech required by the Pregnancy Help Center Requirements. *See id.* at 62 ("This sort of recruiting assistance, however, is a far cry from the compelled speech in *Barnette* and *Wooley*."). The discussion in *Rumsfeld* about the lack of First Amendment protection must be understood in the context of what was at issue: "compelled statements of fact" such as "The U.S. Army recruiter will meet interested students in Room 123 at 11 a.m." *Id.* at 62. While the claim in *Rumsfeld* "trivialize[d] the freedom protected in *Barnette* and *Wooley*," the same cannot be said with regard to the compelled statements of fact in this case. That is, there is a clear difference between "The U.S. Army recruiter will meet interested students in Room 123 at 11 a.m." and "I am pregnant and have chosen to have an abortion. The name of my abortion physician is Dr. X." The Pregnancy Help Center Requirements are therefore an intentional and purposeful regulation of speech that compels the patient to disclose to the pregnancy help center the name of her abortion physician, her pregnancy, and her decision to obtain an abortion. The plain language therefore makes it clear that the Pregnancy Help Center Requirements are not merely an incidental regulation of speech.

The court finds that plaintiffs have met their burden of demonstrating that the Pregnancy Help Center Requirements "implicate[] First Amendment

11

protections." *Rounds*, 530 F.3d at 733. The burden is therefore on defendants to demonstrate that "the action is narrowly tailored to serve a compelling state interest." *Id.*

There is a compelling state interest in protecting a woman from being forced against her will to have an abortion and in informing a woman of truthful, relevant, and non-misleading information about abortion, alternatives to abortion, and pregnancy assistance. While plaintiffs dispute that these identified goals are the true goals behind the Pregnancy Help Center Requirements, there is no dispute that these goals constitute a compelling state interest. The court assumes, without deciding, that these are the real goals sought to be achieved by the Pregnancy Help Center Requirements and that they constitute a compelling state interest.

Even if the Pregnancy Help Center Requirements are directed at a compelling state interest, however, they must be narrowly tailored toward achieving those interests. *See Rounds*, 530 F.3d at 733. Physicians have been, and continue to be, fully capable of ensuring that the patient has not chosen to undergo an abortion against her will. *See* SDCL 34-23A-10.1 ("No abortion may be performed unless the physician first obtains a voluntary and informed written consent of the pregnant woman upon whom the physician intends to perform the abortion[.]"). Indeed, section 2 of the Act acknowledges the

existence of the physician's common law duty to determine that "the patient's consent is voluntary and uncoerced and informed[.]"

Moreover, when considering the goal of protecting the patient from coercion and defendants' portrayal of what the Pregnancy Help Center Requirements actually require, it becomes clear that the requirements are not tailored towards the proclaimed compelling state interest. As discussed earlier, defendants argue that the Pregnancy Help Center Requirements do not require the pregnant woman to say anything to the pregnancy help center employee other than that she is pregnant and has chosen to undergo an abortion. If this is all that is required, then the requirements do little, if anything, in terms of achieving the goal of protecting a woman from being coerced into obtaining an abortion.

With regard to the goal of informing the woman about abortions, alternatives to abortion, and pregnancy assistance, there are several less restrictive alternatives that are equally capable of informing the pregnant woman about such matters. For example, the physician or the physician's agent is already required by SDCL 34-23A-10.1 to provide the following information to the patient at least 24 hours in advance of the abortion: the name and address of a pregnancy help center near the abortion facility; that written materials produced by the state of South Dakota are available free of charge; and that a multi-media website developed by the state South Dakota

13

exists. *Cf. Reno v. American Civil Liberties Union,* 521 U.S. 844, 874 (1997) (holding that a statute was not narrowly tailored because there were "less restrictive alternatives [that] would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve"). If the woman wishes to consult with a pregnancy help center, read pamphlets, or study the website, she is free to do so. Because the Pregnancy Help Center Requirements only apply to women who have chosen to undergo an abortion, they do nothing to inform pregnant women who may not be seeking an abortion but are seeking information about alternatives to abortion and information about assistance for raising children.

Defendants argue that using printed materials or the patient's physician to provide information to pregnant women who have chosen to undergo an abortion have not always been successful. Thus, according to defendants, the legislature is allowed to experiment with different message delivery mechanisms in an attempt to ensure that the woman is fully informed. The court rejects defendants' underlying assumption that legislatures are allowed to use more intrusive means that regulate speech because the alternatives are not 100 percent successful in achieving a compelling state interest. *See Reno*, 521 U.S. at 875 (reaffirming the holding in *Sable Communications of California, Inc. v. F.C.C.,* 492 U.S. 115 (1989), that "rejected the argument that we should defer to the congressional judgment that nothing less than a total ban would

14

be effective in preventing enterprising youngsters from gaining access to indecent communications").

Moreover, the burden is on defendants to demonstrate that the requirements are narrowly tailored, and there is nothing in the record that supports defendants' underlying assumption that truthful, relevant, and non-misleading information given through a pregnancy help center will cause a pregnant woman to be better informed than the current existing methods from which a woman can choose on a voluntary basis. In fact, forcing a woman to listen to someone who is opposed to her decision to have an abortion is likely to cause the woman to reject the information outright.

For these reasons, the court finds that defendants have failed to demonstrate that the means chosen to achieve the identified interests are narrowly tailored toward achieving the purported compelling state interests. In accordance with recent Supreme Court decisions involving facial free speech challenges, the court concludes that plaintiffs have demonstrated that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) (internal quotations and citation omitted). *See also Brown v. Entm't Merchs. Ass'n*, ___ S. Ct.___, 2011 WL 2518809, at *4 (June 27, 2011) (recognizing that the holding in *Stevens* "controls this case"). *Cf. Gonzales v. Carhart*, 550 U.S. 124, 167 (2007) ("The latitude given facial challenges in the

15

First Amendment context is inapplicable here."). Therefore, plaintiffs have met their burden of demonstrating that they are likely to succeed on the merits of their claim that the Pregnancy Help Center Requirements violate the First Amendment's Free Speech Clause.

### 2.    Undue Burden Analysis

Plaintiffs argue in the alternative that the Pregnancy Help Center Requirements constitute a substantial obstacle that will deter many women from exercising their constitutional right to obtain an abortion.[6] Defendants argue that plaintiffs have not demonstrated, and cannot demonstrate, that the Pregnancy Help Center Requirements will interfere with the decision to obtain an abortion for a "large fraction" of the affected women.[7]

─────────────────

[6] Specifically, plaintiffs argue that the Pregnancy Help Center Requirements create an undue burden for four reasons: (1) the Act does not adequately protect the patient's confidentiality; (2) the pregnancy help centers are not required to act in an expeditious manner; (3) the pregnancy help centers are allowed to give untruthful and misleading information; and (4) the Pregnancy Help Center Requirements unduly deter physicians from offering abortion services.

[7] Defendants also argue that the Act has a legitimate purpose. Defendants acknowledge, though, that even if a statute seeks to further a legitimate governmental purpose, it may still constitute an undue burden. Docket 32 at 26. *See also Casey*, 505 U.S. at 877 ("And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends."). The court assumes, without deciding, that the Pregnancy Help Center Requirements have a legitimate purpose.

When a statute is challenged on the ground that it violates a woman's constitutional right to obtain an abortion, the burden placed on the challenger "has been a subject of some question." *Gonzales v. Carhart*, 550 U.S. 124, 167 (2007) (citations omitted). Nonetheless, the Eighth Circuit Court of Appeals has determined that the standard set out in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), applies. *See Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1456-58 (8th Cir. 1995) ("We will therefore apply the *Casey* standard to determine if South Dakota's Act to Regulate the Performance of Abortion is constitutional on its face.").[8]

Thus, the court will apply the following standard as set out in *Casey*: "If the law will operate as a substantial obstacle to a woman's choice to undergo an abortion 'in a large fraction of the cases in which [it] is relevant, . . . [i]t is an undue burden, and therefore invalid.' " *Id.* at 1458 (alteration in original) (quoting *Casey*, 505 U.S. at 895). In determining whether plaintiffs have met this burden, " '[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.' " *Id.* (alteration in original) (citation omitted).

