IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| PLANNED PARENTHOOD MINNESOTA, NORTH DAKOTA, SOUTH DAKOTA, and CAROL E. BALL, M.D., | : Civil Case No.: 4:11-cv-04071-KES |
| Plaintiffs, | |
| v | |
| DENNIS DAUGAARD, Governor, MARTY JACKLEY, Attorney General, DONEEN HOLLINGSWORTH, Secretary of Health, Department of Health, and ROBERT FERRELL, M.D., President, Board of Medical and Osteopathic Examiners, in their official capacities, | : DECLARATION OF MIRIAM : GROSSMAN, M.D. PURSUANT TO : 28 U.S.C.1746 |
| Defendants, | |
| ALPHA CENTER, and BLACK HILLS CRISIS PREGNANCY CENTER, doing business as CARE NET, | |
| Applicants for Intervention | |

Miriam Grossman, M.D., being of full age, deposes and says:

1.      I am a medical doctor, board certified in psychiatry.  I obtained a Bachelor of Arts

degree, *cum laude*, from Bryn Mawr College in Bryn Mawr, PA, in 1974.  I graduated New York

University Medical School, in New York, in 1979. I did a one year internship at Beth Israel Hospital

in New York City from 1979 to 1980.  Thereafter, I did a two year residency in adult psychiatry at

Cornell University's North Shore University Hospital from 1985 to 1987.  That was followed by a

two year fellowship in child and adolescent psychiatry at Cornell University's North Shore

University Hospital from 1987 to 1989. I was first licensed to practice medicine in New York in 1981 and I was licensed in California in 1989.

2.     I have devoted my medical career to specializing in psychiatry, and I was board certified as a Diplomat in adult psychiatry by the American Board of Psychiatry and Neurology in 1991, followed by board certification as a Diplomat in child and adolescent psychiatry in 1993, also by the American Board of Psychiatry and Neurology. I taught medical students at University of California at San Diego Medical School.

3.     I was in private practice for a number of years in both San Diego, California and Los Angeles, California. I participated in research studies at Feighner Research Institute in San Diego between 1989 and 1992. I had inpatient privileges at various hospitals in San Diego.

4.     Beginning in 1995, I devoted my practice to evaluation and treatment of university students with various chronic and acute psychiatric disorders, including emergency treatment of students in crisis. About 70% of my patient-students were women. Therefore, I often worked with young women  in crisis facing critical dilemmas and observed the negative consequences of decisions made under conditions of time pressure, conflict and stress. Decisions made under such adverse circumstances often led to the women's later realization that her decision was detrimental to her future well-being.

5.     Between 2000 and 2005, while at UCLA, I maintained a private practice in child, adolescent and adult psychiatry.

6.     In late 2008, I left UCLA. In early 2009, I began working at Vista del Mar outpatient clinic (where I had previously worked on a part-time basis, also while at UCLA), and remained there until April 1, 2011. I am currently working as a consultant, as well as lecturing at universities and

2

other venues across the country and internationally. Most recently, I lectured at Oxford University and at the House of Lords in Great Britain.

7.  Attached to this Declaration and marked as Exhibit A is my *Curriculum Vitae*.

8.  As a general matter, decision making concerning important life issues is a complex cognitive process. This is particularly true in adolescents, and young adults. When a decision will have long-term consequences, the decision making process is not only complex, but the importance of what is at stake itself can create stress, which in turn affects one's ability to properly assess the problem or decision to be made.

9.  Effective decision making requires an accurate analysis of one's problems and options. It requires identifying optimal resources for information and advice. Ideally, with decisions that are of major importance in one's life, support is obtained from trusted people and resources. In the process, an opportunity to "brainstorm" with objective advisors is usually of utmost importance.

10.  In the decision making process, one must clarify and prioritize one's personal values and goals. To advance one's interest in a happy and well adjusted life, major life decisions are made in a manner consistent with those values and goals. When that does not occur, the consequences in the life of the individual and her family can be catastrophic.

