## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH DAKOTA
## SOUTHERN DIVISION

---

| | |
|---|---|
| **PLANNED PARENTHOOD MINNESOTA,** | : **Civil Case No.: 4:11-cv-04071-KES** |
| **NORTH DAKOTA, SOUTH DAKOTA, and** | : |
| **CAROL E.  BALL, M.D.,** | : |
| | : |
| **Plaintiffs,** | : |
| | : |
| **v** | : |
| | : |
| **DENNIS DAUGAARD, Governor,** | : |
| **MARTY JACKLEY, Attorney General,** | : |
| **DONEEN HOLLINGSWORTH, Secretary of** | : |
| **Health, Department of Health, and** | : |
| **ROBERT FERRELL, M.D., President,** | : |
| **Board of Medical and Osteopathic Examiners,** | : |
| **in their official capacities,** | : **MEMORANDUM OF LAW** |
| | : **IN SUPPORT OF MOTION** |
| **Defendants,** | : **FOR INTERVENTION OF ALPHA** |
| | : **CENTER AND CARE NET** |
| **ALPHA CENTER, and BLACK HILLS CRISIS** | : **PREGNANCY RESOURCE CENTER** |
| **PREGNANCY CENTER, doing business** | : |
| **as CARE NET PREGNANCY RESOURCE,** | : |
| **CENTER,** | : |
| | : |
| **Applicants for** | : |
| **Intervention.** | : |

---

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTORY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.     Prior South Dakota Law and the Evidence that Led
            South Dakota to Amend that Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.     The Act – South Dakota's 2011 Abortion Regulation
            Law, 2011 S.D. Laws ch. 186, also known as HB
            1217. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      C.     Plaintiffs' Challenges to the Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      D.     The Intervenors – Who Are They?  What Do They
            Do?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      E.     Intervenors' Interests in the Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

     POINT I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

           THE COURT MUST GRANT THE APPLICATION FOR INTER-
           VENTION. THE APPLICANTS HAS RECOGNIZED INTERESTS,
           WHICH COULD BE ADVERSELY AFFECTED BY THE OUT-
           COME OF THIS LITIGATION.  THOSE INTERESTS ARE
           SUFFICIENT TO ESTABLISH ARTICLE III STANDING.  THE
           STATE DEFENDANTS CANNOT ADEQUATELY REPRESENT
           THE INTERESTS OF INTERVENORS.  THEREFORE, THE
           STANDARDS ESTABLISHED UNDER F.R.C.P. R. 24 (A) HAVE
           BEEN SATISFIED, AND THE MOTION MUST BE GRANTED.

      A.     The interests of Intervenors that can be impacted by
            this litigation are sufficient to satisfy both the require-
            ments of Rule 24 and the requirements of Article III
            standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B.    The State Defendants cannot adequately represent the
interests of Intervenors that are implicated by the
litigation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF AUTHORITIES

## CASES

*Canterbury v. Spence*, 464 F.2d 772 (D.C.Cir.), *cert. denied*, 409 U.S. 1064 (1972). . . . . . . . . . . 3

*Curry v. Regents of the University of Minnesota*, 167 F.3d 430 (8th Cir. 1999). . . . . . . . . . . 35, 36

*Granville House, Inc. v. Department of Health and Human Services*, 715 F.2d 1292 (8th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Kansas Public Employees Retirement System v. Reamer & Koger Associates, Inc.*, 60 F.3d 1304 (8th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26, 30, 32, 35

*Mausolf v. Babbitt*, 85 F.3d 1295 (8th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Meese v. Keene*, 481 U.S. 465 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Mille Lacs Band of Chippewa Indians v. Minnesota*, 989 F.2d 994 (8th Cir. 1993). . . . 23, 31, 32, 36

*Planned Parenthood Minnesota, South Dakota, North Dakota v. Rounds*, 2006 WL 2092595 (D.S.D. 2006), *rev'd* 213 Fed.Appx. 508 (8th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . 27

*Planned Parenthood Minnesota, South Dakota, North Dakota v. Rounds*, 213 Fed.Appx. 508 (8th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Planned Parenthood Minnesota, South Dakota, North Dakota v. Rounds*, 2005 WL 2338863 (D.S.D. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861 (8th Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25, 33, 36

*Savold v. Johnson*, 443 N.W.2d 656 (S.D. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*SEC v. Flight Transportation Corp.*, 699 F.2d 943 (8th Cir. 1983). . . . . . . . . . . . . . . . . . . . 24, 25

iv

*Sierra Club v. Robertson*, 960 F.2d 83 (8th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . 24, 33, 36

*South Dakota Farm Bureau, Inc., v. Hazeltine*, 340 F.3d 583 (8th Cir. 2003), *cert. denied sub nom*, *Dakota Rural Action v. South Dakota Farm Bureau, Inc.*, 541 U.S. 1037 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*South Dakota v. Ubbelohde*, 330 F.3d 1014 (8th Cir. 2003), *cert. denied sub nom*, *North Dakota v. Ubbelohde*, 451 U.S. 987 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*St. Cloud v. Leaply*, 521 N.W.2d 118 (S.D. Sup. Ct. 1994). . . . . . . . . . . . . . . . . . . . . . . . 30

*Trbovich v. United Mine Workers*, 404 U.S. 528 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*United States v. Union Electric Co.*, 64 F.3d 1152 (8th Cir. 1995). . . . . . . . . . . . . . . . . 25, 31-33

*Weeldon v. Madison*, 374 N.W.2d 367 (S.D. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3


## STATUTES

1993 S.D. Laws ch. 249. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

2005 S.D. Laws ch. 186. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

2011 S.D. Laws ch. 186. . . . . . . . . . . . . . . . . . . . . . . . . . 1-4, 6-13, 16-22, 27, 28, 34, 35

S.D.C.L. 34-23A-10.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S. Constitution, Article III. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 27, 30


## COURT RULES

F.R.Civ.P., R. 24. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 23-26, 30


## OTHER AUTHORITIES

## <u>INTRODUCTORY STATEMENT</u>

This action involves a challenge by the Planned Parenthood affiliate that operates in South Dakota and its medical director to a statute adopted in the 2011 legislative term in South Dakota. This statute is South Dakota's newly enacted abortion regulation Act, 2011 S.D. Laws ch. 186, also known as HB 1217 (hereinafter the Act).  This Act establishes procedures that must be followed by abortion providers prior to performing any abortion.  Among things, it provides that before any woman contemplating abortion can undergo the procedure, she must first participate in a consultation with a pregnancy help center, where an assessment will be conducted to determine if there is any evidence the woman is being subjected to coercion to have the abortion, and where the center can provide the woman with information on alternatives to abortion, including information about the resources available to assist her if she were to choose to continue the pregnancy and not have the abortion.

The applicants for intervention (hereinafter "Intervenors") are two entities that currently operate as pregnancy help centers in South Dakota.  Each has applied to qualify to provide pregnant women contemplating abortion with the consultations that will be required by the Act.

Plaintiffs have filed this action challenging the Act.  One of the primary focuses on the challenge is on the Act's requirement of a consultation with a pregnancy help center.  If Plaintiffs are successful in this challenge, it would directly impact the Intervenors, since it would deprive them of the referrals they would have if the Act is in operation.