As the applicable test makes clear, whether the Pregnancy Help Center Requirements constitute an "undue burden" depends on whether, in a large

_____

[8] As recently noted by the Eighth Circuit Court of Appeals, "the standards enunciated by the *Casey* plurality opinion [are] controlling precedent in abortion cases." *Rounds*, 530 F.3d at 733 n.8 (citations omitted).

fraction of the cases in which they are relevant, the Pregnancy Help Center
Requirements create a "substantial obstacle to a woman's choice to undergo an
abortion." *See id.* There are three issues that must be resolved in order to
determine whether plaintiffs have met their burden: (1) in what cases are the
requirements "relevant;" (2) do the requirements create a "substantial obstacle
to the woman's choice to undergo an abortion" in those cases in which the
requirements are "relevant;" and (3) is the substantial obstacle present in a
"large fraction" of the "relevant" cases.

    As to the issue of what cases are "relevant," the Pregnancy Help Center
Requirements would not apply if the woman has not chosen to undergo an
abortion or is uncertain about whether or not she wishes to obtain an
abortion.[9] That is, the requirements are only relevant in those instances where
a woman has chosen to undergo an abortion in South Dakota. Similarly, the
Pregnancy Help Center Requirements are only relevant in those instances
where a woman has not chosen to consult with a pregnancy help center on her
own. Thus, the relevant cases are those that involve a woman who has chosen

--------

    [9] The plain language of the Pregnancy Help Center Requirements
establishes that a pregnant woman must consult with a pregnancy help center
only if she chooses to undergo an abortion. There is nothing in the Act that
requires a pregnant woman who does not want an abortion to consult with a
pregnancy help center. There is also nothing in the Act that requires a
pregnant woman who is only considering whether or not to undergo an
abortion to consult with a pregnancy help center. The Pregnancy Help Center
Requirements are targeted only at those pregnant women who have chosen to
undergo an abortion.

to undergo an abortion and would otherwise not consult with a pregnancy help center. *Cf. Casey*, 505 U.S. at 894 (limiting the relevant cases to "married women seeking abortions who do not wish to notify their husbands of their intentions and who do not qualify for one of the statutory exceptions to the notice requirement").

With the relevant cases in mind, the next issue is whether the Pregnancy Help Center Requirements create "a substantial obstacle to a woman's choice to undergo an abortion." *See Miller*, 63 F.3d at 1458. The plain language of sections 3, 4, 5, and 6 makes it clear that a woman can obtain an abortion if, and only if, she first consults a pregnancy help center when she otherwise would not. Forcing a woman to divulge to a stranger at a pregnancy help center the fact that she has chosen to undergo an abortion humiliates and degrades her as a human being. The woman will feel degraded by the compulsive nature of the Pregnancy Help Center Requirements, which suggest that she has made the "wrong" decision, has not really "thought" about her decision to undergo an abortion, or is "not intelligent enough" to make the decision with the advice of a physician.

Furthermore, these women are forced into a hostile environment. Aside from its compulsive nature, the hostility of the consultation is evidenced by the fact that section 5 of the Act establishes that the only entities that can be listed on the state registry of pregnancy help centers are those that routinely

19

"consult[] with women for the purpose of helping them keep their relationship with their unborn children" and that "one of [their] principal missions is to educate, counsel, and otherwise assist women to help them maintain their relationship with their unborn children." A pregnancy help center cannot have even "referred any pregnant women for an abortion at any time in the three years immediately preceding July 1, 2011." Requiring these women to "have a consultation," and a "private interview" with a "pregnancy help center" destroys "[t]he right to avoid unwelcome speech" that is "protected in confrontational settings." *Cf. Hill v. Colorado*, 530 U.S. 703, 717 (2000). And it forces an unnecessary confrontation on one of the most volatile subjects in America. *See Stenberg v. Carhart*, 530 U.S. at 920 (acknowledging that "[m]illions of Americans believe that . . . abortion is akin to causing the death of an innocent child"); *Casey*, 505 U.S. at 852 (recognizing that "some deem [abortions as] nothing short of an act of violence against innocent human life").

There are clear ideological differences between a woman who has chosen to undergo an abortion and a "pregnancy help center." When considering these differences, a woman will likely be unwilling to actually consult with a pregnancy help center because she will fear being ridiculed, labeled a murderer, subjected to anti-abortion ideology, and repeatedly contacted by the pregnancy help center. Moreover, a woman may likely believe, rightly or wrongly, that her decision to have an abortion could become public

20

information. And it will not matter to her that in the future she may be able to obtain legal relief from the pregnancy help center worker who disclosed the information. By then it will be too late. Thus, rather than risk having such information being made public or to avoid "consulting" with someone who is not supportive of her decision to have an abortion, she will be forced to remain pregnant.

The Pregnancy Help Center Requirements establish that those women who choose to undergo an abortion must consult with the pregnancy help center and divulge personal information against their will in order to effectuate their decision to undergo an abortion. The court finds these requirements do "not merely make abortions a little more difficult or expensive to obtain." *Casey*, 505 U.S. at 893. Rather, the requirements constitute a substantial obstacle to a woman's decision to obtain an abortion because they force the woman against her will to disclose her decision to undergo an abortion to a pregnancy help center employee before she can undergo an abortion. *Cf.* *Casey*, 505 U.S. at 887, 892 (finding the spousal notification requirement to be unconstitutional partly because there are "many cases in which married women do not notify their husbands [because] the pregnancy is the result of an extramarital affair" even though the spousal notification requirement allowed the woman to "certify[] that her husband is not the man who impregnated her").

21

Defendants argue that the Pregnancy Help Center Requirements are not a substantial obstacle because no woman "who wants to keep her pregnancy a secret, will forgo her option to have an abortion because she does not want to reveal her pregnancy to a third party [because] she will already have disclosed her pregnancy to staff members at an abortion clinic." Docket 32 at 68. This argument is without merit. There is an inherent difference between compelling a woman to disclose her decision to undergo an abortion to a "pregnancy help center" and a woman freely disclosing this decision to someone she chose to provide her with the medical services that she seeks. *See Hill*, 530 U.S. at 717 (recognizing the significance of "confrontational settings" in the context of free speech issues). The former situation leads to the fear described above. *See Casey*, 505 U.S. at 893, 894 ("We must not blind ourselves to . . . the significant number of women who fear for their safety[.]"); *Miller*, 63 F.3d at 1463 (acknowledging that "non-abusive parents who differ from their daughters on religious or moral grounds over abortion may be prepared to prevent their daughters from obtaining abortions even when those abortions are in the daughters' best interests"). The latter situation does not. For the reasons expressed above, the court finds that the Pregnancy Help Center Requirements do create a substantial obstacle in the relevant cases.

The next issue is whether this substantial obstacle is present in a "large fraction" of the "relevant" cases. Defendants argue that a "large fraction" means

22

"at least half of the group in question." *See* Docket 32 at 32. If the plurality opinion in *Casey* intended "large fraction" to mean a majority, it would have said majority. Indeed, *Casey's* use of the phrase "large fraction" at most indicates that the number of women affected by the requirements must be more than a "small" fraction of the group in question. Admittedly, this construction of "large fraction" does little in terms of establishing the phrase's scope. *See Casey*, 505 U.S. at 973 n.2 ("The joint opinion concentrates on the situations involving battered women and unreported spousal assault, and assumes, without any support in the record, that these instances constitute a 'large fraction' of those cases in which women prefer not to notify their husbands (and do not qualify for an exception)." (Rehnquist, White, Scalia, Thomas, JJ. dissenting). Nonetheless, some guidance as to the rigidity of the phrase "large fraction" is available.