11.  Adhering to a disciplined and ordered method of decision making in major life decisions promotes one's emotional well-being and happiness. Effective decision making advances one's interests and well-being. To achieve that objective all substantive information and counseling about options must be obtained *before* the weighing and assessment of information and options. This is essential to the process. Acting on impulse, emotion, in response to pressure from others,

3

or without full awareness of one's circumstances and options, can result in a decision which is contrary to the interests of the person. Only after obtaining all information and options, can one arrive at a tentative decision. It is then important for the person to "sleep on" the decision. She must remain free from external pressure, especially the pressure to make a quick decision when it is unnecessary to do so.

12.    For the current and future well-being of the individual, autonomous decision making must be preserved. The decision must be one's own and one must not be forced to live with the resentment and anger resulting from a decision that was not truly one's own, but instead one made to advance the desires or interests of another at the expense of damaging or even destroying one's own interests.

13.    The decision of a woman of whether to keep her relationship with the unborn child (as referenced by South Dakota HB 1217) or to terminate that relationship, either by an adoption or by an abortion, is one of the most complex a woman will ever face. It is fraught with potential adverse consequences and she may believe that any option she decides to take has adverse consequences. The decision making process may be compromised by a number of difficulties and factors. These factors, which are often amplified or compounded in young women, include a sense of urgency to make a decision; a sense of shame; isolation from usual support systems; pressure from other parties whose interests may be in conflict with her's – parents, the child's father, his parents, the abortion provider, the clinic staff themselves. Limited access to information and limited access to support may compromise the decision making ability, as may tacit environmental assumptions, immature cognitive functioning, the inclination to give in to the desires of others in order to avoid conflict, the need for the emotional and financial support of others. The burden of stress, confusion,

4

fear and conflicting emotions, all make the woman's decision complicated and difficult.

14.    As a result of these factors, and because the stakes are high, a girl or woman may be unable to go through the cognitive process of effective decision making described above. She may instead make a decision based entirely on her emotions and/or what others are saying, what others prefer, or what she infers others would like.  She is vulnerable to manipulation and can be more easily influenced in this context than in other decision making circumstances. She may accept a course of action that she later realizes was not in her best interest: a course of action she really did not want to take. For example, when a pregnancy leads to conflict (overt or covert) within a romantic relationship, a woman may skip many or all of the decision-making steps.  She is susceptible not just to the undue influence of others but coercion that deprives her of her own decision making.  Stress and strong emotions such as fear and confusion are obstacles to effective decision making. In teens and young adults in particular, rational thinking can be impaired under those circumstances. It is well established that the prefrontal cortex (PFC), the area of the brain involved in the cognitive processes of rational thought-out decision-making, matures last. This area can remain immature until the mid-twenties. While the PFC is immature, a person is more likely to act in an impulsive manner, without considering the big picture.  This cognitive immaturity, combined with the emotional immaturity that is typical of adolescence and young adulthood, creates an increased vulnerability to manipulation by psychological coercion.

15.    All the above must be understood in the context of the woman's experiences and circumstances in order to examine and determine the reasonableness of South Dakota's requirements that: (1) an abortion cannot be scheduled prior to a physician interview and assessment; (2) the pregnant mother counsel with a pregnancy help center for assessment for coercion and information

5

about what resources are available that help her keep her child if that is what she wants; and (3) a minimum of three days pass before she makes a final decision to consent to the abortion procedure. In my opinion, each of these requirements are not only reasonable, but necessary to insure that the pregnant woman's decision is both informed and voluntary. That opinion is reinforced by the experiences of the pregnancy help centers in South Dakota in both their pre-abortion and post-abortion counseling. The experiences of some of the women who submitted Declarations, such as Brittany Weston, illustrate the harm to women that can occur when consent to an abortion is not fully voluntary and informed.