Furthermore, the outcome of this action would adversely affect the Intervenors in a number of other ways.  These arise in particular because of the claims Plaintiffs have made in their

Complaint.  In their Complaint, Plaintiffs have made a number of allegations in support of the challenge to the pregnancy help center requirement.  A number of these challenges target the entities that currently operate as pregnancy help centers in South Dakota – the entities that would be expected to register to provide the consultations required by the Act – and make accusations against those centers.  Many of these accusations are false, misleading, inflammatory, impertinent, and scandalous.  As such, these accusations, if accepted by the Court, will directly impact the reputation of the pregnancy help centers – and in particular Intervenors, given that they have actually registered under the Act and so will be understood to be the direct targets of these accusations.  Moreover, these attacks will direct impact on the ability of Intervenors to perform their primary mission, which is the service of women who are pregnant and in need of help.

As a result, Intervenors are now moving to intervene in this action in accordance with Rule 24, in order to protect their interests.  For the reasons that will be developed at length herein, this Motion must be granted.

# STATEMENT OF FACTS

**A.**     **Prior South Dakota Law and the Evidence that Led South Dakota to Amend that Law**

While prior to the adoption of the Act, South Dakota had a number of laws that addressed the performance of abortions, none of these directly addressed the issue of coercion.  Furthermore, the common law of the State was less than clear regarding the issue of the extent to which a physician needed to go in order to make sure that any consent to a medical procedure was voluntary and not coerced[1].

In 2005, South Dakota established a Task Force which conducted hearings on whether additional regulation of abortion practice would be appropriate, and then adopted by majority vote

---

[1]     It is the legal position of Intervenors that even before the adoption of the Act, South Dakota would recognize that no medical procedure should be performed if the patient is being coerced to undergo the procedure, based both on the principles of medical ethics and common law.  However, Intervenors also recognize that before the Act's adoption there was no court decision directly holding.  Instead, with regard to the common law this position is based on the fact that South Dakota, like many states, has adopted as its model for determining whether consent for medical procedures are valid the model established in the seminal case of *Canterbury v. Spence*, 464 F.2d 772 (D.C.Cir.), *cert. denied*, 409 U.S. 1064 (1972).  *Weeldon v. Madison*, 374 N.W.2d 367, 374 (S.D. 1985); *see also Savold v. Johnson*, 443 N.W.2d 656 (S.D. 1989).  In *Canterbury*, one of fundamental premises for the Court's decision was the concept that any consent must be voluntary and uncoerced.   As the Court stated, "It is also clear that the consent, to be efficacious, must be free from imposition upon the patient."  *Id.*  at 782-783.

More to the point, there was nothing in either the statutes or the case law in South Dakota that would establish that a physician has any duty to affirmatively inquire as to whether a patient is being coerced.  Thus, a physician could accept a consent for a medical procedure without inquiring about whether it was voluntary or whether there was coercion, and most likely be compliant with common law duties, even when the physician's state of mind borders on "willful ignorance."

3

a Report in December of 2005.  In this Report, the majority of the Task Force addressed the issue of coercion, among other things.  The majority concluded that in numerous instances abortions were being performed upon pregnant women who had been the subject of coercion, and that the practices of the entities that performed abortions in South Dakota – in particular Plaintiff Planned Parenthood, which performs the overwhelming majority of abortions done in the state – fail to adequately screen for coercion.  (Task Force Report, at 37-40.)  The Task Force therefore recommended that legislation be adopted providing for better screening to avoid situations where an abortion would be performed even though it was the result of coercion.  (Task Force Report, at 69-72.)

During the 2011 legislative session, committees in each house of the South Dakota Legislature conducted hearings at which further testimony was presented on the issue of coercion. During these hearings, the legislators heard testimony that indicated the situation had not changed from what the Task Force found.  There continued to be numerous instances when a pregnant woman was undergoing an abortion where she did not want to have the procedure but was instead being coerced into having it by another, whether by a spouse or the father of the unborn child or the woman's own parents or someone else.  This sort of coercion is not identified by the abortion providers such as Planned Parenthood due to the procedures that they follow, which fail to adequately screen patients.  As the Legislature noted in the findings of fact included in Section 1 of the Act, as abortions are currently practiced in South Dakota – and in particular as they are practiced by Plaintiffs, in the overwhelming majority of cases the procedure is scheduled before the pregnant mother has even met any physician, much less developed any kind of relationship with that physician.  Also, the procedures are scheduled by somebody who is not a physician, without any

4

medical or social assessment of the appropriateness of the procedure or whether the pregnant woman's decision is truly voluntary, uncoerced and informed.

The testimony also indicated, as the Legislature stated in its Section 1 findings, that where has been coercion, then there is a substantially increased risk that the woman will subsequently come to regret the abortion and will experience adverse psychological conditions, including depression and even suicide. Thus, there was evidence establishing that women were being harmed by these coerced abortions.

Based on this evidence, the Legislature concluded that if screening for coercion was left to the abortion providers, the interests of pregnant mothers would never be adequately protected. Rather, full protection of those interests would be achieved if and only if the screening was done by an entity independent of those who would benefit economically if the abortion was in fact provided.

The testimony also established that while long-standing law in South Dakota required abortion providers to give pregnant women contemplating abortion certain information relevant to the social implications of pregnancy and childbirth, such as what resources that would be available to assist the women if they decided to carry the child to term rather than having the abortion[2], nonetheless abortion providers in the State had only done what was minimally necessary to comply with the law, giving the bare essentials and nothing else. The Legislature recognized that women who become pregnant are often far more concerned about the social implications that flow from pregnancy and childbirth, such as the impacts on the economic aspects of their lives and on whether

_____

[2]      The information is required by the provisions of S.D.C.L. 34-23A-10.1. Some of the information was required by the version of that section that was in effect since it was originally enacted by 1993 S.D. Laws ch. 249, while additional information was required when the section was amended by section 7 of  2005 S.D. Laws ch. 186.

they will have emotional support and assistance, than they are about the medical implications.  These social implications are often a major factor in women's decisions about whether to give birth or undergo abortions.  The Legislature therefore concluded that the only way that women contemplating abortion would have sufficient information about those resources would be if that information was provided by an entity independent of the abortion providers.

The testimony also provided information about the role pregnancy help centers are currently playing in South Dakota.  This information will be addressed subsequently in this Brief.  At this point, suffice it to say that based on this testimony, the Legislature concluded that pregnancy help centers are especially qualified to serve as these independent entities for two reasons: first, because they focus on the social implications of pregnancy and childbirth, and so have experience in addressing those topics, and second, because they have considerable experience in counseling women who have undergone abortions were there was coercion, and so are familiar with the kind of factors that can constitute coercion in this context.

**B.**     **The Act – South Dakota's 2011 Abortion Regulation Law, 2011 S.D. Laws ch. 186, also known as HB 1217**

In order to provide the added protection for pregnant mothers contemplating abortion that these hearings demonstrated was not only appropriate but necessary, South Dakota adopted the Act. The Act was approved by large majorities in both Houses of the South Dakota Legislature and signed into law by Governor Michael Daugaard.

The Act has two primary purposes.  First, it confirms that an abortion can only be performed if the pregnant mother's consent is voluntary and not coerced.  In this regard, it establishes a formal

procedure for determining whether the consent was voluntary or whether it is coerced.  Second, it identifies additional information that abortion providers would have to disclose to their prospective patients before obtaining a valid informed consent, having concluded that this information is material to any woman's decision about whether to undergo an abortion, and having concluded that it was best to avoid arguments about whether this information would have to be disclosed under the principles of the common law doctrine.