In *Casey*, the Supreme Court addressed the constitutionality of, among other provisions, a "spousal notification requirement." 505 U.S. at 887. The relevant cases in *Casey* with regard to that requirement were "married women seeking abortions who do not wish to notify their husbands of their intentions and who do not qualify for one of the statutory exceptions to the notice requirement." *Id.* at 895. The Court held that the requirement was unconstitutional under the "large fraction" test after it found that the requirement was "likely to prevent a ***significant*** number of [those] women from

23

obtaining an abortion." 505 U.S. at 893, 894 (emphasis added). This language and reasoning indicates that the term "large fraction" should not be construed as some numerical threshold that must be established.[10]

While certainly not establishing the bottom end of what constitutes a "large fraction," it appears that the Eighth Circuit Court of Appeals' decision in *Miller* comes the closest.[11] In *Miller*, the Eighth Circuit Court of Appeals addressed the validity of South Dakota's bypass procedure for minors seeking an abortion without parental consent. 63 F.3d at 1458. In the opinion, two different sets of relevant cases were analyzed. The first set involved those pregnant minors who did not have access to a "bypass procedure" because they did "not fall under [the] abuse exception," even though they "could show that an abortion is in their best interests." *See id.* at 1462. The second set involved pregnant minors who had access to a "bypass procedure" because they were abused, but were nonetheless unable "to use the abuse exception" due to the

─────────────

[10] The other case in which the Supreme Court has found a statute to be unconstitutional is *Stenberg v. Carhart*, 530 U.S. 914 (2000). That case is of little help with regard to this issue because the defendant did "not deny that the statute impose[d] an 'undue burden' ***if*** it applies to the more commonly used . . . procedure[.]" *Id.* at 938. Thus, the central issue was essentially a statutory interpretation issue.

[11] In *Carhart v. Stenberg*, 192 F.3d 1142 (8th Cir. 1999), the Eighth Circuit Court of Appeals held that the statute "impose[d] an undue burden on a woman's right to choose to have an abortion" because it "prohibit[ed] the most common procedure for second-trimester abortions[.]" *Id.* at 1151. Thus, this decision does little in terms of establishing what is meant by a "large fraction."

minor "blam[ing] themselves for the abuse" or being "very protective of the
abusive parent." *See id.* at 1463. The Eighth Circuit Court of Appeals found
that the challengers had "shown that a large fraction of minors seeking
pre-viability abortions would be unduly burdened by South Dakota's
parental-notice statute, despite its abuse exception." *Id.*

       With regard to the first set of relevant cases, which involved the "best
interest" minors, the court rejected the argument that "the minor could simply
notify her other parent" because "many of them, as a practical matter, have
only one parent to notify." *Id.* at 1462 n.10. According to the Eighth Circuit
Court of Appeals, approximately 18 percent warranted use of the descriptive
term "many." *See id.* ("Roughly eighteen [percent] of South Dakota's minors live
in single-parent homes; many of them, as a practical matter, have only one
parent to notify."). The Eighth Circuit Court of Appeals struck down this
portion of the statute because the challengers had "shown that a large fraction
of [these] minors seeking pre-viability abortions would be unduly burdened by
South Dakota's parental-notice statute, despite its abuse exception." *Id.* at
1463.

       With regard to the second set of relevant cases, which involved minors
that were abused, the Eighth Circuit Court of Appeals recognized that "[a]
minor faced with the untenable choice of turning in her parent or forgoing an
abortion will often delay her decision until it is too late; she may even commit

25

suicide rather than choose between two such agonizing choices." *Id.* (emphasizing that "[e]ven if South Dakota's exception were otherwise acceptable, its failure to provide an alternative procedure for these minors would doom it"). The number of the abused minors who would choose not to utilize the "bypass procedure" was not explicitly identified. Nonetheless, it stands to reason that many of those minors would be hesitant to report their parents.

Here, in nearly every instance where the Pregnancy Help Center Requirements are relevant, a woman who chooses to undergo an abortion will experience a high degree of degradation because she will be forced to disclose her decision to someone who is fundamentally opposed to it. Women will also be afraid of being berated, belittled, or confronted about their decision, being subsequently contacted by the pregnancy help center, and having their decision to have an abortion become public information. As a result, women will delay or refrain from consulting with the pregnancy help centers, which will prevent them from being able to carry out their decision to undergo an abortion. *See Casey*, 505 U.S. at 893-95; *Miller*, 63 F.3d at 1462-63. Thus, the Pregnancy Help Center Requirements constitute a substantial obstacle for a large fraction of the relevant cases.

Plaintiffs have therefore demonstrated that they are likely to succeed with regard to their claim that the Pregnancy Help Center Requirements violate

26

the Fourteenth Amendment's Due Process Clause because they create an
undue burden on the woman's choice to obtain a legal abortion. *See Casey*,
505 U.S. at 877 ("A finding of an undue burden is a shorthand for the
conclusion that a state regulation has the purpose or effect of placing a
substantial obstacle in the path of a woman seeking an abortion of a nonviable
fetus.").

To summarize, plaintiffs have demonstrated that they are likely to
succeed on their challenges to the Pregnancy Help Center Requirements
because the Requirements compel patients to speak in violation of the First
Amendment's Free Speech Clause and because they constitute an undue
burden on a woman's choice to undergo an abortion in violation of the
Fourteenth Amendment's Due Process Clause.

### B.    The 72-Hour Requirement—Undue Burden Analysis

The beginning portion of section 3 of the Act establishes that before
obtaining an abortion, a patient must wait at least 72 hours between her initial
consultation and an abortion. Specifically, section 3 reads in relevant part as
follows:

> No surgical or medical abortion may be scheduled except by a
> licensed physician and only after the physician physically and
> personally meets with the pregnant mother, consults with her, and
> performs an assessment of her medical and personal
> circumstances. Only after the physician completes the consultation
> and assessment complying with the provisions of this Act, may the
> physician schedule a surgical or medical abortion, but in no
> instance may the physician schedule such surgical or medical

27

abortion to take place in less than seventy-two hours from the completion of such consultation and assessment except in a medical emergency[.]

Section 3 also limits when and how a patient can consent to the medical procedure. This portion of section 3 states:

No physician may take a signed consent from the pregnant mother unless the pregnant mother is in the physical presence of the physician and except on the day the abortion is scheduled, and only after complying with the provisions of this Act as it pertains to the initial consultation, and only after complying with the provisions of subdivisions 34-23A-l0.1(1) and (2).[12]

Finally, section 4 establishes that "no physician may . . . perform an abortion[] unless the physician has fully complied with the provisions of this Act[.]"

Plaintiffs challenge these portions of section 3 and 4, hereafter identified as the 72-Hour Requirement, on two grounds: (1) they create an undue burden on women's rights to obtain an abortion; and (2) they violate the patients' and plaintiffs' rights to equal protection of the laws. Because plaintiffs do not brief their equal protection claim, the court will only conduct an undue burden analysis.

Similar to the other provisions in the Act, whether the 72-Hour Requirement constitutes an "undue burden" depends on whether, in a large

---

[12] Portions of SDCL 34-23A-10.1(1) were found by the district court to be unconstitutional in *Planned Parenthood Minn., N.D., S.D., v. Rounds*, 650 F. Supp. 2d 972 (D.S.D. 2009). That case is currently before the Eighth Circuit Court of Appeals.

fraction of the cases where it is relevant, the 72-Hour Requirement creates a "substantial obstacle to a woman's choice to undergo an abortion." *See Miller*, 63 F.3d at 1458. There are three issues that must be resolved in order to determine whether plaintiffs have met their burden: (1) in what cases is the 72-Hour Requirement "relevant;" (2) does the requirement create a "substantial obstacle to the woman's choice to undergo an abortion" in those cases where the 72-Hour Requirement is "relevant;" and (3) is the substantial obstacle present in a "large fraction" of the "relevant" cases.