16.     The analysis must start with an understanding of the nature of the abortion decision and why it is different and more complicated than many other major life decisions. First, it involves the interests not only of the pregnant mother, but also of her child. There can be instances when the pregnant mother is considering an abortion while she believes an abortion would conflict with the interests of both herself and her child. The abortion decision is, therefore, one in which a woman decides whether to terminate her relationship with her child or to continue that relationship. It goes without saying that most women believe that a child is a potential source of great joy and fulfillment. Thus, considering an abortion may contain inherent conflicts: keeping the relationship with her child could be desirable and deeply fulfilling, but for some reason her circumstances are such that she feels the need to consider giving up that potential source of joy and fulfillment. While some women may not articulate the decision in these terms, on both an emotional and intellectual level many intuit it in this manner. Second, the decision to abort is a decision to terminate the life of a human being in the biological sense. This fact was previously established by South Dakota by the federal court's decision that South Dakota's Law requiring abortion providers to disclose that "an abortion terminate

6

the life of a whole, separate, unique, living human being" must be followed because it is an accurate statement of biological fact. For some women this biological fact implicates significant personal values and mores. Unlike other life altering decisions, such as those related to marriage and career, this further complicates the decision making process and makes it rift with psychological consequences. Third, the decision to have an abortion is irrevocable. Unlike relationship decisions and decisions about one's career, once an abortion has been performed, no alternative course can be subsequently navigated. Fourth, unlike other kinds of medical procedures and even other kinds of life decisions, others may have an interest in her having an abortion which conflicts with her own desires and interests in keeping her child. A young woman's parents, family, or the father of the child may have interests resulting in their pressuring the woman to make a decision she would not otherwise make. Fifth, the decision is made more problematic and the woman is deprived of true autonomous and voluntary decision making if she goes to an abortion clinic for counseling where the clinic personnel proceed as if the decision to abort has already been made, or where the "counseling" of the abortion clinic steers her, in either an overt or covert manner, to believe that an abortion is the best "choice." All these conditions are likely to compromise her ability to make an autonomous and voluntary decision.

17.  The greatest impediment to a voluntary and informed decision is coercion. Coercion can be overt or it can be subtle. In either case, it prevents the woman from making her own decision which compromises her autonomy and, potentially, prevents her from advancing her own interests.

18.  Psychological coercion is recognized and understood by physicians who specialize in psychiatry. It is well recognized that a person can impose their will on another through psychological coercion. In reading the South Dakota Statute, the term "coercion" is defined as

7

follows:

> "Coercion," exists if the pregnant mother has a desire to carry her unborn child and give birth, but is induced, influenced, or persuaded to submit to an abortion by another person or persons against her desire. Such inducement, influence, or persuasion may be by use of, or threat of, force, or may be by pressure or intimidation effected through psychological means, particularly by a person who has a relationship with the pregnant mother that gives that person influence over the pregnant mother.

This definition is consistent with a psychiatric understanding of coercion. It is clear and unambiguous. Coercion by force or intimidation is readily understood. If a girl or woman is influenced or persuaded to act against her desires, she is coerced. There is a great difference between a woman being persuaded by facts to change her mind and a woman being pressured to act against her desires. In the latter instance she believes abortion is not in her interest and she doesn't want one, but she succumbs to pressure from another person and undergoes the procedure. Psychological coercion occurs when a woman is emotionally manipulated to act contrary to her desires and interests. There are many ways this can be accomplished. In the presence of coercion – even of the most subtle kind – autonomous and voluntary decision making is impossible. The price paid by the woman who is psychologically coerced to have an abortion can be terribly high, and is not limited to the deprivation of her autonomous decision making. She is compelled to acquiesce to the termination of a life which is of immeasurable value to her and she is subjected to the potential negative psychological consequences that follow.

19.     The Statute's requirement that a woman first meet with a physician to discuss her circumstances before scheduling an abortion is essential for her decision making process. A physician can review a woman's personal circumstances and in many instances reassure her that she

has time to reach a decision. It gives the physician the opportunity to explore whether she has been subjected to coercion. It should be noted that simply asking a woman if she is "sure about her decision" is not sufficient for a number of reasons. One is that this question implies that a decision was already made and that there is no need to go through any portion of the decision making process as described above.