As noted, the Act establishes procedures to try to make sure that the decision of the woman to undergo the abortion is voluntary and not coerced, both by requiring the physician to engage in a screening for coercion, and by requiring any woman contemplating abortion to be counseled by an entity which is independent of the abortion facility.  The Legislature recognized that a pregnant mothers has a fundamental interest in her relationship with her child, and that an induced abortion is an irrevocable method of terminating that relationship, and concluded that establishment of these procedures was necessary and proper in order to protect the mother's interest, by doing what was reasonable and appropriate to ensure that any termination was voluntary and uncoerced and informed.

These procedures, which apply except in the case of a medical emergency, and which must be followed before any pregnant woman contemplating abortion can undergo the procedure, provide:

1.     Section 3 of the Act requires that the pregnant woman must have an initial consultation with a physician at the facility or office where the procedure would be performed.  During this consultation, the physician must perform an assessment of the woman in order to determine if the woman's consideration of undergoing an abortion is the result of coercion.  The physician must

also provide the woman with the various disclosures that are already required by South Dakota law by operation of S.D.C.L. 34-23A-10.1.

2.   Of particular note relative to this Motion, Section 3 provides that the physician must provide the woman with the names and contact information for the entities that have registered with the Department of Health of South Dakota to function as pregnancy help centers.  The physician must provide the woman with a written statement that states the following: (a) informs her that before the abortion can be performed, she must have a consultation with one of these pregnancy help centers, so that this entity can provide her with information about what education, counseling and other assistance is available to help the pregnant mother keep and care for her child, and engage in a private interview with her in order to discuss any circumstances that may subject her decision about whether to have the abortion to coercion; and (b) informs her that before she can undergo any abortion the physician perform-ing the procedure will have to obtain a written statement from her confirming that the consultation with the pregnancy help center occurred and obtaining information about that consultation.

3.   Section 6 of the Act addresses the consultation between the pregnant woman and the pregnancy help center.  It provides that the pregnancy help center may engage in a private interview with her in order to determine if she has been subjected to any coercion with regard to the decision about whether to have the abortion to coercion.   It also provides that the pregnancy help center may

8

provide the woman with information about what education, counseling and other assistance is available to help the pregnant mother keep and care for her child.  The Section specifically provides that the pregnancy help center, its agents and employees, may not discuss with the pregnant mother religion or religious beliefs, either of the mother or the counselor, unless the pregnant mother first consents in writing.  The section further provides that if the pregnancy help center, through the consultation, concludes that the woman appears to be under coercion, it may notify the physician with whom the woman had the consultation of this conclusion, but also provides that there is no requirement.  The Section expressly provides that even if notification is provided, it is not binding upon the physician, but is instead only one source of information that the physician should consider in determining whether the woman is being coerced.  The Act specifically provides in Section 6 that no information obtained by a pregnancy help center during the consultation shall be released, except in three circumstances: (a) when the pregnancy help center determines through the interview that there is evidence of coercion, in which case the center may report that determination to the physician with whom the woman has consulted about the procedure in accordance with the Act's provisions; (b) when the woman provides a signed written consent for the release; and © when release of the information is required by law, as for instance in response to a subpoena.

9

4.      Section 5 of the Act directs the Department of Health of the State of South Dakota to maintain a registry of the entities that apply and qualify to serve as pregnancy help centers in accordance with the Act.  In order to be eligible to be on this registry, an entity must meet several criteria that are set out collectively in Sections 5 and 7 of the Act.  Among other things, to be eligible, the entity must have as one of its primary missions to provide education, counseling, and other assistance to help a pregnant mother maintain her relationship with her unborn child and care for her unborn child. The entity must either have a medical director licensed to practice medicine in South Dakota or have a collaborative agreement with a physician licensed in the South Dakota.  The entity cannot perform abortions or be affiliated with any physician or entity that performs abortion, and cannot engage in referring pregnant mothers for abortions, whether currently or at any time in the past three years.  The entity must agree to perform the consultations required under the Act, and must further agree that it will comply with the requirements in the Act dealing with discussions of religious beliefs.  The Section further provides that the Department will provide a list of all entities on the registry to any physician upon request, so that the physician can comply with the requirements of Section 4 relative to giving information to a pregnant woman contemplating abortion.

There are other provisions in the Act, but the above are the ones that most directly affect the interests of the Intervenors.

10

**C.**      **Plaintiffs' Challenges to the Act**

There are two Plaintiffs.  The first is Planned Parenthood of Minnesota, North Dakota, South Dakota ("hereinafter "Planned Parenthood"), which operates an abortion facility in Sioux Falls, South Dakota.  The second is Carol E. Ball, M.D., a physician who is the medical director of Plaintiff Planned Parenthood  and who performs abortions at Planned Parenthood's South Dakota facility.

In their original Complaint, Plaintiffs asserted several distinct problems with the Act.  One of the challenges addresses the Act generally (See the First Claim for Relief of the Amended Complaint, Docket entry 24.)  The rest deal with specific provisions of the Act.

Among these are the challenges to the provisions of the Act that provide for the consultation with the pregnancy help centers.  (See the Second, Third, Fourth, Fifth, Sixth and Seventh Claims for Relief of the Amended Complaint.)  These challenges include the following assertions:

1.      That this requirement violates the Freedom of Speech rights of their patients by compelling them to discuss their decisions with a pregnancy help center. (See the Second Claim for Relief.)  In support of this claim, they state several times throughout the Amended Complaint that the pregnancy help centers that will qualify are "opposed to her [the woman's] decision."  (See Paragraphs 1, 15 and 63 of the Amended Complaint.)  They also question whether the pregnancy help centers will provide "accurate and nonmisleading information."  (See Paragraph 26 of the Amended Complaint.)

2.     That this requirement will violate the right of their patients to protect the confidentiality of their personal information.  (See the Third Claim for Relief.)  In support of this claim, they suggest at least twice that pregnancy help centers would be free to disclose personal private and medical information about the women who consult with them.  (See Paragraphs 15 and 35 of the Amended Complaint.)

3.     That this requirement will violate the woman's rights to choose an abortion without undue burdens.  (See the Fourth Claim for Relief.)

4.     That this requirement will violate the Establishment Clause of the First Amendment, by advancing religion and fostering excessive entanglement with religion.  (See the Fifth Claim for Relief.)  In support of this claim, they state that "many PHCs [pregnancy help centers] in South Dakota are religiously affiliated" and that "the Act furthers PHCs' non-secular agendas and entangles the State with religion by inserting such religious entities in the middle of the state-regulated physician-patient relationship." (See Paragraphs 41 of the Amended Complaint).

5.     That the requirement violates both the Plaintiffs' and patients' rights to equal protection, by imposing special requirements on the performance of abortion not applicable to other procedures.  (See Sixth Claim for Relief.)

6.     That the requirement violates Plaintiffs' own right to Freedom of Speech, by engaging in viewpoint discrimination.  (See Seventh Claim for Relief.)  Again, it must be noted that in support of this claim, Plaintiffs state that the

12

pregnancy help centers are "opposed to the woman's decision," and question whether they will provide "truthful and nonmisleading information."

Likewise, Plaintiffs present separate challenges to what they describe as the "Coercion Mandate."  (See the Twelfth, Thirteenth and Fourteenth Claims for Relief.)  While this primarily focuses on the statutory definition of "coercion" (see the Twelfth and Thirteenth Claims for Relief), one of the challenges does assert that the requirement to assess for coercion does violate equal protection (see the Fourteenth Claim for Relief).