On its face, the 72-Hour Requirement applies to every woman who chooses to undergo an abortion. According to defendants, the requirement is therefore relevant to every woman who chooses to undergo an abortion. Because the 72-Hour Requirement imposes a substantial obstacle on almost every woman who chooses to undergo an abortion, the court assumes, without deciding, that defendants' broad construction of the relevant cases is proper. *But see Casey*, 505 U.S. at 894 ("The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.").

With regard to whether the 72-Hour Requirement constitutes a substantial obstacle, plaintiffs argue with supporting evidence that women could be forced to wait up to one month between their initial consultation and the abortion procedure if the same physician is required to conduct both the

29

initial consultation and the abortion. *See* Docket 10-6 at 6 ("[D]ue to the physicians' schedules, a woman could be delayed up to a month in order to have two appointments with the same physician."). This is because there is only one clinic in South Dakota, which provides abortions one day a week on average. Docket 10-6 at 4. And the three to four physicians who perform the abortions take turns flying into Sioux Falls about once a month. Docket 10-6 at 4. Defendants argue that such a delay will not occur because there is no requirement that the initial consultation be performed by the same physician who performs the abortion.

Section 4 of the Act states that "no physician may . . . perform an abortion, unless the physician has fully complied with the provisions of this Act and first obtains from the pregnant mother, a written, signed statement setting forth all information required by subsection (3)(b) of section 3 of this Act." Defendants' argument that "the physician" actually means "a physician" is without merit because when a statute is "not ambiguous," "[i]t is to be assumed that [the statute] means what it says and that the legislature has said what it meant." *Kreager v. Blomstrom Oil Co.*, 298 N.W.2d 519, 521 (S.D. 1980) (citation omitted). Such an alteration is therefore beyond the court's authority.

Even if the physician who performed the abortion was not required to have conducted the initial consultation, the 72-Hour Requirement still creates a substantial obstacle considering the circumstances that surround many of

30

the women who choose to undergo an abortion in South Dakota. For example, 56 percent of women who chose to undergo an abortion "during the year beginning March 1, 2010," had "incomes that [were] 100% or less than the federal poverty level." Docket 10-6 at 4. And 87 percent of the women who chose to undergo an abortion during that same time period lived "at or below 200 percent of the [Federal Poverty Level]." Docket 10-6 at 4. Furthermore, approximately 30 percent of the women who chose to undergo an abortion during this time period traveled more than 150 miles to the abortion clinic, for a total of 300 miles. Docket 10-6 at 3.

Because the 72-Hour Requirement effectively requires two trips, almost every woman will be forced to cope with the financial burdens created by the additional trip. These burdens are great when considering the fact that approximately 87 percent of the women are at or below 200 percent of the Federal Poverty Level. For many of these women, it stands to reason that they will be unable to afford the second trip and will abstain from obtaining an abortion even though they have chosen to undergo one. And women who live farther away are even more likely to be unable to afford a second trip. The inability to pay for the additional trip also becomes worse for the women who are stay-at-home mothers because they will be required to make additional arrangements for childcare. Docket 10-6 at 4. And if a pregnant woman has a job, she will be required to take twice as much time off from work. Docket 10-6

31

at 4. The court finds that these financial circumstances constitute a substantial obstacle for a large fraction of the relevant cases.

The effective doubling of the financial burden created by the 72-Hour Requirement is arguably insignificant when compared to the other obstacles created by the 72-hour delay. For example, even if the delay between the initial consultation and the abortion is only one week, pregnant women who choose to undergo an abortion can be denied the ability to undergo a medication abortion, which may be their chosen method of abortion, because of the delay. Docket 10-6 at 2-3. A medication abortion is only available until 9 weeks after the first day of the woman's last menstrual period, after which time a surgical abortion is required. Docket 10-6 at 2. For those women who refuse to undergo a surgical abortion in such situations, the 72-Hour Requirement effectively denies them of their right to an abortion. As to those women who choose a surgical abortion near the end of the first trimester, the delay created by the 72-Hour Requirement will prevent them from being able to obtain any abortion in South Dakota because these abortions are only available through the first 13.6 weeks after the first day of the woman's last menstrual period. Docket 10-6 at 2-3. It stands to reason that the number of women who are effectively denied their right to undergo an abortion increases as the required period of delay increases.

Moreover, it is generally accepted that women are often the victims of abuse. And abusers often forcibly impregnate their partners to maintain control or increase their control over their women. Docket 10-7 at 7-8. The abusers in such relationships closely monitor the women. Docket 10-7 at 9. For example, the abuser will often keep track of the mileage on the car or remove the distributor cap on the car to prevent the woman from leaving the house. Docket 10-7 at 9. Abusers will call the woman numerous times at work or home to ensure that she is there. Docket 10-7 at 9. An abuser will also regularly appear at the woman's place of work unexpectedly "to check up on her." Docket 10-7 at 9. For those women who are in such relationships, the 72-Hour Requirement creates an incredible obstacle because it requires them to make separate trips, which for many is effectively impossible to do because two trips double the chances of being "caught" and punished by the abusive partner. Docket 10-7 at 9-10.

In summary, all women who choose to undergo an abortion will be forced to wait between 7 to 30 days before actually being able to obtain an abortion. That constitutes a substantial obstacle for those women who have chosen to undergo an abortion near the end of the first trimester because there are no second trimester abortions available in South Dakota. Moreover, because every woman will be forced to make two trips, many women will not undergo an abortion because they will be unable to financially afford a second trip.

33

Furthermore, the 72-Hour Requirement creates a substantial obstacle for those women who are unable to make a second trip because it places them in greater risk of being caught by their abuser.

When considering the numerous substantial obstacles created by the 72-Hour Requirement, there can only be one conclusion: it creates a substantial obstacle for a large fraction of the women who choose to undergo an abortion in South Dakota. Plaintiffs have therefore demonstrated that they are likely to succeed on their claim that the 72-Hour Requirement constitutes an undue burden on a woman's ability to obtain an abortion.

### C.    The Coercion Provisions—Unconstitutionally Vague

Subsection 1 of section 3 of the Act reads, in relevant part, as follows:

> During the initial consultation between the physician and the pregnant mother, prior to scheduling a surgical or medical abortion, the physician shall [d]o an assessment of the pregnant mother's circumstances to make a reasonable determination whether the pregnant mother's decision to submit to an abortion is the result of any coercion, subtle or otherwise. In conducting that assessment, the physician shall obtain from the pregnant mother the age or approximate age of the father of the unborn child, and the physician shall determine whether any disparity in the age between the mother and father is a factor in creating an undue influence or coercion.

Subsection 4 of section 7 states that "coercion," for purposes of the Act, "exists if the pregnant mother has a desire to carry her unborn child and give birth, but is induced, influenced, or persuaded to submit to an abortion by another person or persons against her desire." The Act further states that

34

"[s]uch inducement, influence, or persuasion may be by use of, or threat of, force, or may be by pressure or intimidation effected through psychological means, particularly by a person who has a relationship with the pregnant mother that gives that person influence over the pregnant mother."

As part of the Pregnancy Help Center Requirements, section 6 of the Act states:

> The pregnancy help center may voluntarily provide a written statement of assessment to the abortion provider, whose name the woman shall give to the pregnancy help center, if the pregnancy help center obtains information that indicates that the pregnant mother has been subjected to coercion or that her decision to consider an abortion is otherwise not voluntary or not informed. . . . The physician shall review and consider any information provided by the pregnancy help center as one source of information, which in no way binds the physician, who shall make an independent determination consistent with the provisions of this Act, the common law requirements, and accepted medical standards.

Section 6 further explains that "[a]ny written statement or summary of assessment prepared by the pregnancy help center . . . as a result of the procedures created by this Act[] may be forwarded by the pregnancy help center, in its discretion, to the abortion physician." Once the statement or summary is sent to the physician, it must "be maintained as a permanent part of the pregnant mother's medical records."