20.     The requirement that a woman be referred to a pregnancy help center is reasonable and necessary. The requirement is based upon the experiences reported by women who were denied that process. *See*, Declaration of Brittany Weston for an egregious example of clinic workers who had no understanding or sympathy for a woman's circumstances, and failed to conduct a proper assessment for coercion. It is vital that this assessment be conducted away from the abortion clinic, in an environment that will support a woman in whatever course she decides to take. She should not be steered to an abortion. Some women will want to explore the option of giving birth and keeping her child and it is critical, in order to make a voluntary and informed decision that she discuss her circumstances with someone sympathetic to her desire to keep her child. Pregnancy help centers are experienced in helping women keep their children and are knowledgeable about the help available to the pregnant mother. Therefore, for those women, a session with the pregnancy help center advances her autonomy and frees her from coercive forces.

21.     At the same time, the seventy-two hour period between the initial assessment and interview by the physician and the first date on which a woman can sign a consent and undergo an abortion is critical to her voluntary and informed decision making. It gives her an opportunity to absorb the information and think through what may be one of the most important decisions of her life. She also, as a result of the procedure created by South Dakota's new statute, obtains the benefit

of the counseling at a pregnancy help center. Some women will be able to make an autonomous, thought-out decision and be in a position to give informed consent and undergo an abortion on the same day as the initial assessment. But many other women, perhaps most, must have the seventy-two hour period and the counseling at the pregnancy help center. This includes those at highest risk for long term negative consequences in an abortion: young, unmarried, and childless women, women who are being coerced, and women who are ambivalent because of their moral beliefs or other factors. These women most likely have learned new information during their meeting with the physician, as well as their session at the pregnancy help center. They must have those seventy-two hours for careful deliberation, consultation and soul searching. For these women and for the unborn lives they carry, the stakes are simply too high. The argument that the seventy-two hours places a woman at greater risk of harm is specious. To the contrary, this approach (which includes the demand of payment for the abortion even before there is any counseling regarding a decision) pressures a woman to make a quick decision when acting quickly is not in her best interests, and when she seeks to make an informed, voluntary decision. That approach – that the decision must be made quickly – is itself inherently coercive. This is one of the points made by Abby Johnson in her Declaration. The requirement that all women comply with the seventy-two hour period and PHC counseling is necessary in order to insure that the large number of women who need the time and necessary counseling receive them.

22.     Also per Abby Johnson, counselors cannot assume that crying is "normal". Crying indicates the presence of intense emotion, and should always be thoroughly explored. This usually takes time. There will certainly be cases in which a woman is assessed to be too distraught or unstable to undergo an abortion on that day. To go ahead with the procedure without a full

assessment of the patient's mental status, and in the absence of adequate exploration or resolution of her conflict, is contrary to the patient's interests. It is profoundly alarming to learn that this practice of proceeding with an abortion without adequate assessment of the woman's emotional state is accepted at abortion clinics. The decision making capacity of someone who is deeply distraught is compromised. The individual is also more vulnerable to coercion, and should she abort, she is at increased and significant risk of depression, substance abuse, and suicide ideation. An adequately trained, experienced, and ethical counselor knows this.

23.     Effective counseling of women considering abortion requires professional training and experience. It is not a simple matter of asking a few questions and completing forms. For an abortion clinic to provide "counseling" by untrained and/or inexperienced individuals is irresponsible and contrary to the patients' rights and best interests. For the clinic to require payment for the abortion prior to the "counseling", as if the decision to abort is a "done deal", completely undermines the entire notion of unpressured, objective support and guidance during the decision-making process. It is not only reasonable, but necessary for women to have the opportunity to discuss their circumstances with a pregnancy help center where the staff is motivated to assess for coercion and will properly counsel the woman about the help and resources available to help her keep her child if that is indeed what she prefers to do.

24     Pursuant to 28 U.S.C. 1746, I certify, under penalty of perjury, that the foregoing is true and correct.

Miriam Grossman MD
Miriam Grossman, M.D.