**D.**    **The Intervenors – Who Are They?  What Do They Do?**

Intervenors include two pregnancy help centers that have facilities in South Dakota, namely Alpha Center, which operates in Sioux Falls (the same city where Plaintiffs function), and Care Net, which operates in Rapid City.  Each has already applied to the South Dakota Department of Health to be listed on the registry of pregnancy help centers permitted to provide the consultation services that will be required by the Act, and that application has been accepted and they have been informed by the Department they will be listed when the registry is published.  *See*, Declarations of Kimberly Martinez and Stacey Wollman.[3]

The pregnancy help centers provide counseling and services to women who are or may be pregnant.  They also provide services to women following pregnancy, and provide counseling for women following abortions.

---

[3]The facts set forth in this recitation of facts are supported by the Declarations filed in support of the Motion to Intervene, submitted by Kimberly Martinez, Leslie Unruh, Dr. Patricia Giebink, M.D., Dr. Glenn Ridder, M.D., Dr. Miriam Grossman, M.D., Stacey Wollman, Abby Johnson, Brittany Weston, Vixie Miller and Alexandra Szameit.

Most times a client come into either of these centers seeking to determine whether or not she is in fact pregnant, although occasionally the client comes in already knowing she is pregnant. Either way, once the fact of pregnancy is established, the center arranges for the pregnant mother to discuss her options or plans with a client advocate. This can include discussing keeping and raising the child, adoption and abortion, depending on the thoughts and needs of the woman. In this way, the mother can make the best informed decision possible.

In providing these services, each of the centers focuses on fostering, developing and protecting the relationship between the mother and her unborn child. Indeed, the centers see this relationship – and its protection – as the linchpin of their programs. They assess for coercion to insure that any decision is truly voluntary.

Each year on average, of the women whose pregnancies are confirmed, the percentage that initially indicate that they are leaning toward or seriously considering having an abortion is 50% at Alpha Center, and more than half of the women at Care Net. In these instances, the centers provide counseling in order to help the pregnant mother understand the nature of her options and alternatives.

In counseling women who are currently pregnant, Intervenors focus in particular on assisting women with the social implications that flow from becoming pregnant, which in their experience are typically far more important to the women than the medical implications. For the women, the social implications about which they are commonly concerned include such topics as whether there will be sufficient ways to deal with the financial impacts that will occur due to pregnancy, not just during the term of the pregnancy but also following birth of the child if the woman carries the pregnancy to term, as well as whether there will be emotional support and assistance, which can

14

frequently be a concern even for women in committed relationships, and is especially a concern for women who are not.

The counselors advise the pregnant mother that if she decides to continue with the pregnancy and keep her child, resources are available to help her, both financially and with other support. For instance, they will discuss the fact that the father can be held responsible for child support, that there are child care facilities available to help care for the baby so that she can continue to work, and the like. Both centers also provide some material assistance, helping with housing when necessary, and referring for medical assistance. Both centers also have referral systems so that a woman who needs or wants to discuss her options with a medical doctor can do so.

Most importantly, both pregnancy help centers do assessments for coercion. Because of their skill and caring approach to counseling, they learn from the pregnant women whether they are being subjected to some form of coercion.

After the pregnant mothers receive this counseling, 90 to 95% of those who initially indicated that they were seriously considering an abortion decide to carry their children to full term, and about 95 to 98% of those mothers in turn decide to exercise their rights to keep and raise their children themselves.

Besides counseling women who are or may be pregnant, pregnancy help centers who see women who were previously pregnant, in particular women who terminated the pregnancy and the relationship with their child through an abortion. In these instances, the woman most often comes in because she is experiencing emotional difficulties and so is seeking counseling. Each center has found that there are large numbers of women who experience depression, indeed even have suicidal

thoughts and ideation, sometimes suicidal attempts, following abortion.  Even the women who do not display these sorts of extreme reactions show signs of significant depression.

In these cases, each center again counsels the woman and provides supportive services.  Such services include directing the woman to mental health professionals when appropriate and necessary. As they counsel the women, each center has found that as many as 90% of the women feel that the abortion providers failed to provide them with appropriate and adequate information.

Intervenors have learned from the counseling that they provide these women that a significant number of these women were the subject of some form of coercion, and that this was a contributing factor in why the women now feel the need to seek counseling.  Some estimates are that as many as 60% of the women whom are seen by pregnancy help centers following abortions experienced coercion in connection with the decision about whether to have the abortion.  As a result, Intervenors have developed experience in identifying the sort of factors that can contribute to a decision being coerced.

Intervenors have each established procedures in anticipation of the Act addressing how they will implement the Act.  These procedures will create a new process for the new clients they will be seeing for the consultations required by the Act that is distinct from the processes they follow with their existing clients.  These procedures describe the new clients as "1217 clients."  The procedures will limit what can be discussed during the consultations to the topics set out in the Act, namely information about the resources available to assist the women if they should decide to continue the pregnancy, as well a discussion of the circumstances that would indicate that she is being subjected to coercion in connection with the decision about whether to have an abortion.  The procedures also provide that there will be no discussions of religion or religious beliefs during the consultations,

16

unless the client first raises the topic and then signs a waiver permitting the counselor to discuss it. The procedures also will ensure the confidentiality of all information about prospective clients seeking consultations under the Act.  Lastly, the procedures provide that if the client desires to seek additional services from the center beyond those provided to 1217 clients, then she must set up a separate appointment in order to be seen as a regular client rather than a 1217 client.  Copies of their new procedures for 1217 clients are attached to the Declarations of Kimberly Martinez and Stacey Wollman.

### E.      Intervenors' Interests in the Litigation

The Intervenors have several interests that are implicated by this litigation.  If the Plaintiffs are successful in their challenges to the Act, these interests will be negatively impacted, whereas if the Plaintiffs fail the negative impact will not occur, and indeed there will be a positive benefit to the two pregnancy help centers.

First and foremost among these interests is the Intervenors' interest in the number of clients they see.  If the Plaintiffs' challenge fails, there will clearly be an increase in the number of clients that Intervenors will see, because in addition to the clients they already serve, they will also be seeing the new clients for the consultations required by the Act, the clients that Intervenors are calling "1217 clients."  Both Alpha Center and Care Net will receive a significant increase in the clients they serve.  If, on the other hand, Plaintiffs' challenge succeeds, this increase will not occur.

Not just will the number of their clients increase directly as a result of the Act, it is also likely that there will be an increase in the number of clients Intervenors have as regular clients due to the Act.  That is because at least some portion of the women that they see as 1217 clients, having learned

about the existence of pregnancy help centers and the services they provide, will choose to continue with them as regular clients.

Thus, if the Act goes into effect Intervenors are likely to have an increase in the number of clients they see.  If, on the other hand, Plaintiffs are successful in challenging the Act, this increase will not occur.[4]  In fact, as set forth in the Declarations filed in support of the Motion to Intervene, because of the likely negative fall-out from Planned Parenthood's successfully challenging the Act and its PHC provisions, Intervenors' current clientele is likely to be reduced.  The PRC's have a great deal at stake.

The Intervenors have other interests that are implicated because of the nature of Plaintiffs' challenges to the Act.  As the discussion of Plaintiffs' challenges above indicates, Plaintiffs have asserted a number of contentions in their Amended Complaint about Intervenors and the other pregnancy help centers that may apply to be registered under the Act.  Thus, in their Amended Complaint, they assert the following:

1.      That Intervenors and the other pregnancy help centers that will be registered under the Act are "opposed to her [the woman's] decision."  (See Paragraphs 1, 15 and 63 of the Amended Complaint.)