Section 8 recognizes a civil cause of action with "a civil penalty in the amount of ten thousand dollars, plus reasonable attorney's fees and costs," for "[a]ny woman who undergoes an abortion, or her survivors, where there has

35

been an intentional, knowing, or negligent failure to comply with the" Coercion Provisions in the Act. This is in addition to damages for injuries sustained under any common law or statutory provisions. And subsection 2 of section 9 provides that "[i]f the trier of fact [in a civil action] determines that the abortion was the result of coercion, and it is determined that if the physician acted prudently, the physician would have learned of the coercion, there is a nonrebuttable presumption that the mother would not have consented to the abortion if the physician had complied with the provisions of this Act[.]" The Act does not establish a time frame as to when the pregnancy help center's written statement or summary will be submitted to the physician. And section 6 of the Act concludes by establishing that "[n]othing in this Act may be construed to impose any duties or liability upon a pregnancy help center."

Plaintiffs challenge these sections, hereafter identified as the Coercion Provisions, on the following three grounds: (1) they violate a woman's right to obtain an abortion because they create an undue burden; (2) they are impermissibly vague; and (3) they violate the patients' and plaintiffs' rights to equal protection of the laws.[13]

---

[13] Plaintiffs did not discuss in their brief how the Coercion Provisions violate the Fourteenth Amendment's Equal Protection Clause. The court therefore expresses no opinion as to whether plaintiffs are likely to succeed on the merits with regard to that claim. The court does not reach the undue burden claim because the Coercion Provisions are unconstitutionally vague.

Plaintiffs argue that the term coercion, as defined in the Act, is unconstitutionally vague. In a challenge against a statute on the basis that it is unconstitutionally vague, the challenger "must demonstrate that the law is impermissibly vague in all of its applications, and that the statute could never be applied in a valid manner." *Planned Parenthood of Minn. v. Minn.*, 910 F.2d 479, 482 (8th Cir. 1990) (internal quotations and citations omitted). The standard for determining whether a statute is unconstitutionally vague is whether it gives people of common intelligence fair notice that certain conduct is prohibited. *Id.* at 482. If the forbidden conduct is so poorly defined that a person of common intelligence must necessarily guess at its meaning and differ as to its application, the statute is unconstitutionally vague. *Id.* (citations omitted). And the statute cannot be so vague as to allow for arbitrary or discriminatory enforcement. *Id.* (citations omitted).

For purposes of the Act, coercion exists if the pregnant woman "is induced, influenced, or persuaded to submit to an abortion by another person or persons ***against her desire***." While coercion is explicitly defined in the Act, the term "desire" is not. The common meaning of desire is "to long or hope for." *See Merriam-Webster Dictionary* (2011). An individual's longing or hope is an amorphous standard that is difficult for a physician to ascertain and is not synonymous with the concept of depriving someone of their free will that is generally considered when determining whether someone acts under coercion.

*See State v. Willis*, 370 N.W.2d 193, 199 (S.D. 1985) (affirming jury instruction that explained coercion as "exist[ing] where one is . . . induced to do or perform some act under circumstances which deprive her of the exercise of her free will").

Recognizing that the phrase "against her desire" does not give a physician fair notice of what is meant by "coercion" as defined in the Act, defendants argue that "against her desire" actually means "against her will." As the Eighth Circuit Court of Appeals recently noted, however, "South Dakota recognizes the well-settled canon of statutory interpretation that " '[w]here [a term] is defined by statute, the statutory definition is controlling.' " *Rounds*, 530 F.3d at 735 (alteration in original) (quoting *Bruggeman v. S.D. Chem. Dependency Counselor Certification Bd.*, 571 N.W.2d 851, 853 (S.D.1997)). The Eighth Circuit Court of Appeals emphasized that "[w]hen a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning." *Id.* (citations omitted). Thus, the court cannot "redefine" how the legislature defined "coercion."

Furthermore, defendants' argument that the Coercion Provisions only apply when the abortion is conducted against the pregnant woman's "will," instead of "desire," is generally irrelevant when considering the fact that private individuals can bring suit against the physician and argue that the legislature meant what it said. *Stenberg v. Carhart*, 530 U.S. at 940 ("[O]ur precedent

38

warns against accepting as 'authoritative' an Attorney General's interpretation of state law when 'the Attorney General does not bind the state courts or local law enforcement authorities.' " (citation omitted)). *See also Simpson v. Tobin*, 367 N.W.2d 757, 763 (S.D. 1985) ("While we have in the past recognized that Attorney General's opinions should be considered when construing statutes, such opinions are not binding on the courts.").[14] The court therefore finds that defendants' attempt to have the court alter the "explicit definition" of coercion is fundamentally unreasonable because it goes against the express language used by the legislature in defining a term in the Act. *See Kreager*, 298 N.W.2d at 521 ("It is to be assumed that . . . the legislature has said what it meant." (citation omitted)).

Moreover, subsection 1 of section 3 of the Act requires the physician to determine whether the decision to undergo an abortion "is the result of any coercion, ***subtle or otherwise***." Because the Act defines "coercion" as "exist[ing] if the pregnant mother has a desire to carry her unborn child and give birth, but is induced, influenced, or persuaded to submit to an abortion by another person or persons against her desire," "subtle or otherwise" must mean something different. *See Delano v. Petteys,* 520 N.W.2d 606, 609 (S.D. 1994) ("This court will not construe a statute in a way that renders parts to be

_____

[14] It is questionable whether the argument made by defendants even constitutes an official opinion by the Attorney General.

39

duplicative and surplusage." (citing *Farmland Ins. Co. v. Heitmann*, 498 N.W.2d 620 (S.D. 1993); *Revier v. Sch. Bd. of Sioux Falls*, 300 N.W.2d 55, 57 (S.D. 1980))). If it means "subtle" inducement, influence, or persuasion, then a physician will be forced to guess whether a patient is the victim of coercion because the pregnant woman herself is likely unaware of the "subtle coercion." If "subtle or otherwise" does not mean "subtle inducement, influence, or persuasion," then the court, and presumably "a person of common intelligence," must "guess" what the phrase actually means. *See Planned Parenthood of Minn. v. Minn.*, 910 F.2d at 482. This uncertainty will cause physicians to refuse to offer abortion services out of fear of being subjected to severe civil sanctions. *Cf. Miller*, 63 F.3d at 1467 ("The potential civil liability for even good-faith, reasonable mistakes is more than enough to chill the willingness of physicians to perform abortions in South Dakota." (citations omitted)). Plaintiffs have therefore demonstrated that "the law is impermissibly vague in all of its applications, and that the statute could never be applied in a valid manner." *Planned Parenthood of Minn. v. Minn.*, 910 F.2d at 482.

The court finds that plaintiffs have met their burden of demonstrating that they are likely to succeed on the merits of their claim that the Coercion Provisions are unconstitutionally vague.

40

### D.     The Risk Factors Requirement

Subsections 4 and 5 of section 3 of the Act require the physician,

"[d]uring the initial consultation between the physician and the pregnant

mother, prior to scheduling a surgical or medical abortion[,]" to:

(4)     Conduct an assessment of the pregnant mother's health and circumstances to determine if any of the risk factors associated with abortion are present in her case, completing a form which for each factor reports whether the factor is present or not; [and]

(5)     Discuss with the pregnant mother the results of the assessment for risk factors, reviewing with her the form and its reports with regard to each factor listed[.]

Subsection 6 of section 3 of the Act describes what the physician must

do in the event that "any risk factor is determined to be present."

(6)     In the event that any risk factor is determined to be present, discuss with the pregnant mother, in such manner and detail as is appropriate so that the physician can certify that the physician has made a reasonable determination that the mother understands the information, all material information about any complications associated with the risk factor, and to the extent available all information about the rate at which those complications occurs both in the general population and in the population of persons with the risk factor[.]

And subsection 7 of section 3 of the Act describes what the physician

must do in the event that "no risk factor is determined to be present."