Dated:   6/23/11

11

# EXHIBIT A

# Curriculum Vitae

## Contact Information

| | |
|---|---|
| Name: | **Miriam Grossman, M.D.** |
| Address: | Post Office Box 3033 |
| | Beverly Hills, California 90212 |
| Email: | MiriamGrossmanMD@hotmail.com |
| Website: | www.MiriamGrossmanMD.com |

## Education

| | | |
|---|---|---|
| 1970-1974 | Undergraduate: | Bryn Mawr College, Bryn Mawr, Penna. B.A., *cum laude* |
| 1975-1979 | Medical School: | New York University, New York, NY |
| 1979-1980 | Internship: | PGY I, Pediatrics, Beth Israel Hospital, NYC |
| 1985-1987 | Residency: | PGY II and III, Adult Psychiatry North Shore University Hospital (Cornell University) Manhasset, New York |
| 1987-1989 | Fellowship: | Child and Adolescent Psychiatry North Shore University Hospital (Cornell University) |

## Employment and Affiliations

| | |
|---|---|
| July 2010 – present | Scholar-in-Residence, World Youth Alliance |
| February 09 - present | Psychiatrist, Vista del Mar outpatient clinic. Evaluation and medication management of children and adolescents |
| June 2007 – December 2008 | Senior Fellow, Clare Boothe Luce Policy Institute |

Provide articles and lectures about young women's physical, reproductive and emotional health, and analysis of public policies.  Write commentary column for CNSnews.com and townhall.com; radio and TV interviews.  Campus lecture tour.

1995- 2008     UCLA Student Psychological Services, Los Angeles, CA Evaluation and psychopharmacological treatment of students Provided diagnostic and emergency evaluations of undergraduate and graduate students including international students and those at the law, medical, and dental schools. This represents a very complex and diverse population. Crisis intervention and hospitalization, medication management, multidisciplinary case management, teaching and presentations to interns, consultation to staff consisting of psychologists and social workers, consultation to other campus departments as needed. Consulted with the Office of Student Disabilities, and the UCLA School of Law.

2000-2005     Private psychiatric practice. Diagnostic and emergency evaluation of children, adolescents and adults. Crisis intervention, medication management and psychotherapy.

2000-2001     Psychiatrist, Vista del Mar outpatient clinic. Evaluation and medication management of children and adolescents; consultant, Julia Ann Singer Center  - Therapeutic School for Emotionally Disturbed and Developmentally Delayed Children.

1994-1995     Psychiatrist, Inpatient Adolescent Unit, Talbia Mental Health Center, Jerusalem, Israel.

1991-1993     Consultant, Young Adolescent Program, Southwood Hospital, Chula Vista, CA., including inpatient privileges.

1991-1994     Staff Psychiatrist, Frontier Adolescent Day Treatment Center, Santee, CA

1989-1993     Private Practice with Psychiatric Centers at San Diego, CA.  Provided general child, adolescent and adult psychiatry, both inpatient and outpatient, emergency and diagnostic evaluations, crisis intervention, medication management, case management, consultation to multidisciplinary staff.

1989-1992     Clinical Investigator, Feighner Research Institute, San Diego, CA.

| | |
|---|---|
| 1989–1994 | Inpatient privileges at Alvarado Parkway Institute, San Diego, CA. |
| 1987-1989 | Psychiatric residency at Cornell University affiliated North Shore University Hospital, Manhasset, NY in child and adolescent psychiatry.  Consultant to the emergency room and to the pediatric and adolescent medical floors. The center specialized in the treatment of abused children and their families, eating disorders, and suicidal adolescents. |
| 1985-1987 | Psychiatric residency at Cornell University affiliated North Shore University Hospital, Manhasset, NY in adult psychiatry. Consultant in the emergency unit, admitted to the inpatient unit, and cared for hospitalized and clinic patients. Consulted to medical and surgical floors as well as ICU's.  Diagnostic interviews, crisis intervention, medication management, ECT. |
| 1974-1975 | Research assistant for Peter Auld MD, Director, Neonatology Department, Cornell University Medical Center. Examined sleep and respiratory patterns of premature infants and how these patterns may be related to sudden infant death syndrome. |
| Summer 1971 | EEG lab assistant (electroencephalography), Presbyterian University Hospital, Department of Neurology, Pittsburgh, Pennsylvania.  Prepared patients for exam, applied electrodes to head, monitored patient during exam, studied basic principles of electrical  activity of the brain, and assisted attending neurologist in library research. |