---

[4]The likelihood of this increase is more obvious relative to Alpha Center, because Alpha Center operates in Sioux Falls, which is the only location where Plaintiffs provide abortion services. Alpha Center also has a network of physicians in many communities throughout the state, who participate in Alpha's counseling program.  However, it is also likely to occur relative to Care Net, which operates in Rapid City.  Women from the western part of South Dakota who seek out the services of a pregnancy help center are more likely to contact the one closest to them, namely Care Net.  Furthermore, when Alpha Center receives a call from a woman in the western part of the State, they refer the woman to Care Net.

2. That there is a question as to whether Intervenors and the other pregnancy help centers that will be registered under the Act will provide "accurate and nonmisleading information." (See Paragraph 26 of the Amended Complaint.)

3. That Intervenors and the other pregnancy help centers that will be registered under the Act would be free to disclose personal private and medical information about the women who consult with them.  (See Paragraphs 15 and 35 of the Amended Complaint.)

4. That Intervenors and the other pregnancy help centers that will be registered under the Act are religiously affiliated and that "the Act furthers PHCs' non-secular agendas and entangles the State with religion by inserting such religious entities in the middle of the state-regulated physician-patient relationship."  (See Paragraphs 41 of the Amended Complaint.)

Each of these allegations is false, misleading, inflammatory, impertinent, and scandalous as to Intervenors.  Specifically, Intervenors respond to each as follows:

1. With regard to the assertion that Intervenors are "opposed to her [the woman's] decision" (see Paragraphs 1, 15 and 63 of the Amended Complaint), it is absolutely false, and is directly contrary to Intervenors' interests. In general, Intervenors' mission is to serve pregnant women and provide them with assistance; they are in no way opposed to the women or their decisions. Particularly in the context of providing the consultations required by the Act, the function that Intervenors will perform is not in any way opposed to the decision of the woman, but rather is designed and intended to ensure that

19

whatever decision the woman makes is her own free choice, not the decision of some other person, and that it is voluntary, uncoerced and informed as to options.  Plaintiffs' assertions are based on the false premise that women have already made an irrevocable decision to have an abortion before they contact Plaintiffs, where Intervenors know from experience that when women make that contact in many cases they are exploring options and have not made any decision at all.  That Plaintiffs have this premise only serves to demonstrate why they are incapable to making the determinations as to coercion that the Legislature wanted made, and why the Legislature decided that there was need for an assessment by an entity independent of Plaintiffs.

2.     With regard to the assertion that there is a question as to whether Intervenors will provide "accurate and nonmisleading information" (see Paragraph 26 of the Amended Complaint), it is absolutely false, and is directly contrary to Intervenors' interests.   Intervenors always seek to ensure that all the information they provide the women they serve is truthful.  If they are perceived as providing false information, it will destroy their reputations, and they will no longer be able to function.

3.     With regard to the assertion that Intervenors would be free to disclose personal private and medical information about the women who consult with them (see Paragraphs 15 and 35 of the Amended Complaint), it is absolutely false, and is directly contrary to Intervenors' interests.   Furthermore, it ignores the express mandate in Section 6 of the Act that the information

20

obtained by pregnancy help centers during the consultations required by the Act must be treated as confidential and can only be released under the conditions set forth in the Act.  Generally speaking, Intervenors already realize that it is important for them to treat the information they receive from clients as confidential, regardless of whether it is required by law or not. Particularly in the context of providing the consultations required by the Act, Intervenors realize that they are required to maintain the confidentiality of that information by Section 6 of the Act.  In fact, the procedures they have established to implement the providing of services under the Act include provisions designed to ensure that confidentiality.

4.   With regard to the assertion that Intervenors are religiously affiliated and that "the Act furthers PHCs' non-secular agendas and entangles the State with religion by inserting such religious entities in the middle of the state-regulated physician-patient relationship" (see Paragraphs 41 of the Amended Complaint), it is at the very least overbroad and contrary to the interests of Alpha Center.  Furthermore, it ignores the express mandate in Section 6 of the Act that the pregnancy help centers during the consultations required by the Act cannot engage in discussions of religion or religious beliefs with the women unless the women first consent.  Alpha Center is in no way religiously affiliated, and to describe it as such would harm it, at least in the eyes of women who desire secularly based counseling.  On the other hand, Black Hills Crisis Pregnancy Center does identify itself as religiously based, but

even it currently provides services without regard to religion.  Particularly in the context of providing the consultations required by the Act, Intervenors realize that they are required by Section 6 of the Act to avoid any discussions of religion or religious beliefs.  In fact, the procedures they have established to implement the providing of services under the Act include provisions designed to fulfill that requirement.

If the Court were to adopt any of these assertions in its rulings, it would directly impact the Intervenors in several ways.

Among the ways Intervenors would be affected is that their reputations would be severely harmed.  In order to be successful, Intervenors must have a good reputation.  Any one of Plaintiffs' assertions, if accepted, would do damage to the reputations of Intervenors.  If the potential clients believe that Intervenors are opposed to women and their decisions, or presenting false information, or failing to protect the confidentiality of their information, or any of the other things charged by Plaintiffs, it is very doubtful that many of those women will take advantage of Intervenors' services.

Indeed, the damage to their reputations may be so destructive that it would endanger the Intervenors' ability to continue to function.  Even if it does not directly lead to a loss of so many clients as to affect the ability to continue operations, the damage to Intervenors' reputations will affect their ability to engage in the fund-raising necessary to keep their operations going.

Conversely, if the Act's validity is upheld, Intervenors' reputations and mission would be enhanced, because they would not only be providing their regular services but also the consultations required by the Act.  This would reflect positively upon Intervenors, not just in the eyes of potential clients, but in the eyes of potential donors and in the eyes of the community at large.

22

Another way that Intervenors would be affected is that they would be exposed to civil liability from prior clients and donors.  Several of these attacks are contrary to how Intervenors have presented themselves to their clients and donors, and so any adverse determination in this litigation could lead those clients and/or donors to decide they were misled by Intervenors and so sue.

On the other hand, if the Court rejects Plaintiffs' contentions and attacks, then none of these would occur.  Intervenors' interests would remain unharmed.

# ARGUMENT

## POINT I.

**THE COURT MUST GRANT THE APPLICATION FOR INTERVENTION. THE APPLICANTS HAS RECOGNIZED INTERESTS, WHICH COULD BE ADVERSELY AFFECTED BY THE OUTCOME OF THIS LITIGATION. THOSE INTERESTS ARE SUFFICIENT TO ESTABLISH ARTICLE III STANDING. THE STATE DEFENDANTS CANNOT ADEQUATELY REPRESENT THE INTERESTS OF INTER-VENORS. THEREFORE, THE STANDARDS ESTABLISHED UNDER F.R.C.P. R. 24 (A) HAVE BEEN SATISFIED, AND THE MOTION MUST BE GRANTED.**

The standards that apply to an application for intervention under Rule 24 (a) of the Federal Rules of Civil Procedure are well settled. The Eighth Circuit has stated that a party seeking to intervene as of right must satisfy a tripartite test: (1) the party must have a recognized interest in the subject matter of the litigation, (2) that interest must be one that might be impaired by the disposition of the case, and (3) the interest must not be adequately protected by the existing parties. *Mille Lacs Band of Chippewa Indians v. Minnesota*, 989 F.2d 994, 997 (8th Cir. 1993), citing *Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861, 869 (8th Cir. 1977). In addition, the party's interest must be such that the party will be able to meet the Article III standing requirements. *Mausolf v. Babbitt*, 85 F.3d 1295, 1300-1301 (8th Cir. 1996). Lastly, the application must be made in a timely fashion. *Mille Lacs*, *supra*, 989 F.2d at 998.[5]

---

[5] With regard to the timeliness prong, Intervenors would note that this application is being filed within a month of when the action was commenced. Issue is just being joined in the action. Under the circumstances, there is simply no basis for contending that the application is not timely. Thus, this prong will not be further addressed in this Brief.