(7)     In the event that no risk factor is determined to be present, the physician shall include in the patient's records a statement that the physician has discussed the information required by the other parts of this section and that the

> physician has made a reasonable determination that the
> mother understands the information in question[.]

The Act defines "risk factor associated with abortion" as "any factor, including any physical, psychological, emotional, demographic, or situational factor, for which there is a statistical association with an increased risk of one or more complications associated with legal abortion, such that there is a less than five percent probability that the statistical association is due to sampling error." And the Act defines "complications associated with abortion"[15] as "any adverse physical, psychological, or emotional reaction, for which there is a statistical association with legal abortion, such that there is a less than five percent probability that the statistical association is due to sampling error."

In order "[t]o be recognized as a risk factor" or "complication associated with legal abortion," "the statistical information must have been published in the English language, after 1972, in at least one peer-reviewed journal indexed by the search services maintained by the United States National Library of Medicine (PubMed or MEDLINE . . . ) or in at least one peer-reviewed journal indexed by any search service maintained by the American Psychological Association (PsycINFO . . . )[.]" *See* Section 7(2)-(3) of the Act. And "the date of

---

[15] The phrase "complications associated with abortion" does not appear anywhere else in the Act. The court presumes that the legislature meant to define the term "complications associated with ***legal*** abortion" because this phrase is used in defining what is meant by "risk factor associated with abortion." *See* Section 7(2) (emphasis added).

first publication [of the article] must be not less than twelve months before the date of the initial consultation described in section 3 of this Act." *See* Section 7(2)-(3).

Plaintiffs challenge these sections, hereinafter referred to as the Risk Factors Requirement, on four grounds: (1) they violate the patients' rights to obtain an abortion; (2) they violate plaintiffs' right to free speech; (3) they violate the patients' and plaintiffs' rights to equal protection of the laws; and (4) they are unconstitutionally vague.[16]

### 1.    Compelled Speech (Physician) Analysis

"In general, to address a claim that a state action violates the right not to speak, a court first determines whether the action implicates First Amendment protections." *Rounds*, 530 F.3d at 733. If the state action does implicate First Amendment protections, then "the court must determine whether the action is narrowly tailored to serve a compelling state interest." *Id.*

The Eighth Circuit Court of Appeals has determined that *Casey* and *Gonzales v. Carhart*, 550 U.S. 124 (2007), "establish that, while the State cannot compel an individual simply to speak the State's ideological message, it can use its regulatory authority to require a physician to provide truthful,

---

[16] The court expresses no opinion as to whether plaintiffs are likely to succeed on the merits with regard to their claim that the Risk Factors Requirement violates patients' and physicians' rights to equal protection of the laws or that the Risk Factors Requirement is unconstitutionally vague.

non-misleading information relevant to a patient's decision to have an abortion[.]" *Rounds* at 734-35. According to the Eighth Circuit Court of Appeals, plaintiffs have the burden of demonstrating that the Risk Factors Requirement compels a physician to disclose untruthful, misleading, or irrelevant statements to a patient when consulting with her about whether or not to have an abortion. *See id.* at 735 ("Therefore, Planned Parenthood cannot succeed on the merits of its claim that § 7(1)(b) violates a physician's right not to speak unless it can show that the disclosure ***is either untruthful, misleading or not relevant*** to the patient's decision to have an abortion." (emphasis added)). *But see Casey*, 505 U.S. at 882 ("If the information the State requires to be made available to the woman ***is truthful and not misleading***, the requirement may be permissible." (emphasis added)).[17]

A "risk factor associated with abortion" is "any factor, including any physical, psychological, emotional, demographic, or situational factor, for which there is a statistical association with an increased risk of one or more complications associated with legal abortion[.]" And "complications associated with [legal] abortion" are "any adverse physical, psychological, or emotional reaction, for which there is a statistical association with legal abortion[.]" The

_____

[17] The burden explicitly imposed on the challenger by the Eighth Circuit in *Rounds* appears to be inconsistent with the burden implicitly imposed on the government in *Casey*. This court must follow the most recent decision of the Eighth Circuit Court of Appeals.

definition of a "risk factor associated with abortion" therefore contains within it the definition of "complications associated with [legal] abortion." Thus, when read in conjunction, a "risk factor associated with abortion" is "any factor, including any physical, psychological, emotional, demographic, or situational factor, for which there is a statistical association with an increased risk of" "any adverse physical, psychological, or emotional reaction, for which there is a statistical association with legal abortion, such that there is a less than five percent probability that the statistical association is due to sampling error."

Applying the Act's plain language, a physician must inform a patient about the adverse reaction if the patient has a physical, psychological, emotional, demographic, or situational factor that is statistically associated with any adverse physical, psychological, or emotional reaction when the adverse reaction is statistically associated with legal abortion. That is, as long as the patient has a "factor" that is statistically associated with an "adverse reaction," and the "adverse reaction" is statistically associated with legal abortion, the doctor must inform the patient about those factors and their association to the adverse reactions.

Under South Dakota law, when a statute is "not ambiguous," "[i]t is to be assumed that [the statute] means what it says and that the legislature has said what it meant." *Kreager v. Blomstrom Oil Co.*, 298 N.W.2d 519, 521 (S.D. 1980) (citation omitted). Thus, the Act requires the physician to tell the patient about

45

"any factor . . . for which there is a statistical association with an increased risk of" "any adverse physical, psychological, or emotional reaction, for which there is a statistical association with legal abortion, such that there is a less than five percent probability that the statistical association is due to sampling error" that can be found anywhere in the nearly forty years of published literature covered by the Act. The literature covered by the Act also includes studies conducted in countries where abortion may be legal, but not practiced as safely as in the United States. And nothing in the text of the statute permits physicians to use their medical judgment to avoid disclosing information that is untrue, misleading, or irrelevant.

For example, the literature covered by the Act includes articles that find a statistical association between abortion and breast cancer for patients with certain risk factors. *See* Docket 10-3, Declaration of Jill L. Meadows, M.D., at ¶ 10 (citing M.C. Pike et al., *Oral Contraceptive Use and Early Abortion as Risk Factors for Breast Cancer in Young Women*, 43 Brit. J. Cancer 72 (1981)). The cited article finds that for women having a first-trimester abortion without a prior full-term pregnancy, the risk of breast cancer increases nearly two-and-a-half times. Thus, under the Act a physician would be required to tell a patient in her first trimester who had not previously carried a pregnancy to full term that an abortion would increase her risk of having breast cancer by nearly two-and-a-half times. This information is misleading.

46

In the intervening twenty years, national organizations with specialized expertise in cancer and reproductive health such as the National Cancer Institute, the American Cancer Society, and the American College of Obstetricians and Gynecologists, have reached a consensus that having an abortion does **not** increase patients' risk of breast cancer. *See* Docket 10-3 at ¶ 12. These organizations have found that the methodology of the earlier study was flawed and unreliable. Other examples exist of misleading, irrelevant, and untruthful information that must be disclosed under the Risk Factors Requirement. *See* Docket 10-3 at ¶¶ 16-25.

Defendants argue that the physician is free to explain to the patient that this type of forced disclosure is untruthful or misleading. The court rejects this argument because even if the physician is allowed to tell the patient that the previously disclosed information is untruthful or misleading, then that information is irrelevant to the patient. And a physician cannot be forced to disclose information that is "untruthful, misleading or not relevant to the patient's decision to have an abortion." *See Rounds*, 530 F.3d at 735.

Under the analytical framework established in *Rounds,* this court must now evaluate whether the Act is "narrowly tailored to serve a compelling state interest." 530 F.3d at 733. The Act's title states that the purpose of the Act is "to establish certain procedures to better insure such decisions are voluntary, uncoerced, and informed." The court assumes, without deciding, that this is a

compelling state interest. But defendants are unlikely to be able to demonstrate that the Act is narrowly tailored to serve this interest.