## *Teaching:*

| | |
|---|---|
| 1997 | UCLA Student Health Center: "Psychiatric Emergencies" |
| 1993 | Instructor, University of California at San Diego Medical School "Human Growth and Development" |
| 1992-1993 | Presented lecture series at Southwood Hospital, San Diego, CA Topics included Tourette Syndrome, sexual abuse of children, child and adolescent psychopharmacology |

## *University Committees:*

| | |
|---|---|
| 2006 | Member, UCLA Selection Committee-Psychological Services to review applications and interview applicants for psychiatry positions. |

| 2005-2006 | Member, UCLA Student Psychological Services Peer Review Committee.  Attend weekly meeting in which difficult and complex cases are reviewed and treatment recommendations made. |
| --- | --- |
| 1995 | Member, system-wide committee of the University of California charged with developing practices for the documentation and accommodation of students with ADD/ADHD |

## *Awards*

| 2003 | UCLA Physician's Performance-Based Augmentation Award (PPBA) |
| --- | --- |
| 2000 | UCLA PPBA award |
| 1999 | UCLA PPBA award |
| 1974 | Jane V. Myers Scholarship |

## *Licensure*

| 1980 | Diplomat, National Board of Medical Examiners |
| --- | --- |
| 1989 | California License G067174 |
| 1991 | Diplomat, American Board of Psychiatry and Neurology |
| 1993 | Diplomat, Specialty of Child and Adolescent Psychiatry |

## *Books:*

Grossman, M. (1989).  *The Wonder of Becoming You: How a Jewish Girl Grows Up.*
    Nanuet, NY: Feldheim Books.  Still in print, has been translated into French,
    Spanish, German and Portuguese.

Grossman, M. (2006).  *Unprotected: A Campus Psychiatrist Reveals How Political
    Correctness in Her Profession Endangers Every Student.* New York, NY:
    Sentinel / Penguin Books (First edition published under "Anonymous MD").
    Paperback released 2007.

Grossman, Miriam (2009) *You're Teaching My Child WHAT? A Physician Exposes the Lies of Sex Education and How They Harm Your Child* (Washington DC: Regnery)

*Columns (on www.Townhall.com unless noted otherwise)*

Grossman, M. (21010) "Teach My Child That, And You'll Be Sorry"
                    www.MercatorNet.com

Grossman, M. (2009) *"Beware the Science in Sex Education"*

Grossman, M. (2009) "Sex, Lies, and SIECUS"

Grossman, M. (2009) "Way to Go, Planned Parenthood"

Grossman, M. (2009) "Attention New Jersey: Christie's Nominee May Pose
                    A Danger to Your Children"

Grossman, M (2008) "Shocked"

Grossman, M. (2008) "What Our Daughters Must Know"

Grossman, M. (2008) "What Girls Want: An Edward Cullen to Love Them"

Grossman, M. (2007) "S&M, Ivy League Style" www.frontpagemagazine.com

Grossman, M. (2007) "Chlamydia: Not in Vogue" www.CNSNews.com

Grossman, M. (2007) "Media Mum on Oral Sex and Throat Cancer Risk Among Kids"
                    www.CNSNews.com

Grossman, M. (2007) "Want protection from Breast Cancer? Have a Baby",

Grossman, M. (2007). "What Sex Week Forgot", Op-Ed. *Chicago Sun-Times,*
http://www.suntimes.com/news/otherviews/383068,CST-CONT-college13.article

Grossman, M. (2007). "Misery U". *Arizona Republic*,
http://www.azcentral.com/arizonarepublic/viewpoints/articles/0304grossman0304.html

Grossman, M. (2007).  "Students suffer when campuses are too PC about sex."
                    *UCLAToday*, May 8.