24

The Eighth Circuit has directed that Rule 24 must be construed liberally, and that any doubts must be resolved in favor of the proposed intervenors. *Kansas Public Employees Retirement System v. Reamer & Koger Associates, Inc.*, 60 F.3d 1304, 1307 (8th Cir. 1995).  As the Court noted in *Sierra Club v. Robertson*, 960 F.2d 83, 86 (8th Cir.  1992), "this serves the judicial system's interest in resolving all related controversies in a single action."

**A.**   **The interests of Intervenors that can be impacted by this litigation are sufficient to satisfy both the requirements of Rule 24 and the requirements of Article III standing.**

In this case, Intervenors have identified a number of different interests that would be impacted by the litigation.  These include: Intervenors' interest in the number of clients they see; Intervenors' interest in their respective reputations; Intervenors' interest in being able to continue to function; and Intervenors' interest in being free from exposure to civil liability to prior clients and/or donors.  It is of course clear that so long as any one of these interests meets the criteria, then the intervention was proper and should not have been terminated.

It is true that each of these interests will only be impacted if the Court rules in favor of Plaintiffs, and that they will not be affected if the Court rules in other ways.  However, that is not a basis for rejecting an intervention application.  To the contrary, the Eighth Circuit has repeatedly held that in such situations intervention is appropriate, reserving decisions below that had denied intervention.

For instance, in *SEC v. Flight Transportation Corp.*, 699 F.2d 943, 947-948 (8th Cir. 1983), the SEC was seeking disgorgement of funds allegedly obtained through fraudulent securities transactions.  A creditor of defendants moved to intervene to protect its rights relative to the assets

25

of defendants.  The trial court denied intervention, based on a perception that the asserted interest was at this stage was too hypothetical, since it would only be impacted if the court were to rule for the SEC.  The Eighth Circuit reversed.  Rejecting the lower court's analysis, the Court of Appeals wrote, "Although the intervenor cannot rely upon an interest which is wholly remote and speculative, intervention of right may be based upon an interest which is contingent upon the outcome of the litigation." *Id.* at 948.

In support of this conclusion, the Court cited *Planned Parenthood of Minnesota, Inc.*, *supra*, 558 F.2d 861.  In that case, Planned Parenthood was challenging local regulations that would prevent it from constructing, at a site it already owned, a facility where abortions would be performed.  A neighborhood association and individual residents of the neighborhood sought to intervene to ensure that neighborhood and property values would not be aversely affected by the construction of the abortion facility.  Once again, the asserted interests would only be impacted if the court were to rule in favor of Plaintiffs.  Nonetheless, the Eighth Circuit reversed the decision of the court below denying intervention, holding that these were the sort of recognized interests that support intervention.  *Id.* at 869.

Likewise, in *United States v. Union Electric Co.*, 64 F.3d 1152, 1162 (8th Cir. 1995), the Court reiterated that "a person claiming an interest in the litigation does not have to wait until he or she has suffered irreparable harm before the requirements for intervention under Rule 24(a) have been met."  The Court indicated that the primary focus of the inquiry should be whether the interest relates to an issue that is tangential or collateral to the case or whether it is an interest that is directly related to the subject matter of the litigation.  *Id.* at 1161.  Where it is the later, then intervention should be allowed.

26

Similarly, in *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1024-1025 (8th Cir. 2003), *cert. denied sub nom*, *North Dakota v. Ubbelohde*, 451 U.S. 987 (2004), the Court reversed a decision denying intervention, saying, "When we consider the effect that an ultimate ruling for South Dakota might have, we think the proposed intervenors have presented sufficient evidence of a threatened injury to give them standing."

Thus, while in this case any impact on Intervenors' interests is contingent upon how the Court rules, this does not render the interests so remote or speculative that they cannot be considered. Rather, the Court must assume that the ruling on the merits will go in favor of Plaintiffs and against Intervenors, and then determine whether it may have an impact on Intervenors' interests.

In assessing the impact, it is important to keep in mind that it is not necessary that there definitely will be an impact. As the Eighth Circuit emphasized in *Kansas Public Employees Retirement System*, *supra*, the language of Rule 24 looks to whether "disposition of the action **may** as a practical matter impair or impede the applicant's ability to protect that interest." 60 F.3d at 1307 (emphasis added). There is no requirement that the interest **will be** impaired, only that it may be so impaired. *Id.* at 1308.

With these general principles in mind, it is appropriate to briefly review each of the interests advanced by Intervenors.

Looking first at the interest in increasing the number of clients, this is a recognized interest sufficient not only to satisfy the first prong of the intervention test but also the requirements of standing. *Granville House, Inc. v. Department of Health and Human Services*, 715 F.2d 1292, 1297 (8th Cir. 1983) (nonprofit corporation's interest in achieving its primary mission in serving the poor, by action reducing the number of such clients it could serve, was sufficient to establish standing);

27

*see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (nonprofit organization has standing in its own right where defendant's actions impaired its ability to provide counseling and referral services to its clients).  Here, a ruling by the Court in favor of the Act will require any woman contemplating abortion to engage in a consultation with a pregnancy help center listed on the registry maintained by the South Dakota Department of Health.  This registry will include Intervenors, who applied and have been informed they will be listed.  Alpha Center and Care Net are two of the three pregnancy help centers who are registered with the South Dakota Department of Health.  Together, initially they will probably handle 85% to 90% of the pregnant mothers referred under the Act. Thus, it is clear that Intervenors will have an increase in clients.  In contrast, this increase in clients will not occur if the Court rules in favor of Plaintiffs such that the Act does not go into effect.

In the   prior *Planned Parenthood Minnesota, South Dakota, North Dakota v. Rounds* litigation (the action that in this Court was designated  Action Civ. 05-4077-KES), both this Court and the Eighth Circuit held that a version of this interest, which this Court described as the "referral interest," was sufficient to support intervention, as well as sufficient to meet the Article III standing requirement. *Planned Parenthood Minnesota, South Dakota, North Dakota v. Rounds*, 213 Fed.Appx. 508, 510 (8th Cir. 2007) (in reversing order terminating intervention, accepting that Intervenors had established not only the referral interest but also reputational and financial interests); *Planned Parenthood Minnesota, South Dakota, North Dakota v. Rounds*, 2006 WL 2092595, at 5-8 (D.S.D. 2006) (order terminating intervention, finding interests sufficient but terminating on adequacy of representation prong), *rev'd* 213 Fed.Appx. 508 (8th Cir.  2007); *Planned Parenthood Minnesota, South Dakota, North Dakota v. Rounds*, 2005 WL 2338863, at 2 & 3-4 (D.S.D. 2005) (original order granting intervention).  In this case, the referral interest is even more direct and

immediate than it was in that case.  Thus, Intervenors would respectfully submit that these decisions compel a ruling in their favor in this application.