The Risk Factors Requirement is not narrowly tailored because it forces physicians to disclose all "risk factors" and "adverse reactions" identified, even if the study demonstrating the statistical association is subsequently discredited and is therefore untruthful, misleading, or irrelevant. Plaintiffs have therefore demonstrated that they are likely to succeed on their challenge to the Risk Factors Requirement because it violates the First Amendment's Free Speech Clause.

### 2.   Undue Burden Analysis

As discussed above, whether the Risk Factors Requirement constitutes an "undue burden" depends on whether, in a large fraction of the cases in which it is relevant, it creates a "substantial obstacle to a woman's choice to undergo an abortion." *See Miller*, 63 F.3d at 1458. There are three issues that must be resolved in order to determine whether plaintiffs have met their burden: (1) in what cases is the requirement "relevant;" (2) does the requirement create a "substantial obstacle to the woman's choice to undergo an abortion" in those cases that are "relevant;" and (3) is the substantial obstacle present in a "large fraction" of the "relevant" cases. *Id.*

With regard to the first issue, determining the relevant cases, it is clear that the Risk Factors Requirement applies to every woman who chooses to

48

undergo an abortion. That is, if a woman chooses to undergo an abortion, the physician must provide her with certain information before performing an abortion. Thus, the relevant cases are those instances where a pregnant woman has chosen to undergo an abortion.

The second issue is whether the Risk Factors Requirement constitutes a substantial obstacle. The Risk Factors Requirement departs from standard medical practice by mandating that physicians identify, retrieve, and review every article published in English, after 1972, in every peer-reviewed journal indexed by PubMed or MEDLINE or PsycINFO that could trigger an assessment or disclosure obligation because it could include a "risk factor" or "complication" as defined in the Act. After this undertaking, physicians are required to assess every patient for the resulting list of "risk factors," discuss the assessment, and disclose the associated "complications," as well as "the rate at which those complications occur both in the general population and in the populations of persons with the risk factor." *See* Section 3(6) of the Act.

PubMed is an online, searchable database of approximately 20 million journal article citations (including articles from MedLine). Docket 10-12, Declaration of Kelly Blanchard, at ¶ 14. PsycINFO is a database covering the psychological literature that includes over 3 million records from approximately 2,500 journals. *Id.* But neither PubMed nor PsycINFO contains full coverage of every indexed journal. Docket 10-12 at ¶ 18. Thus, to access all of the English

language post-1972 articles published in every peer-reviewed journal indexed by either database, a physician would have to figure out which journals and articles are not fully covered back to 1973 on PubMed or PsycINFO and find some other means to access and search those articles. Docket 10-12 at ¶ 19. This could entail searching each individual journal online or through a library or publisher. Docket 10-12 at ¶ 19. Finally, neither PubMed nor PsycINFO searches the full text of articles. Docket 10-12 at ¶ 20. Instead, each searches only a series of fields (including article title, abstract, author, and certain terms or keywords). Therefore, unless the article contains the relevant search term in one of the fields, it would not turn up in a search. But if a physician misses **even one** responsive "factor" mentioned **anywhere**—even in a footnote—in just **one article** the physician could be subject to civil and professional penalties under the Act.

Even if a physician could formulate a search and retrieve all of the required materials, the volume of articles the physician would have to review and analyze would be prohibitive. For example, a search for the term "abortion," restricted to journals published in English between January 1973 and July 2010 yields more than 45,000 results in PubMed and more than 2,000 results in PsycInfo. Docket 10-12 at ¶ 24. Even ignoring the fact that some responsive articles will be missed in the above search, no physician could review the thousands of articles yielded by searching the two databases.

50

Defendants argue that when these requirements are properly construed, a physician can comply with the Risk Factors Requirement. They assert that "the relevant databases are easily searched" and that "a number of comprehensive reviews have been published since 1973 which would identify most, if not all, of the relevant literature." Docket 32-1, Declaration of Byron C. Calhoun, M.D., at ¶ 31. Defendants do not identify or describe these "comprehensive reviews." And the plain language of the Act places the burden on physicians to identify and review ***all*** of the relevant literature, not ***most*** of it. Thus, plaintiffs have shown that they are likely to demonstrate that compliance with the Risk Factors Requirement is impossible or nearly impossible to satisfy.

The barrier imposed by the Risk Factors Requirement is compounded by the Act's provisions imposing civil liability on physicians who perform abortions. The Act creates a new civil action by the woman or her survivors against both the physician and the facility where the abortion was performed if the physician fails to comply with any of the Act's requirements, including the Risk Factors Requirement. Future plaintiffs may receive a wide range of damages and attorneys' fees.[18] Moreover, the Act creates a presumption that a

---

[18] Future plaintiffs may "obtain a civil penalty in the amount of ten thousand dollars, plus reasonable attorney's fees and costs, jointly and severally from the physician who performed the abortion and the abortion facility[.]" This amount is "in addition to any damages that the woman or her survivors may be entitled to receive under any common law or statutory

woman would not have had the abortion if the physician had complied with the Act's requirements.

This presumption is a rebuttable presumption. But the Act provides that if a physician presents evidence rebutting the presumption, the "finder of fact" must determine whether the woman would have consented to the abortion "if she had been given . . . all information required by this Act to be disclosed[.]" *See* Section 9(3) of the Act. And as explained above, this includes information that is presented in an article as being true but is actually untrue and therefore misleading or irrelevant. Understandably, physicians will be unwilling to perform abortions when faced with likely litigation that will include this type of situation. *See Planned Parenthood of the Heartland v. Heineman*, 724 F. Supp. 2d 1025, 1044 (D. Neb. 2010).

As Judge Smith Camp found when assessing similar legislation in Nebraska, "[t]he threat of such litigation is real, and imminent." *Id.* at 1045. Because the Risk Factors Requirement is impossible or nearly impossible to comply with, women may lose a constitutional right because no physician may be willing to perform an abortion in South Dakota. *See id.* at 1044 (recognizing that a similar impossible requirement "plac[ed] women in immediate jeopardy of losing access to physicians who are willing to perform abortions" by "placing

---

provisions, . . . [and] in addition to the amounts that the woman or other survivors of the deceased unborn child may be entitled to receive under any common law or statutory provisions[.]" *See* Section 8 of the Act.

physicians who perform abortions in immediate jeopardy of crippling civil litigation"). "If this statutory provision is allowed to stand, there may not be any provider willing to subject himself to the vagaries of the statute for those women who desire to exercise their constitutional rights consistent with *Roe* and *Casey*." *Planned Parenthood, Sioux Falls Clinic v. Miller*, 860 F. Supp. 1409, 1418 (D.S.D. 1994). Thus, plaintiffs have demonstrated that the Risk Factors Requirement poses a substantial obstacle to a woman's choice to undergo an abortion.

The third issue in the undue burden analysis is whether the Risk Factors Requirement is a substantial obstacle in a large fraction of the relevant cases. Every woman who chooses to undergo an abortion will be unable to obtain one because the Risk Factors Requirement applies to every woman who seeks an abortion in South Dakota and no physician will be able, or willing, to perform an abortion without violating these requirements. The Risk Factors Requirement is therefore a substantial obstacle in a large fraction of the relevant cases. Thus, plaintiffs are likely to demonstrate that the Risk Factors Requirement constitutes an undue burden on a woman's constitutional right to a pre-viability abortion.

For the reasons stated above, the court finds that plaintiffs have met their burden of demonstrating that they are likely to succeed on the merits with regard to their challenges against the Pregnancy Help Center Provision,

the Risk Factors Provision, the Coercion Provisions, and the 72-Hour Requirement.