Grossman, M. (2004, February). *Saving Patient Brian*, on www.worldnetdaily.com.

Grossman, M. (1981). "Antidote for the existential blues". *Bryn Mawr Alumni Bulletin*.

*Lectures:*

    2008   "Challenges in Counseling University Students", annual meeting of Chabad Campus Rabbis, New York

    2008   "Unprotected: A Campus Psychiatrist Reveals How Political Correctness in Her Profession Endangers Every Student", Jerusalem, Israel

    2007   "Does Reproductive Freedom Include the Freedom to Reproduce?" National Press Club, Washington DC

    2002   "Evaluation of Attention Deficit Disorder" at Clinical Training Seminar, Student Psychological Services, UCLA.

    2001   "Psychiatric Emergencies", presentation to community hotline volunteers Jewish Family Service of Los Angeles.

    1999   "Obsessive Compulsive Disorder: A Multimodal Treatment Approach" California Counseling Center Directors

    1997   "Psychiatric Emergencies", UCLA Student Health Center

*Media Appearances:*

I have been interviewed on over 150 radio shows including :

    Bill Bennett
    Michael Medved
    Dennis Prager
    G. Gordon Liddy
    Paul Weyrich
    Pete Wilson
    Michael Savage
    Tony Perkins
    Milton Rosenberg
    Lars Larson
    Jan Michelson
    Martha Zoller
    David Allen Show
    North Carolina Family Policy Matters
    Carmen Pate

*Television:*

>Fox 11 News, Los Angeles

>Fox & Friends, New York

>Pat Robertson's 700 Club

>Fox News New York, "Live Desk with Martha MacCullum"

*Speaking Engagements and Seminars (partial list):*

Oxford University, United Kingdom

UN Commission on the Status of Women, New York

A Rose and a Prayer, Wilmington, Delaware

Agnes Scott College, Atlanta, Ga.

Amherst College, Amherst, Mass.

Central Ohio ATM Education, Columbus, OH

Commonwealth Education Organization, Pittsburgh, Pennsylvania

Constitutional Coalition, St Louis, Missouri

Doctors for Disaster Preparedness, Phoenix, Arizona

Dartmouth College, Dartmouth, New Hampshire

Free Teens, Teaneck, New Jersey

George Washington University, Washington, DC

Georgetown University, Washington, DC

Heritage Community Services, Columbia, South Carolina

Institute of Marriage and Family Canada, Ottawa, Canada

Princeton University, Princeton, NJ

University of Amsterdam, Amsterdam, Netherlands

University of California, Los Angeles

University of Dallas, Dallas, Texas

University of North Texas, Fort Worth, Texas

University of Southern California, Los Angeles

University of Texas, San Antonio, Texas

University of Virginia, Norfolk, Virginia

Trinity College, Austin, Texas

Stacy Zallie Foundation, Philadelphia, Penna.

AWARE, Vancouver, Washington

Best Friends Foundation, Washington DC

Family Research Council, Washington DC

Regents University, Norfolk, Virginia.

International Abstinence Association, Baltimore, Md.

Clare Booth Luce Policy Institute, Washington, DC

Abstinence 'Til Marriage, Columbus, OH

Vineyard Church, Columbus, OH

Utah State Senate, Salt Lake City, Utah

South Carolina State Senate, Columbia, South Carolina

Medical Institute for Sexual Health, Austin, Texas

South Carolina Parents Involved in Education, Myrtle Beach, South Carolina

International Abstinence Association, Baltimore, Maryland

Regent University, Fairfax, Virginia

Family Research Council, Washington, DC

Ethics and Public Policy Center, Washington, D.C.

St. Joseph Regional Medical Center, South Bend, Indiana

Conejo Valley Women's Resource Center, Thousand Oaks, California

Mid-Michigan Medical Center, Midland, Michigan

Operation Keepsake, Twinsburg, Ohio

Ruth Institute