While discussion of the remaining interests may not be necessary in light of those decisions, nonetheless a brief discussion will be presented in the interests of being comprehensive.  The remaining interests all are implicated by the nature of the challenges that Plaintiffs have brought against the Act, and the attacks that are set out in Plaintiffs' pleadings against Intervenors and the other pregnancy help centers that might qualify under the Act.  Thus, if the Court were to adopt any of these attacks in ruling on Plaintiffs' challenges, it would directly impact Intervenors' interests, and be severely damaging to them.

Among the interests that would be impacted by such a determination is the Intervenors' interests in their respective reputations.  It is beyond question that the interest in one's reputation is recognized and protected.  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 22 (1990).  Furthermore, it is beyond question that an assertion that a person is making false and misleading statements would be damaging to that person's reputation.  *Id.* at 21-22.

In *Meese v. Keene*, 481 U.S. 465, 475-476 (1987), the Court concluded that the interest in reputation was sufficient to establish standing.  In that case, the plaintiff was a film exhibitor who was also an attorney and was active in state politics.  He contended that a federal law violated the First Amendment by using the term "political propaganda" to describe various types of media, including certain films that he desired to exhibit.  He contended that if he were to exhibit the films while the law described them as "political propaganda," his personal, political and professional reputation would suffer.  *Id.* at 473.  The Supreme Court held that this was sufficient to establish standing.  The fact that the statute did not prevent him from exhibiting the films did not control.

29

Likewise, the fact that he could have minimized the risks through clarifying statements did not matter.  It was enough that he showed that the alleged violation of the First Amendment would cause him harm to his reputation, and that a decision in his favor could redress the harm.  *Id.* at 475 & 477.

In this case, the harm to the reputations of the pregnancy care centers and their counselors, if it were perceived that they are opposed to the woman and her decisions, or that they might give false and misleading counseling, or that they would fail to protect the confidentiality of the information they obtain about clients or that they act on ideology and an agenda instead of what is best for their clients, is all too palpable.  A ruling against the State would give the public the message that the pregnancy help centers are not competent or trust worthy.

Indeed, the damage to the reputations of the pregnancy care centers would be so significant that it would threaten their very ability to continue to operate, since their ability to engage in fund-raising – which is their primary source of income – depends almost entirely upon their reputation for competence, honesty and integrity.  There is no question but that their interest in continuing to function is a recognized interest sufficient to satisfy the requirements of intervention and standing.  *South Dakota Farm Bureau, Inc., v. Hazeltine*, 340 F.3d 583, 592 (8th Cir. 2003), *cert. denied sub nom*, *Dakota Rural Action v. South Dakota Farm Bureau, Inc.*, 541 U.S. 1037 (2004) (loss of business satisfies injury-in-fact requirement of standing).

The next interest is their interest in being free from exposure to civil liability to prior clients and/or donors.  Former clients and/or donors, being told that they had been provided false and misleading information, and having made major decisions based on that information, could well be inclined to sue.  In this regard, it is important to keep in mind that Alpha Center conducts its current regular program of counseling for approximately 500 to 600 pregnant mothers a year, about 350 to

400 of whom were indicating that they were seriously considering an abortion before the counseling, while Care Net conducts its program of regular counseling for approximately 110 pregnant mothers a year, about 60 of whom were indicating that they were leaning towards or seriously considering having an abortion before the counseling.  Thus, there is a substantial base of persons who could sue.

Intervenors anticipate that Plaintiffs' primary response to this interest will be to assert that it was speculative to contend that any holding in this litigation would have preclusive effect in such a suit.  However, the case law in South Dakota would suggest that such a result is entirely possible. *See*, *e.g.*, *St. Cloud v. Leaply*, 521 N.W.2d 118, 122 (S.D. Sup. Ct. 1994).  Such a potential is especially strong here, where the issues arise from federal constitutional law.  More to the point, the question is not whether it is definite that there will be such a preclusive effect, but rather whether it may apply.  *Kansas Public Employees Retirement System*, *supra*, 60 F.3d at 1308 (so holding in a case where the basis for seeking intervention was the potential preclusive effect of the court's decision).  Thus, this interest meets the criteria as well.

In sum, each of the interests that Intervenors have identified is sufficient to satisfy the requirements of both Rule 24 and Article III standing.  Therefore, those prongs of the test for intervention are met.

**B.**      **The State Defendants cannot adequately represent the interests of Intervenors that are implicated by the litigation.**

With these interests in mind, it is now appropriate to consider the "adequacy of representation" prong of the test for intervention.  As the Supreme Court has stated, "the requirement of the Rule is satisfied if the applicant shows that the representation of his interest 'may be' inadequate;

31

and the burden of making that showing should be treated as **minimal**." *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n. 10 (1972). That case is instructive in how this issue is approached. In the case, the Secretary of Labor brought an action against a union to set aside an election of officers. One of the union members who originally brought the issues to the attention of the Secretary moved to intervene. The Court reversed a ruling denying intervention. With regard to the adequate representation issue, the Court noted that the Secretary was obligated to protect two interests. *Id.* at 538-539. Firstly, the Secretary in effect serves as the member's lawyer for purposes of enforcing the member's rights against the union. Secondly, the Secretary had an obligation to protect the public interest in free and democratic union elections that "transcends the narrower interests of the union member." *Id.* at 529. The Court observed that "Both functions are important, and they may not always dictate precisely the same approach to the conduct of the litigation." *Id.* As a result, the Court concluded that the union member was not adequately represented by the Secretary, even though the operative law in effect made the Secretary the member's lawyer. Thus intervention was allowed.

More recent cases from the Eighth Circuit have stated that "where the state is a party to a suit involving a matter of sovereign interest, the state is presumed to represent the interests of all its citizens." *Union Electric Co.*, *supra*, 64 F3d at 1168; *see also Mille Lacs Band*, *supra*, 989 F.2d at 1000. This is because under the *parens patriae* concept a state that is a party to a suit involving a matter of sovereign interest is presumed to represent the interests of all its citizens. *Id.* However, this presumption is by no means a strong one. As the Court said in *Union Electric Co.*, "even where such a presumption of adequate representation arises on this basis, however, it may be rebutted by a showing that the applicant's interest cannot be subsumed within the shared interest of the citizens

of the state." 64 F.3d at 1169.  "The court must compare the interests of proposed intervenors with the interests of current parties." *Id.* Where those interests are disparate, even though directed at a common legal goal, ... intervention is appropriate." *Kansas Public Employees Retirement System*, *supra*, 60 F.3d at 1308-1309.

In any number of cases, including *Union Electric Co.* and *Mille Lacs Band*, the Court concluded that there was enough of a difference between the interests that the state represents in the exercise of its *parens patriae* powers and those presented by the proposed intervenors to justify the intervention.  Much the same is true here.

While *Union Electric Co.* is distinguishable on the facts, *Mille Lacs Band* is not.  In that case, an Indian tribe filed an action seeking declaratory and injunctive relief in order to allow them to exercise various rights on land now owned by the government and/or private citizens that they contended were protected under a treaty.  A number of persons sought to intervene, including various counties and private citizens/entities.  In some cases, the land they owned was subject to the claims of the Indians.  But they also contended that even if the Indians were not given the right to enter private land, nonetheless allowing them to fish and hunt on public lands would deplete the fish and game stocks and lower the values of their properties.  The Indians opposed these applications, in part contending that the State adequately represented these interests.  The Court of Appeals rejected this contention.  989 F.2d at 1000-1001.  It noted that they were seeking to protect individual interests that were not shared by the general citizenry of the state.  *Id.* at 1001.  It said that even though the proposed answers of the intervenors were almost identical to the answer filed by the state, "there is no assurance that the state will continue to support all the positions taken in its initial pleading." *Id.*

33

Thus, the Court held that the adequate representation test was not established, and that the intervention should have been allowed.

Similarly, in *Sierra Club v. Robertson*, *supra*, the issue was adequate representation. In that case, various individuals and environmental organizations filed suit against the federal Forest Service relative to the forest management practices it was proposing to follow in a national forest located in Arkansas. The State of Arkansas sought to intervene, in order to protect a number of interests. These included its interest in the fish and wildlife in the area, which could be impacted by the proposed practices, as well as its interests in encouraging recreation and tourism and other interests. The district court denied the application on the ground that the plaintiffs adequately represented the State's interests. The Court of Appeals reversed. It held that there was a sufficient diversity of interests between the plaintiffs and the state to conclude that the intervention should be allowed. 960 F.2d at 83. In support of this conclusion, it cited to *Planned Parenthood of Minnesota*, *supra*, where the Court had reached a similar conclusion and held that the interests of the local landowners in their property values was sufficiently different from the interests of the local government to justify intervention in a suit by Planned Parenthood attacking an ordinance that prevented it from building on a property that it owned in the area. 558 F.2d at 870.

In this case, the interests of the Intervenors in increasing the number of clients they see, in their reputation, in their ability to serve their clients, in their ability to continue to operate, and in avoiding civil liability to former clients and/or donors, are all different from the interests that the State was seeking to protect when it adopted the legislation at issue in the litigation. No one would suggest that the Legislature was looking to protect pregnancy care centers in adopting this legislation, and in particular the provisions that are at the core of the Plaintiffs' challenge.

34

As *Union Electric Co.* and the other cases have said, the proper approach is to compare the interests of the intervenors with the interests of the current parties.  Doing so shows clearly that the interests of the Intervenors are in no way similar to those of the State Defendants.  Looking at each of the interests of Intervenors in turn, the question becomes:

1.  Did the State adopt the Act for the purpose of increasing the number of clients that Intervenors would see?

2.  Did the State adopt the Act for the purpose of protecting the reputations of Intervenors?

3.  Did the State adopt the Act for the purpose of protecting Intervenors' ability to continue to function?

4.  Did the State adopt the Act for the purpose of protecting Intervenors from liability to former clients and/or donors?

In each case, the answer is obvious: of course not.

The State's interests in adopting the Act were set out at length in the findings in the first section of the Act.  These show that the primary reason the State adopted the Act was to protect the interests of pregnant mothers contemplating abortion, by attempting to ensure that they would be free to make their own choices about whether to have abortions rather than being coerced, and by attempting to ensure that whatever decisions they make are more fully informed.  Indeed, the Act might be called the Woman's Right to Free Choice Act.

While the procedures that the State established through the Act do have the effect of increasing the number of clients that pregnancy help centers will see, that was not the purpose of the Legislature, but simply the means the Legislature chose to use in order to achieve its purposes – the

protection of pregnant women.  Thus, the focus of the State Defendants in this litigation will not be to ensure that Intervenors can in fact have the increase in clients that they expect, but instead to ensure that the litigation outcome does as much as possible to protect the women – and if that means, for instance, conceding the validity of the requirement that those women be sent to pregnancy help centers for consultations, if the judgment were made that it was the best way to protect the rest of the provisions, that would hardly be shocking.  That such a scenario is even conceivable establishes that the State Defendants will not adequately represent the interests of Intervenors.

Beyond that, it is clear that the State Defendants have absolutely no interest in the other interests that have been advanced by Intervenors – the interests in reputation, in being able to continue to operate, in avoiding civil liability to former clients and/or donors.  These are all interests that are unique to Intervenors and which the State Defendants will have no role in protecting.

Thus, it is clear that there is a sufficient divergence between the interests of the State Defendants and the interests of the Intervenors to support intervention.

Intervenors anticipate that Plaintiffs' primary response will be to focus on whether the litigation goals of the State Defendants and Intervenors will be the same.  Thus, it is anticipated that Plaintiffs will focus on the fact that both the State Defendants and the Intervenors were seeking enforcement of the Act.  In doing so, the Court Below disregarded the direction of the Eighth Circuit in *Kansas Public Employees Retirement System*, *supra*, that "common legal goals" do not matter, but disparity of interests does.  60 F.3d at 1308-1309.

Plaintiffs will no doubt contend that their position is supported by *Curry v. Regents of the University of Minnesota*, 167 F.3d 430 (8th Cir. 1999).  That case, however, is nothing like this case. In that case, the primary interest that the prospective intervenors identified was an interest that was

not sufficient to support standing.  *Id.* at 422 (the potential harm to the intervenors was "not a legally cognizable injury in fact").  Moreover, the Court went on to observe that this interest did "not rise to the level of a legally protectable interest necessary for mandatory intervention."  *Id.*  Thus, when it came to consider the "adequacy of representation" prong, all that was left was the fact that the prospective intervenors shared the same goal as the Defendants, upholding the University's regulations.

The *Curry* Court's approach to the "adequacy of representation" prong was dictated by these earlier holdings relative to standing and the first prong of the intervention test.  Once their asserted interests were held insufficient, all that was left was their naked litigation goal.

To the extent that Plaintiffs read *Curry* more broadly as encouraging the trial courts to look at the litigation goals rather than the legitimate interests, this conflicts with the earlier precedents of the Eighth Circuit, such as *Mille Lacs Band* and *Sierra Club v. Robertson* and *Planned Parenthood of Minnesota*, that were discussed above.  In each of those cases, the intervenors shared a litigation goal with one of the existing parties.  But in each, their interests were different than the interests of that party.  And so in each the Eighth Circuit allowed the intervention.  There is nothing to suggest that the panel in *Curry* intended to draw into question those earlier precedents, even if it could.

Here, in contrast to the situation in *Curry*, Intervenors have identified a number of interests, each of which is sufficient to satisfy the requirements of standing and the first two prongs of the intervention test.  The litigation goal is not naked, as in *Curry*, but instead is supported by all those interests.  Thus, it is those interests that should have been considered, not the litigation goal.

37

In sum, the State Defendants do not have any interest in adequately representing the interests that Intervenors have identified as being impacted by this litigation.  Therefore, the application for intervention must be granted.

# **CONCLUSION**

For the reasons set forth above, the Motion for Intervention must be granted.

DATED: July 1, 2011

BANTZ, GOSCH & CREMER, L.L.C.

*/S Rory King*

By: _____

Rory King, Esq.
305 Sixth Avenue S.E.
P.O. Box 970
Aberdeen, South Dakota 57402
Phone: (605) 225-2232
Fax: (605) 225-2497
E-mail: RKing@BantzLaw.com

THE CASSIDY LAW FIRM
Harold J.  Cassidy, Esq.
Robert W.  Ruggieri, Esq.
750 Broad Street
Suite 3
Shrewsbury, NJ 07702
Telephone: (732) 747-3999
Fax: (732) 747-3944
E-mail: HJC.Cassidy@Verizon.net

ATTORNEYS FOR APPLICANTS FOR INTERVENTION

39

# <u>CERTIFICATE OF COMPLIANCE</u>

1.      In accordance with D.S.D. Civ.  LR 7.1 (B) (1), I hereby certify that Intervenors' Brief on this motion, excluding the Cover page, the Table of Contents and Table of Authorities, contains 10,578 words, according to the word count provided by WordPerfect.


                    *s/ Harold J.  Cassidy*
                    _____
                    Harold J. Cassidy, Esq.