### E.    Separability Issues

Section 11 of the Act states that "[i]f any provision of this Act is found to be unconstitutional or its enforcement temporarily or permanently restrained or enjoined by judicial order, the provision is severable." As plaintiffs correctly point out, "[t]he 'doctrine of separability' requires [a] court to uphold the remaining sections of a statute if they can stand by themselves and if it appears that the legislature would have intended the remainder to take effect without the invalidated section." *Dakota Sys., Inc. v. Viken*, 694 N.W.2d 23, 32 (S.D. 2005) (citations omitted). This doctrine applies even when the legislature enacts a separability provision as it did here. *See Application of Nelson*, 163 N.W.2d 533, 537 (S.D. 1968) (applying "doctrine of separability" when the legislature enacted a similar separability clause). A two-part test applies under the doctrine of separability: (1) whether "the remaining sections can stand by themselves;" and (2) whether "the Legislature would have intended the remaining sections to take effect." *Dakota Sys., Inc.*, 694 N.W.2d at 32 (citation omitted).

Section 2 of the Act states that "[t]he requirements expressly set forth in this Act, that require procedures designed to insure that a consent to an abortion is voluntary and uncoerced and informed, are an express clarification

54

of, and are in addition to, th[e] common law duties" of a physician. Because each of the requirements imposed on a physician by the Act are likely to be unconstitutional as explained above, this section cannot stand on its own.

Section 3 contains the 72-Hour Requirement and is likely to be unconstitutional. Section 3 also contains portions of the Coercion Provisions, the Risk Factors Provisions, and the Pregnancy Help Center Requirements. And each of these is likely to be unconstitutional. Those portions of Section 3 that are record keeping requirements associated with the unconstitutional provisions cannot stand by themselves.

Section 4 depends on the other provisions in the Act, including the Risk Factors Requirement, Pregnancy Help Center Requirements, 72-Hour Requirement, and the Coercion Provisions, and is therefore likely to be unconstitutional.

Section 5 of the Act establishes that the Department of Health shall maintain a registry of pregnancy help centers located in South Dakota and identifies the requirements associated with the registry. Plaintiffs have not challenged this section of the Act in their motion for preliminary injunction.[19] Moreover, this section can stand on its own because there is nothing in

---

[19] By itself, section 5 does not regulate abortions, women seeking abortions, or physicians who perform abortions.

55

section 5 that is likely to be unconstitutional.[20] And there is nothing to suggest that the legislature did not intend for this section to remain in effect.

Section 6 of the Act cannot stand on its own because it consists entirely of the Pregnancy Help Center Requirements that are likely to be unconstitutional.

Section 7 of the Act defines several terms used in the Act that are part of the Risk Factors Requirement, the Coercion Provisions, and the Pregnancy Help Center Requirements. With the exception of the pregnancy help center definition, the legislature clearly did not intend for this section to take effect on its own because the definitions are limited to the Act. The pregnancy help center definition, however, can stand on its own because it relates to section 5, which is valid, and it regulates which entities can register to become a "pregnancy help center." Thus, subsection 1 of section 7 is severable because it can stand on its own and is intended to take effect on its own.

Section 8 of the Act creates a civil cause of action for violations of sections 3 and 4 of the Act, which are likely to be unconstitutional. Thus, this section cannot stand on its own.

Section 9 of the Act establishes different "presumptions" that apply in a civil action that arises from a failure to comply with any of the provisions of

---

[20] Subsection 7 of section 5 references "section 11 of this Act as it relates to discussion of religious beliefs," but section 11 does not deal with religion.

Chapter 34-23A. Subsection 2 of section 9 contains portions of the Coercion Provisions and establishes a "nonrebuttable presumption that the mother would not have consented to the abortion if the physician had complied with the provisions of this Act." Because the Coercion Provisions are likely to be unconstitutional, this subsection cannot stand on its own.

Subsection 3 of section 9 provides that if a physician produces evidence to rebut the presumption created in subsection 1, then the finder of fact is required to consider "all information required by this Act to be disclosed." The information that is required by "this Act" includes information provided under the Pregnancy Help Center Requirements and the Risk Factors Requirement, which are likely to be unconstitutional. Thus, subsection 3 cannot stand on its own.

Although on its face subsection 1 of section 9 appears to be capable of standing alone, it is clear that the legislature did not intend for it to take effect on its own because subsection 3 explicitly refers to subsection 1 and explains what needs to be shown for a physician to overcome the presumption created in subsection 1.

Subsection 4 of section 9 of the Act cannot stand on its own because it imposes a duty on a pregnant woman to consult with a "pregnancy help center as referenced in sections 3 and 4 of this Act," which are likely to be unconstitutional.

57

Subsection 5 of section 9 has not been challenged by plaintiffs. Moreover, it can stand on its own because it does not reference any of the other provisions in the Act that are likely to be unconstitutional. The legislature intended for it to take effect on its own because it extends to "the requirements of this chapter," rather than just the Act.

Sections 1, 10, and 11 cannot stand on their own and were obviously not intended by the legislature to take effect on their own.

To summarize, the following portions of the Act are severable from those portions that are likely to be unconstitutional: section 5; subsection 1 of section 7; and subsection 5 of section 9. The remaining portions of the Act are likely to be struck down and are not severable as explained above. Having found that plaintiffs have satisfied the threshold requirement for enjoining a duly enacted statute, the court will now consider the remaining *Dataphase* factors.

## III.    Threat of Irreparable Harm

As discussed above, plaintiffs have established that they are likely to succeed on the merits with regard to their challenges against the Pregnancy Help Center Requirements, the 72-Hour Requirement, the Risk Factors Requirement, and the Coercion Provisions. Constitutional violations, however brief, are unquestionably irreparable. *See Kirkeby v. Furness*, 52 F.3d 772, 775 (8th Cir. 1995) (" 'The loss of First Amendment freedoms, for even minimal

58

periods of time, unquestionably constitutes irreparable injury.' " quoting *Elrod v. Burns*, 427 U.S. 347, 373, (1976)). Thus, the court finds that this factor, the threat of irreparable harm, weighs in favor of granting the preliminary injunction.

## IV.    Balance of the Harms

The balance of the harms factor calls for the court to balance the harms that would result in the following scenarios:  (1) if the preliminary injunction was improperly denied because plaintiffs prevailed on the merits of the case; and (2) if the preliminary injunction was improperly granted because defendants prevailed on the merits of the case. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002) ("[W]hile cases frequently speak in the short-hand of considering the harm to the plaintiff if the injunction is denied and the harm to the defendant if the injunction is granted, the real issue in this regard is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is ***improperly*** granted or denied."); *see also Hillerich & Bradsby Co. v. Christian Bros., Inc.*, 943 F. Supp. 1136, 1142 (D. Minn. 1996) (balancing the harms by looking at what the harm to the defendant would be if the injunction were "improperly granted").

If the preliminary injunction is improperly denied, many women will have been denied their right to free speech and effectively forced against their will to remain pregnant until they give birth. The extent of the harm if the preliminary

injunction turns out to have been improperly granted is that defendants will have been wrongly prevented from carrying out their official duties.

After balancing the harm to the parties, the court finds that both are potentially exposed to harm if the preliminary injunction is found to have been improperly granted or denied. Nonetheless, when considering the nature of the parties' interests that are at stake, the potential harm to plaintiffs' interests are more severe because the harms directly affect personal liberty interests. Thus, the court finds that the balance of the harms weighs in favor of granting the preliminary injunction.

## V.      Public Interest

As discussed above, plaintiffs have demonstrated that the Act and its specified provisions are "likely" unconstitutional. There is a public interest in protecting a woman's constitutional right to choose an abortion and in protecting the constitutional right to free speech. And the public has a clear interest in ensuring the supremacy of the United States Constitution. While the public also has an interest in the enforcement of duly enacted state laws, that interest is secondary to the public interests expressed above. Thus, the court finds that this factor weighs in favor of granting the preliminary injunction.

## CONCLUSION

In weighing the four factors set out in *Dataphase*, as modified by *Planned Parenthood v. Rounds*, 530 F.3d at 732-33, the court finds that plaintiffs have sufficiently demonstrated the need for a preliminary injunction.

Accordingly, it is

ORDERED that plaintiffs' motion for a preliminary injunction is granted as to all sections of the Act except for section 5, subsection 1 of section 7, and subsection 5 of section 9.

Dated June 30, 2011.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE