1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF SOUTH DAKOTA

3                        SOUTHERN DIVISION

4
   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
5                                   Case No. Civ. 11-4071

6  PLANNED PARENTHOOD MINNESOTA,
   NORTH DAKOTA, SOUTH DAKOTA,
7  and CAROL E. BALL, M.D.,

8
                            Plaintiffs,
9
            -vs-
10

11 DENNIS DAUGAARD, Governor,
   MARTY JACKLEY, Attorney General,
12 DOREEN HOLLINGSWORTH, Secretary of
   Health, Department of Health, and
13 MARGARET HANSEN, Executive Director,
   Board of Medical and Osteopathic Examiners,
14 in their official capacities,

15
                            Defendants.
16

17

18                                  U.S. District Courthouse
                                    Sioux Falls, SD
19                                  June 27, 2011
                                    1:30 o'clock p.m.
20 *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

21
                         MOTION HEARING
22

23 *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

24 BEFORE:   The Honorable Karen E. Schreier
              Chief U.S. District Court Judge
25

```
 1   APPEARANCES:

 2   Ms. Mimi Y.C. Liu
     Planned Parenthood Federation of America
 3   1110 Vermont Avenue N.W.   Suite 300
     Washington, D.C. 20005
 4
          -and-
 5
     Mr. Stephen D. Bell
 6   Dorsey & Whitney LLP
     1400 Wewatta Street  #400
 7   Denver, CO 80202-5549

 8        -and-

 9   Ms. Brigitte Amiri
     ACLU (New York, NY)
10   125 Broad Street, 18th Floor
     New York, NY 10004
11

12                            for the Plaintiffs

13

14   Mr. John P. Guhin
     Ms. Patricia J. DeVaney
15   Attorney General's Office of South Dakota
     1302 E. Highway 14  Suite 1
16   Pierre, SD 57501-8501

17
                              for the Defendants
18

19

20

21

22

23

24

25
```

1          THE COURT:  This is the time scheduled for a

2   hearing on the Motion for a Preliminary Injunction or a TRO

3   in the matter entitled Planned Parenthood vs. Dennis

4   Daugaard, et al.

5       Would counsel please note their appearances for the

6   record?

7          MS. LIU:  Mimi Liu for the Plaintiffs,

8   Your Honor.

9          MR. BELL:  Stephen Bell, Dorsey & Whitney, LLP,

10  for the Plaintiffs.

11         MS. AMIRI:  Brigitte Amiri, ACLU, for the

12  Plaintiffs.

13         MR. GUHIN:  John Guhin for the State Defendants.

14         MS. DeVANEY:  Patty DeVaney for the State

15  Defendants.

16         THE COURT:  Counsel, do either of you plan on

17  presenting any evidence today or just argument?

18         MS. LIU:  Just argument, Your Honor.

19         MR. GUHIN:  Just argument.

20         THE COURT:  Okay.  Then the Plaintiffs are the

21  moving party.  You may proceed.

22         MS. LIU:  Good afternoon, Your Honor.  May it

23  please the Court.  My name is Mimi Liu, and I represent the

24  Plaintiffs Planned Parenthood and Dr. Carol Ball.

25      Plaintiffs have asked the Court to issue a preliminary

1    injunction to prevent H.B. 1217 from taking effect on

2    Friday, so that the status quo will remain in place, and

3    Plaintiffs and our patients will not suffer irreparable

4    harm while this case is pending.  Plaintiffs have

5    demonstrated that we are likely to prevail on the merits of

6    our claims, and the State has not refuted this showing.

7         Under the pretext of ensuring voluntary, uncoerced,

8    and informed consent to abortion, the Act both has the

9    purpose and effect of restricting women's access to

10   abortion by imposing multiple extreme requirements, none of

11   which are required by any other state in this country, in a

12   state where women are already severely hampered in their

13   ability to exercise their constitutional right to choose to

14   terminate their pregnancies.

15        To briefly summarize, Your Honor, the Act imposes the

16   longest and most extreme mandatory delay in the country

17   requiring that each patient make two trips to the clinic;

18   an unprecedented assessment for so-called coercion, as that

19   term is broadly and vaguely defined in the Act; an

20   unprecedented third trip to a so-called pregnancy help

21   center that by statutory definition is not required to be

22   regulated, licensed, or subject to any standards or

23   oversight or qualifications whatsoever, other than that it

24   is required to be opposed to abortion; an unprecedented

25   requirement that every woman disclose her most intimate

```
1    personal and medical information to that pregnancy help

2    center, and be subjected to further assessment for

3    so-called coercion; and an assessment for so-called risk

4    factors and complications associated with abortion that is

5    a drastic departure from accepted medical practice and

6    imposes impossible or nearly impossible requirements on

7    physicians and requires physicians to give false and

8    misleading information to their patients.

9         The Act, as a whole, is unconstitutional, because it

10   was passed with the improper purpose of restricting access

11   to abortion.  Each of its requirements is also

12   independently unconstitutional.

13        I will begin by addressing improper purpose,

14   Your Honor, and then move on to the additional

15   constitutional problems with each of the requirements.

16             THE COURT:  Let me ask one question first.  You

17   laid out basically four different areas.  Do those -- are

18   any of those restrictions part of any states' laws anywhere

19   else in the United States?

20             MS. LIU:  No, Your Honor.

21             THE COURT:  All four of them are unique to South

22   Dakota?

23             MS. LIU:  That's correct.

24             THE COURT:  All right.

25             MS. LIU:  The Act has an improper purpose.  The
```

1    State does not deny the context in which this Act arises;

2    namely, it is the latest in a series of efforts by the

3    Legislature, the sponsors, and the proponents to ban and

4    severely curtail access to abortion in this state.

5         The State also does not deny that the requirements

6    imposed by this Act are extreme, in many cases wholly

7    unprecedented, and would be the only such requirements of

8    their kind, as I just mentioned, Your Honor, ever imposed

9    by any state.

10        The Act is targeting Planned Parenthood, the only

11   abortion provider in the state, and the State does not

12   seriously deny that numerous false statements were made by

13   the Act's sponsors, among others, about Planned Parenthood

14   and its practices to secure passage of the Act.  These

15   false statements, as our papers show, Your Honor, were

16   significant.  Indeed, they were the reasons cited for why

17   the requirements imposed by the Act are necessary.

18        I'm not aware, Your Honor, of any case with this

19   background and history, not Mazurek, not Karlin, not even

20   Atchison where they found an improper purpose.  All this

21   demonstrates is that the legislators' alleged purpose of

22   ensuring informed consent is a sham, and Courts have made

23   clear that we are not to accept the Government's proffered

24   purpose if it is a sham.

25             THE COURT:  Since Atchison, has another abortion

```
 1   statute been struck down based on improper purpose?

 2           MS. LIU:  Yes, Your Honor.  In fact, last year in

 3   the Nebraska litigation, which challenged the risk factors

 4   requirement, virtually identical to the risk factors

 5   requirement here, the District Judge in Nebraska struck

 6   that provision down on the basis of both improper purpose

 7   and having the effect of imposing undue burden on women

 8   seeking abortion.

 9           THE COURT:  Atchison would be the last Supreme

10   Court case that relied on that?

11           MS. LIU:  Atchison, Your Honor, is an Eighth

12   Circuit decision.  As far as I'm aware, yes, it is the last

13   Eighth Circuit decision.

14           THE COURT:  I meant Eighth Circuit.  Thank you.

15           MS. LIU:  I would just like to point out,

16   Your Honor, also, that the State's own efforts to defend

17   the law further support improper purpose.

18     With respect to the three-day mandatory delay, the

19   State says patients need more time because of all the

20   important information that Plaintiffs must give the patient

21   about the fetus, about the risks of the abortion, about the

22   risks of the alternative, and about the assistance and

23   support that can help them through their pregnancy.  I

24   quote the State, "It is clear that the amount of

25   information extended to women is substantial, more
```

1    substantial, in fact, than in many cases involving medical

2    procedures."

3        Then, Your Honor, with respect to the pregnancy help

4    center mandate, the State defends it on precisely the

5    opposite grounds.  They say that women need to go to

6    pregnancy help centers precisely because Plaintiffs only

7    provide, and I quote, "the bare minimum of information."

8        These conflicting statements, Your Honor, are simply

9    further proof that this is all about piling on more and

10   more restrictions to a woman's right to exercise -- to a

11   woman's ability to exercise their constitutional right to

12   terminate their pregnancy, and that this is not about

13   furthering any proper purpose.

14       I would like to move now, Your Honor, to the pregnancy

15   help center mandate.  First, the pregnancy help center

16   mandate violates the First Amendment right against

17   compelled speech.  As the Supreme Court stated long ago in

18   Wooley v. Maynard, the First Amendment protects both the

19   right to speak and the right to refrain from speaking.  The

20   pregnancy help center mandate requires women to speak about

21   their pregnancy, their decision to have an abortion, and

22   the circumstances surrounding that decision, or information

23   that the Supreme Court in Casey found is one of the most

24   intimate and personal choices a person may make.  This

25   speech involves both fact and belief, and both are

```
 1   protected in this context by the First Amendment.

 2        The State, Your Honor, doesn't seriously dispute that

 3   if this mandate is regulating speech, it would violate the

 4   First Amendment.  Instead, the crux of their argument is

 5   that this is not about speech.  This is about regulating

 6   conduct, namely, abortion.

 7        That is wrong.  The pregnancy help center mandate

 8   clearly requires and regulates speech.  One of the two

 9   so-called parameters of the mandate is that women must have

10   a consultation and shall have a private interview to

11   discuss her circumstances that may subject her decision to

12   coercion.  This discussion must be sufficient to convince

13   the pregnancy help center that the woman has made her

14   decision free from coercion.  Thus, the requirement and

15   regulation of speech appears unmistakably on the face of

16   the statute.

17        And then this discussion is necessary, the State

18   argues, because the 20 minutes to an hour that Plaintiffs

19   spend discussing with the patient her decision is

20   insufficient.  There can be no real disagreement that

21   speech compulsion is core to the pregnancy help center

22   mandate.

23             THE COURT:  The State argues that the woman

24   doesn't really need to consult when she's there.  She can

25   just go give her name and the name of her abortion
```

1    provider.  If that's all she's providing, does that really

2    rise to the level of speech?

3            MS. LIU:  Your Honor, that clearly flies in the

4    face of the plain language of the statute.  The statute

5    requires that prior to the day of the scheduled abortion,

6    the pregnant woman must, and I'm quoting from the statute,

7    "must have a consultation at a pregnancy help center and

8    shall have a private interview to discuss her circumstances

9    that may subject her decision to coercion."

10       So if the woman does not speak about her decision to

11   have the abortion and the circumstances surrounding her

12   decision to have the abortion, I submit on the face of the

13   statute that she cannot certify to the physician that she

14   has engaged in that consultation and that private interview

15   to discuss her circumstances.

16       The PHC mandate, Your Honor, also violates the

17   constitutional right to informational privacy.  I think the

18   Eighth Circuit has made abundantly clear that the

19   constitutional right to informational privacy protects the

20   woman's decision to terminate her pregnancy, and the State

21   does not take serious issue with this.  Instead, what the

22   State argues is that the confidentiality of patients'

23   information will be protected by the pregnancy help

24   centers.

25       This wholly misses the mark, Your Honor.  A woman's

```
 1    informational privacy right is first violated by the fact
 2    of having to disclose their personal information to the
 3    pregnancy help centers.  No Court has ever sanctioned that
 4    every patient turn her private abortion information over to
 5    members of the public, and here we are not just talking
 6    about any members of the public.  We are talking about
 7    anti-abortion so-called counselors that the Supreme Court
 8    in Hill vs. Colorado said women seeking abortion have a
 9    privacy interest in avoiding.
10         Even if the State, Your Honor, could prove there's
11    some need for patients to disclose their most intimate,
12    sensitive, personal, and medical information to these
13    hostile members of the public, no need could outweigh the
14    utter lack of safeguards in the statute to protect this
15    information from being further disclosed to additional
16    members of the public.
17              THE COURT:  But doesn't the statute preclude the
18    center from disclosing any of that information?
19              MS. LIU:  The statute, Your Honor, yes, it does
20    include one line that says that the pregnancy help center
21    cannot release the information unless in accordance with
22    Federal, state, or local law.  Even if that provision were
23    clear, Your Honor, the State concedes there are no
24    penalties for violating this provision, and the Act imposes
25    no duties or liabilities on the pregnancy help centers if
```

1    they disregard this provision.

2        This is unlike the statutes, Your Honor, at issue in

3    Whalen and Tucson where Courts have considered the right to

4    informational privacy.  In both of those statutes there

5    were more safeguards than there are here.  In Whalen, where

6    they upheld the law, Your Honor, the Court pointed to the

7    fact that there were criminal penalties for violation, and

8    in Tucson, Your Honor, the lack -- not even the lack, but

9    the fact that the criminal and civil penalties for further

10   disclosure in the statute were unclear led to the Court

11   striking down that law on informational privacy grounds.

12       In those cases, Your Honor, we are talking about the

13   Government, the information going to the Government.  In

14   Tucson the Court said the safeguards were not sufficient.

15       Here we are talking about the information going

16   directly to a member of the public, and a member or members

17   of the public that the Supreme Court in Hill has said

18   patients seeking abortion have a privacy interest in not

19   interacting with.

20       In this context, Your Honor, I submit there needs to

21   be even further safeguards than there were when the

22   Government is receiving the information.  Those safeguards

23   are utterly lacking, Your Honor.

24       I think our papers are fairly clear on the undue

25   burden argument with respect to the pregnancy help center

1    mandate, Your Honor.  There are a number of circumstances

2    in which the Supreme Court has made clear that the lack of

3    certain safeguards in the statute are ipso facto or,

4    per se, undue burden.  Those situations are where the

5    statute lacks safeguards for the confidentiality of the

6    patients, where the statute lacks safeguards to ensure that

7    decisions are made without delay, and where there are no

8    safeguards to protect against the disclosure of untruthful

9    and misleading information, Your Honor.

10        In this case, I think as we have made clear in our

11   papers, this statute lacks all three of those safeguards.

12   For that reason is also unconstitutional, because it

13   imposes an undue burden on our patients.

14        I would like to jump forward, Your Honor, to the

15   mandatory delay requirement.  This is the most extreme

16   mandatory delay law in the country, combined with the most

17   extreme facts regarding availability of abortion services

18   and characteristics of women who seek them.

19        The Supreme Court in Casey clearly contemplated that

20   there would be situations in which a mandatory delay law

21   would impose an undue burden.  In Justice Blackmun's

22   concurrence, Your Honor, he said that he was confident that

23   in the future evidence will be produced to show that in a

24   large part of the cases in which these regulations are

25   relevant, they will operate as a substantial obstacle to a

```
 1   woman's choice to undergo an abortion.  I submit, Your

 2   Honor, that this is that future case that Justice Blackmun

 3   was envisioning.

 4       The State argues that Plaintiffs must show that a

 5   mandatory delay prevents a large fraction of women from

 6   obtaining abortion.  As our Reply papers state, Your Honor,

 7   neither the Supreme Court, nor the Eighth Circuit, has ever

 8   endorsed the notion that women must be prevented from

 9   obtaining abortions to prove undue burden.  Indeed, Casey,

10   Atchison, and Dempsey stand for the fact that a law that

11   impedes or prevents abortion or imposes something more than

12   an incidental effect of making abortions more difficult

13   would be an undue burden.

14       But even if, Your Honor, the tests were prevent, the

15   circumstances for our patients in South Dakota are so dire

16   that this Court could find even that standard is met; that

17   it will force women out of state and prevent others

18   altogether from accessing an abortion.

19       In addition, the State argues that large fraction

20   means something more than 50 percent.  Neither the Supreme

21   Court, nor the Eighth Circuit, has ever engaged in that

22   sort of mathematical analysis of large fraction.  I just

23   want to touch briefly, Your Honor, on --

24           THE COURT:  In fact, the Supreme Court doesn't

25   use the word "majority."  Right?  They use "large
```

1    fraction."

2              MS. LIU:  Correct, Your Honor.  They do not use

3    the word "majority."  They use the term "large fraction."

4    And they certainly do not engage in any type of qualitative

5    analysis of large fraction.

6        Indeed, in Miller, the Eighth Circuit case,

7    Your Honor, the Court considered mature and best interest

8    minors who did not qualify for an abuse exception in the

9    context of a parental notice law.  In that case the Court

10   also did not engage in any type of quantification of large

11   fraction, nor did they find that a majority of those minors

12   would face a substantial obstacle if they had to notify one

13   parent of their intent to seek an abortion.

14       Yet after considering the hardships that the

15   one-parent notification would impose in some cases on

16   mature and best-interest minors, the Court concluded that

17   it was an undue burden in a large fraction of cases.

18       The State also ignores facts about the Act's impact in

19   South Dakota.  The State's defense for why the mandatory

20   delay is not an undue burden is centered around the

21   argument that South Dakota is no different than

22   Pennsylvania, the state at issue in Casey, and other states

23   where Courts have upheld two-trip laws.

24       Key to this defense is the State's claim that the Act

25   does not require the physician who performs the abortion to

 1    do the initial consultation.  Notably, the State concedes

 2    that reading the Act to require the same physician would be

 3    hostile to the constitution, and they do not even try to

 4    defend the Act under that reading.

 5        The State's construction, Your Honor, is far from

 6    obvious from the face of the Act, but even if the Court

 7    adopts this construction, it does not save the mandatory

 8    delay.

 9        First of all, the 72-hour waiting period will

10    automatically prevent women who are near the end of their

11    first trimester, and that is not an insignificant number of

12    our patients, Your Honor, from having an abortion in South

13    Dakota, because there are no second-trimester providers in

14    South Dakota.

15        Also, the State has utterly failed to show that

16    South Dakota is like any other state in which a Court has

17    upheld a two-trip requirement.  Indeed, in Karlin, the

18    Seventh Circuit Court case, on which the State heavily

19    relies, the District Court specifically cited to South

20    Dakota as a state in which the facts established in Casey

21    would not necessarily be applicable and would potentially

22    warrant a different outcome.

23        Indeed, they do.  There's only one abortion provider

24    that offers abortions one day per week.  Contrast this with

25    Pennsylvania at the time of Casey, for example, Your Honor,

1   where there were more than 80 providers, including some who

2   were able to offer services on a daily basis and who were

3   located in many parts of that state.

4       Second, there are no second-trimester providers at all

5   in South Dakota, and every other state that considered a

6   mandatory delay law had second-trimester providers.

7       Third, 30 percent of Plaintiffs' patients already

8   travel more than 150 miles each way to get to the

9   Sioux Falls clinic, and of those, half traveled 300 miles

10  or more.  Patients from Rapid City, for example, already

11  drive 350 miles each way to the clinic.  Those coming from

12  Lawrence County, almost 400 miles.  Two trips means

13  traveling 1,500 miles, or almost halfway across the

14  country, to access a supposedly constitutionally protected

15  first-trimester abortion.

16      Distance, Your Honor, matters.  It not only means

17  increased time and cost of the travel itself, but it

18  exacerbates all other burdens; the further a woman has to

19  travel; the longer she needs to be away; the harder and

20  more expensive it is for her to find child care; the harder

21  and more costly it is for her to take time off work; the

22  harder it is for her to leave an abusive partner

23  undetected.

24      The Karlin District Court was right, Your Honor.

25  South Dakota is different.  These burdens are compounded by

1    the fact that our patients are not rich.  More than half

2    live below the Federal poverty level.  That is more than

3    double the national average.  In 2011 this meant their

4    income was $10,800 or less per year, which translates into

5    about $900 per month.  No other case, certainly not Casey,

6    came anywhere close to demonstrating burdens of this

7    magnitude.  Yet even in Casey the Supreme Court said it was

8    a closer question.

9            THE COURT:  But wasn't poverty one of the issues

10   discussed in Casey?

11           MS. LIU:  Actually, Your Honor, I don't know that

12   they engaged in any discussion of poverty, beyond the fact

13   that they said the burdens -- the two-trip waiting period

14   would be particularly burdensome for women with the fewest

15   financial resources.  We don't know specifically what the

16   poverty data was at that time.  I'm not sure that that data

17   was submitted in the District Court.  Certainly I'm not

18   aware of any Court that has considered poverty data that is

19   as bad as the facts are in South Dakota.

20      Lastly, Your Honor, I want to touch briefly on the

21   risk factors mandate.

22           THE COURT:  Going back to the mandatory delay

23   issue.  What is the longest period of delay that has been

24   upheld by a Court?

25           MS. LIU:  The longest period of delay is 24

1  hours, Your Honor.  In a State Court case in Planned

2  Parenthood vs. Sundquist in Tennessee, the Court considered

3  a mandatory delay that would effectively be three days.

4  They struck that law down on the basis of strict scrutiny

5  because they were applying the State Constitution.  But the

6  Court did also engage in an undue burden analysis.  They

7  said on its face that that three-day delay would both have

8  the purpose and the effect of imposing an undue burden.

9         THE COURT:  So the statute said 24 hours, but

10  because of the scheduling of doctors, is that why it was

11  effectively three days?

12         MS. LIU:  No.  The statute, Your Honor, I believe

13  said two days.  But then the woman could not have the

14  abortion procedure until the third day after the waiting

15  period.  So I think based on the calculation on the face of

16  the statute, the Court understood it to impose

17  approximately a 62- to 72-hour waiting period.

18         THE COURT:  And that ended up being a State

19  Supreme Court decision?

20         MS. LIU:  Correct.  That was heard by the State

21  Supreme Court.  It was considered to violate both the State

22  Constitution and to have both the purpose and effect of

23  imposing a substantial obstacle under the analysis in

24  Casey, Your Honor.

25         THE COURT:  So a 24-hour waiting period is the

1    longest waiting period that's been upheld by a Court?

2           MS. LIU:  Correct.

3        There are two major constitutional problems with the

4    risk factors mandate.  The first is that it imposes

5    impossible requirements on physicians, and the second is

6    that it requires us to give our patients false and

7    misleading information.  Relying on what it found to be

8    credible testimony of Plaintiffs' experts here, another

9    Federal District Court, evaluating a Nebraska law that in

10   all key respects is the same as the risk factors mandate,

11   concluded that the law suffered from both of these

12   constitutional flaws.

13          THE COURT:  And the State here is arguing the

14   State of Nebraska didn't put on any evidence to dispute the

15   Plaintiffs' expert.

16          MS. LIU:  Your Honor, in that case the State

17   offered a construction of the statute that they felt would

18   alleviate the constitutional problems that we raised, and

19   the District Court very explicitly said in her decision

20   that that was not a plausible reading of the statute, and

21   that, in fact, Plaintiffs were correct and their experts

22   were correct in proving that the statute would impose

23   impossible or nearly impossible requirements on physicians,

24   and also that Plaintiffs' experts demonstrated that false

25   and misleading information would be required under the

1    statute.

2        I would also submit here, it's ironic that the State

3    complains that the State of Nebraska did not put on any

4    evidence when they have submitted virtually no evidence in

5    support of the risk factors mandate, Your Honor.  In fact,

6    what they have submitted is one expert who says that it

7    basically is easy to comply with the statute because "there

8    have been numerous comprehensive reviews published since

9    1973 which would identify most, if not all, the relevant

10   literature."

11       Well, Your Honor, that submission by the State's

12   expert is utterly ridiculous.  If this were true, then the

13   State's expert should easily be able to identify those

14   reviews.  Of course he does not.  In fact, he doesn't even

15   suggest that the dozen or so articles that we cite by name

16   in our papers as being required under the Act are part of

17   any so-called comprehensive reviews.

18       What the State does offer, Your Honor, is a

19   construction of the statute that is wholly unreasonable.

20   They say the statute only requires that the text of the

21   publications be searchable and retrievable by electronic

22   means.

23       It's not even clear, Your Honor, what this exactly

24   means, because the databases required by the statute, that

25   is, PubMed and PsycINFO, they cannot search the text of any

1    publication.  All they can search are certain fields.

2       And there are 20 million publications on PubMed that

3    are searchable by electronic means.  So even if we were to

4    limit the statute to these 20 million publications that

5    Plaintiffs would have to search, a search for the term

6    "abortion" yields 45,000 results.  I think even the State's

7    expert would agree it is impossible, if not nearly

8    impossible, to comb through that many results to find the

9    relevant information required by the Act.

10      That is all I have, Your Honor, unless there are

11   further questions from the Court.

12          THE COURT:  Well, if the risk factors

13   requirements do require a physician to discuss misleading

14   or untruthful information with a patient, what's the proper

15   judicial remedy?  Should the Court just redefine what's

16   meant by risk factors associated with abortion, or should

17   we strike down the provision in its entirety and let the

18   Legislature address the issue?  What remedy should the

19   Court impose?

20          MS. LIU:  Well, as the Judge in Nebraska,

21   Your Honor, I believe the proper remedy is to enjoin the

22   entire risk factors mandate, because it is not the

23   judiciary's role or prerogative to rewrite statutes for the

24   Legislature.  The State's reading is not a reasonable one.

25   Their evidence does not suggest -- does not overcome the

```
 1    constitutional flaws pointed out by the Plaintiffs.  It is
 2    not up to this Court to rewrite that statute, as a Nebraska
 3    Judge said, to resolve these constitutional problems.
 4              THE COURT:  If the Court finds the risk factors
 5    requirements are unconstitutional, what impact would that
 6    have on Subsections 1 and 3 of Section 9 of the Act?
 7    That's the part that establishes the presumptions of when
 8    there's a failure to comply with any of the provisions of
 9    this chapter, and it specifically uses this chapter, rather
10    than this Act.
11              MS. LIU:  Your Honor, if you strike the risk
12    factors mandate, then I believe that Section 9, Subsections
13    1 and 3, can only be required, the sections of this chapter
14    that have not been deemed to be unconstitutional.
15              THE COURT:  So even though this chapter would
16    refer not only to things that are part of this Act, but the
17    entire chapter?  So you think the entire -- that section
18    would still be invalid in total?
19              MS. LIU:  That Section 9 would be invalid in
20    total, Your Honor?
21              THE COURT:  Subsections 1 and 3 of Section 9.
22              MS. LIU:  Your Honor, I think that Subsections 9,
23    1 and 3, what those contemplate are effectively that the
24    information required in this Act would be given, and to the
25    extent that the risk factors mandate is struck, and if the
```

1    other new obligations imposed by this Act are struck, I do

2    think that Section 9 is not severable in that regard and

3    would also need to be enjoined.

4            THE COURT:  And do you want to address the

5    coercion requirement?

6            MS. LIU:  Yes, Your Honor.  I'll briefly address

7    the coercion requirement.

8        As we've said in our papers, Your Honor, the coercion

9    requirement captures common situations in which women

10   indicate a desire to have a child, but decide together with

11   their husband, partner, or loved one that it's not the

12   right time for us.  And as our experts demonstrated,

13   Your Honor, that is a very common situation when a woman is

14   making a decision to have an abortion.  She will consult

15   with her loved ones, with persons she trusts, and together

16   with those people will make a decision to terminate her

17   pregnancy.

18       The State has not in their construction of the statute

19   suggested whether or not those circumstances would or would

20   not be covered by the Act, and, thus, we submit the Act is

21   unduly broad in that regard.  The requirement that we

22   assess for disparity and age, Your Honor, is also vague,

23   because the State in their papers, they argue that that

24   information or that assessment is relevant, and as our

25   physicians have shown, that is not something that is taken

```
1   into account when assessing for voluntariness or for
2   coercion, not only in the context of abortion, but in the
3   context of any medical procedure.  Thus, Your Honor, the
4   coercion mandate is also unconstitutional.
5          THE COURT:  Do you think the State has a
6   compelling State interest in ensuring that women are not
7   coerced into receiving an abortion?
8          MS. LIU:  Your Honor, I am not here to say
9   whether or not the State has such a compelling interest.  I
10  certainly think in the context of ensuring that women are
11  not coerced, as that term is normally understood by our
12  physicians, that we are already under both law,
13  professional and ethical obligations, required to ensure
14  that women are entering into their decision to have an
15  abortion voluntarily and without coercion.  Some of those
16  laws, Your Honor, including 34-23A-10.1, would impose
17  criminal penalties on our physicians if we did not already
18  engage in that type of assessment.
19      But I submit, as we have said in our papers, and as I
20  said in my discussion of the improper purpose, that is not
21  the State's interest here.  The State's interest is not
22  about ensuring that women are not coerced.  If that were
23  the case, then why do they need to send women, Your Honor,
24  to only organizations that are anti-choice or
25  anti-abortion?  If they think it is necessary for women to
```

1    seek some type of counseling to ensure that they are not

2    coerced, why could they not go to a licensed therapist or

3    counselor who treats women -- who treats women facing

4    unplanned pregnancies or treats women who are contemplating

5    seeking an abortion.

6         In addition, Your Honor, they don't even require that

7    the pregnancy help centers have any training or

8    qualifications, or even know the first thing about

9    assessing for coercion.

10        So given that, Your Honor, I do not think this is

11   about preventing coercion.

12             THE COURT:  So if the doctors are already

13   required, as you stated, to ensure that there's no

14   coercion, are they using the same or a different definition

15   of coercion than exists in the Act that was passed?

16             MS. LIU:  They are using -- Your Honor, my

17   understanding is that under professional and ethical

18   obligations, under both common law and statutory law,

19   physicians are already required to ensure that every

20   woman's decision to enter into the decision to have an

21   abortion and the decision to have any medical procedure is

22   voluntary.  I believe that they are using a definition that

23   is not nearly as broad as the definition in this statute.

24   That does not capture many common situations, as I

25   indicated, where women may have some desire to have a

1    child, but based on discussions with loved ones or with

2    their husband or partner, together make a decision that it

3    is not the right time for them.

4         THE COURT:  So you're saying the definition in

5    the Act here is broader than what physicians would normally

6    use in deciding if someone is voluntarily agreeing to a

7    procedure?

8         MS. LIU:  Correct.  I am not aware of this

9    definition of coercion being used by any physician in any

10   context, abortion or otherwise.

11        THE COURT:  Do you know where this definition

12   came from?

13        MS. LIU:  I do not, Your Honor.  I know that our

14   physicians, as well as our experts, have said that this

15   definition is extremely broad and not one that is used in

16   the counseling context or in the context of seeking a

17   medical procedure, including abortion, and no other state

18   in the country, Your Honor, has ever imposed -- not only

19   impose on the physicians to engage in this type of coercion

20   assessment, but then impose the additional requirement that

21   women go to pregnancy help centers to again be assessed for

22   coercion, as it is defined in the statute.

23        THE COURT:  Thank you.

24        MS. LIU:  Thank you, Your Honor.

25        THE COURT:  Mr. Guhin, are you arguing for the

 1    State?

 2          MR. GUHIN:  Yes, Your Honor.  With the Court's

 3    permission, I will discuss two issues -- three issues; the

 4    standard for the grant of preliminary injunction, the

 5    two-visit, three-day delay; and the risk factor provisions.

 6          Ms. DeVaney will discuss the pregnancy help centers in

 7    the Act and the First Amendment claims.

 8          Your Honor, I would like to start with the standard

 9    for the grant of a preliminary injunction, and certainly

10    one of the most important things that I'm going to say this

11    afternoon or I'd like to stress this afternoon is how

12    difficult it is for a party to sustain its burden of proof

13    to obtain a preliminary injunction after Mazurek and

14    Rounds.

15          Planned Parenthood has to demonstrate that it's likely

16    to succeed on the merits.  It has to carry the burden of

17    persuasion by a clear showing by proof more substantial

18    than in a summary judgment proceeding.  It has to do that

19    in the context of a facial challenge.  Those are disfavored

20    by the Supreme Court.  They're disfavored because they rely

21    on speculative evidence, which is entirely what Planned

22    Parenthood's evidence is.

23          They disrupt the Democratic process.  As we've already

24    seen from the discussion this morning, they don't allow the

25    Courts to determine how a statute actually does work, as

1    opposed to how an opposing party might say it works.

2        The proofs in this case from Planned Parenthood are

3    weak.  They do not succeed.

4        Your Honor, the first substantive question I would

5    like to discuss --

6            THE COURT:  Before you get to that, Planned

7    Parenthood argued that these provisions haven't been

8    adopted by any other states.  Do you agree with that?

9            MR. GUHIN:  Certainly.  Apparently a three-day

10   delay was adopted in Tennessee, and was struck down on

11   State constitutional law grounds in that case.

12       The other part about that case is there was a

13   reference to undue burden, if my recollection of the case

14   is.  There's sort of an add-on paragraph, undue burden,

15   sort of a "by the way" comment, but no substantive analysis

16   there.

17       These are new claims.  I'd like to talk about

18   impermissible purpose and start with what the State's

19   purpose really is, since Planned Parenthood failed to

20   identify that.

21       The announced purpose of the Bill, in its title and

22   what the sponsors said, was to ensure that any consent to

23   an abortion is voluntary and uncoerced.  The Supreme Court

24   has never invalidated provisions of the abortion law on an

25   impermissible purpose point.

1       We look at Casey.  It's clear the Supreme Court simply

2  took the State's announcement of its purpose at face value.

3       Karlin said, and I think very accurately, you are

4  rarely going to succeed without having some explicit

5  indication that the State was acting in furtherance of an

6  improper purpose.  There simply isn't such explicit

7  indication here.

8       South Dakota does go beyond Casey, and for that reason

9  our friends from Planned Parenthood says that this whole

10  statute has to be invalidated.  But it's very clear,

11  another thing pointed out in Karlin is that Casey didn't

12  suggest that the Pennsylvania statute set out the outer

13  limits of permissible abortion regulation.  Clearly it

14  didn't.  It would have been fantastic if it did, if

15  Pennsylvania somehow arrived at the exact limits to where

16  abortion regulation could go.  Casey didn't say it did.  It

17  didn't.

18       We know it didn't, because South Dakota passed a

19  provision requiring a human being disclosure, which goes

20  beyond Casey, and certainly that has been upheld by the

21  en banc Court of Appeals.

22       The law on abortion is developing.  It's developing

23  from Roe, to Casey, to Gonzales.  South Dakota is part of

24  that development.  That's the simple story.  There's

25  nothing wrong with that.  This is simply constitutional

1    development before our very eyes.

2        What South Dakota is doing is perfectly permissible.

3    States are laboratories of democracy.  South Dakota is one

4    of those, and it is active in this area.  There's certainly

5    nothing wrong with that, and Planned Parenthood's

6    implications to the contrary are really a blow at

7    Federalism and a blow at developing constitutionalism.

8        Planned Parenthood complains because South Dakota has

9    a pro-life history.  That's no complaint.  That would have

10   invalidated their 1995 informed consent provisions -- or

11   2005 informed consent provisions.  It really doesn't mean

12   anything.

13       Planned Parenthood says, well, there's some inaccurate

14   statements on the floor.  I'd like to talk a little bit

15   about the statements that they are complaining about.

16       The statements reflect the historical Planned

17   Parenthood practice.  What came to light in the depositions

18   taken in the 2005 litigation was that a woman met with an

19   abortion doctor just minutes, literally minutes before her

20   abortion in a surgery gown, and basically the whole deal

21   was over.  There would be a five-minute conversation with

22   Dr. Ball.  That's all you got.  Then you have the surgery,

23   and that was it.  That was it.

24       The 2005 Act should have changed this, but it did not,

25   because the Act was enjoined in whole.  The injunction was

 1    lifted in 2008.  Planned Parenthood should have changed its

 2    practices in 2008.  What Planned Parenthood is complaining

 3    about, as I understand it, is a pair of statements on the

 4    floor that may have implied that it did not.

 5         Well, it's striking -- Planned Parenthood is coming to

 6    this Court saying, boy, this implication is so clear, by

 7    gosh, that the case ought to be decided on it.  If it was

 8    so clear, why didn't Planned Parenthood correct it?  Why

 9    didn't it correct it with its own testimony to a committee,

10    or why didn't it correct it through one of its supporters

11    on the floor?  When you read the transcript of the

12    proceedings, it clearly had supporters on the floor.

13    Nobody mentioned it.  So part of the confusion is certainly

14    Planned Parenthood's responsibility.

15         Further adding to this sort of confusion is that

16    Planned Parenthood continues to challenge the 2005 Act in

17    Court, even the part we think the Eighth Circuit has

18    validated and this Court validated.

19         Finally on this point, Planned Parenthood still hasn't

20    put any evidence before this Court, not in its original

21    Brief, not in its Reply Brief filed just last Friday after

22    our Brief was filed, that says exactly what its practice

23    is.  We don't know for sure when they meet with -- I can't

24    tell you today for sure when they meet with their patients.

25    They didn't put any evidence on to the contrary.  They've

1   had plenty of opportunity to do so, now three months since

2   the Bill, and they've been able to look at our Brief and

3   see that this matter was in controversy.

4       In any event, Legislators can be presumed to know what

5   the 2005 Act demanded, and it's certainly fanciful to

6   suggest, as Planned Parenthood does, that this 11-page Bill

7   was created somehow so these statements could be made.

8   That's kind of what I'm getting out of it.

9       Planned Parenthood says the delay is not reasonable,

10  the three-day delay, and the two-visit delay is not

11  reasonable and lacks rational basis.  I'll combine what I

12  talked about in Parts I(B) and II(A).  There is affirmative

13  evidence in the record that the delay would be of real

14  assistance.

15      Dr. Calhoun testified that many women are ambivalent

16  about their decision.  They waiver back and forth.  And he

17  said the decision and fluctuation alone would justify the

18  value of a 72-hour reflective period.

19      Dr. Coyle said time is of the essence to healthy

20  decision-making, and the 72-hour period allows her to fully

21  consider all her options and to talk to whoever she needs

22  to talk to.

23      The reason for the delay flows from what the Supreme

24  Court has recognized.  Abortion is a unique act.  It's not

25  like anything else.  The Supreme Court went on to say that

 1  the idea that important decisions will be more involved and

 2  deliberate if they follow some period of reflection doesn't

 3  strike us as unreasonable, particularly when the statute

 4  directs that important information becomes part of the

 5  background of the decision.

 6      That's certainly the case here.  South Dakota's

 7  statute certainly fits that description.  There will be

 8  important information that becomes a part of the background

 9  of her decision.

10      It might be the first time that the woman has ever

11  heard the statement that the abortion is going to terminate

12  the life of a whole separate, unique, living, human being,

13  a member of the species Homo sapiens.  That's something to

14  think about for a day, two days, three days, perhaps even

15  more, but three days is what the statute allows.

16      It's probably the first time she's ever really thought

17  about the medical implications of an abortion.  It's

18  unlikely, and Planned Parenthood doesn't suggest to the

19  contrary, unlikely very many women independently research

20  it.

21      It may be the first time they ever heard about

22  government information, assistance information that they

23  may be able to get prenatal care, child birth care,

24  neonatal care, all that kinds of care from the Federal

25  government.

1     It may be the first time she ever finds out her

2  boyfriend, her hypothetical boyfriend is financially

3  responsible for the child.

4     There is a lot.  If the remainder of the Bill goes

5  into effect, there will be other information.  She'll get a

6  more complete risk factors analysis from the doctor, get a

7  coercion assessment from the doctor, get more assistance

8  information from the PHC, and an opportunity for a coercion

9  assessment from the pregnancy help center.

10    It's substantial information, as Planned Parenthood

11  pointed out, but it's substantial for the reason that this

12  is a unique act, because it involves not only the woman,

13  but the unborn child.  That is a fact that has -- that

14  explains why the Supreme Court's approach to abortion is

15  different than a lot of things, because it's not just the

16  woman.  It's the woman and the unborn child.  This is a

17  larger act than simply a woman's decision.  That

18  combination of factors, we think, justifies the three-day

19  delay.

20    There are other things, other analogs we think are

21  applicable.  The best analog to abortion is termination by

22  a Court Order of a person's right to their child.  You

23  can't even file until five days after the child is born.

24  You get 15 days.  According to the statute, the counselor

25  can wait 15 days before the counseling session.  You have

 1    to have a hearing before the Court.  You look at those

 2    numbers in the statute, and you are easily talking about 30

 3    days in the typical case.

 4         THE COURT:  With regard to termination of

 5    parental rights, there's no deadline upon which you can't

 6    any longer terminate your parental rights.  Is there?

 7         MR. GUHIN:  No, there's not.

 8         THE COURT:  So there's no urgency, whereas with

 9    regard to an abortion in South Dakota, you can only get it

10    during a first very short period of time.

11         MR. GUHIN:  That is the difference.  I would not

12    identify adoption as the exact analog.  There is no exact

13    analog to abortion, because there's no other procedure in

14    which one person is allowed to take the life of another

15    human being.  So it is different.  But there are enough

16    similarities which indicate that the end of the woman's

17    rights occurs only after counseling, only after you take an

18    extended period of time for counseling.  There's no way you

19    can compress that adoption stuff into three days.  That is

20    what the South Dakota Legislature is saying has to happen

21    in the abortion context.

22       So we think the South Dakota Legislature has taken

23    notice of the differences between abortion and adoption and

24    demanded all of this take place within the three-day

25    period, unlike adoption which might take 30 days or might

```
1    take much more, as the Court indicates.

2           THE COURT:  Mr. Guhin, there's a difference

3    between the Plaintiffs and the Defendants on whether the

4    same physician has to provide the initial information and

5    then be the one that performs the abortion later.  The

6    statute uses the word "the physician" throughout rather

7    than "a physician."  So isn't it reasonable for the Court

8    to assume that they mean the same person for each of those

9    two meetings?

10          MR. GUHIN:  We don't take that view.  The reason

11   we don't take that view is there's no explicit command in

12   the statute which demands the same doctor provide those

13   services.  The Legislature knows how to demand things, and

14   certainly does know how to demand things in this particular

15   context.  But it does not demand that here.

16       It does seem to us that when you get to Section 4, it

17   says no doctor can perform the abortion unless such and

18   such happens.  That's sort of a generic kind of deal.  The

19   world of doctors can't perform it, so it doesn't refer back

20   to just the one doctor.  We don't see that affirmative

21   command in the statute.

22       Another point is --

23          THE COURT:  The Legislature also knows how to

24   choose words, and in the first section, Parenthetical No.

25   2, they use "a physician," whereas in the Section 3 where
```

 1    they are adding a new Section 3, they use the word "the

 2    physician."

 3            MR. GUHIN:  Your Honor, in response to that, I

 4    guess I would say if there is some ambiguity as to how the

 5    statute should be read, it obviously should be read to be

 6    unconstitutional.  The constitutional reading is required

 7    by the later cases, Gonzales v. Carhart, and Ayotte.

 8        There's another point here that I think is

 9    significant, and that is in the end Planned Parenthood

10    hasn't shown it's going to make any difference.  Planned

11    Parenthood hasn't quantified what difference it will make

12    because the same doctor isn't available every week.

13        So what has Planned Parenthood said?  One doctor will

14    come -- in Paragraph 17 of Dr. Ball's Affidavit, she says,

15    "One doctor comes to Planned Parenthood three times a

16    month."  Okay.  Let's just take that as a given for the

17    purpose of this discussion, anyway.

18        So if there's a same-doctor requirement, assume that's

19    the case, most of Planned Parenthood's patients will

20    probably be able to see that doctor the next week or at

21    least in two weeks.  We know most abortions in South Dakota

22    occur between six and eight weeks, if you look at Page 82

23    of the vital statistics we put in Exhibit 5 of the DeVaney

24    submission.

25        It doesn't look like there will be a problem for most

1    women.

2        Now, some smaller number come between 11 and 13 weeks.

3    What do we know about those women?  Well, we know that some

4    of those women will have the same doctor.  We can assume, I

5    think we ought to assume that women are going to have some

6    knowledge of the law, and may adjust their practices to

7    accommodate the law.  Everybody else has to.  They do, too.

8            THE COURT:  So you're assuming that the women

9    have an understanding of the law, but they don't realize

10   that the abortion is removing more than a tissue?

11           MR. GUHIN:  Your Honor, what we know is that

12   Planned Parenthood was telling women that much within a few

13   years of right now, that there isn't as good of information

14   as there should be.

15           THE COURT:  But you think they understand the

16   law?

17           MR. GUHIN:  I think that the ability to

18   communicate what the timing requirements are are much

19   easier to communicate than the ability to communicate the

20   nature of the unborn child.  I think it's simply easier to

21   communicate.

22       Women are much more likely to be able to pick that up

23   easily than the really profoundly disturbing idea,

24   disturbing because there are so many abortions, that the

25   unborn is a human being, a member of the species Homo

1   sapiens.  It's a harder concept to deal with.  It's much

2   more important, but much harder to deal with.

3           THE COURT:  Your position is if the Act requires

4   the same physician to do the initial consultation and the

5   abortion procedure, that that has no practical impact?

6           MR. GUHIN:  Our position is that Planned

7   Parenthood has not shown the practical impact, and that the

8   burden is a hundred percent on Planned Parenthood.

9       Planned Parenthood could have said, "Well, here are

10  our statistics for the last three months or six months or

11  five years.  Here is what they show, and, Court and

12  counsel, here they are.  Take them for what they are."

13  Didn't do it.  They had three months to do it.  It's their

14  burden.  They failed.

15      That doesn't fall on the state.  That falls on Planned

16  Parenthood.  It is their burden entirely.  They failed

17  entirely.  They just make a statement, "Well, this is going

18  to hurt."  Not enough.  It certainly is not enough under

19  Mazurek or Rounds.

20      We think the requirement is -- we think the statute is

21  valid, whether or not you read it with or without a

22  same-doctor requirement certainly on the record as it comes

23  before this Court.

24      I would like to turn to the question of undue burden.

25  It is our view that Planned Parenthood has, once again,

1    failed to make a clear showing by evidence greater than

2    summary judgment that an undue burden is created by the

3    two-visit, three-day delay.  Undue burdens are rarely

4    found.  The Supreme Court has only found it in two

5    situations, spousal notification and a very particular kind

6    of partial-birth abortion.

7         The Supreme Court has found an undue burden is not

8    simply a regulation that makes it harder to get an abortion

9    or more expensive to get an abortion, but has the effect of

10   putting a substantial obstacle in the path of the woman's

11   choice.  As our Brief pointed out, and as has been pointed

12   out before, that may not be the most illuminating test.

13        The Eight Circuit, consequently, and other Courts,

14   have gone to what the Supreme Court actually did.  We

15   believe that what the test that emerges is that an undue

16   burden is created when a state regulation has the effect of

17   preventing a large fraction of women affected by the

18   regulation from obtaining abortions.  The operative word

19   there is "prevented."

20        In Casey, according to Casey, the spousal notice

21   regulation was likely to prevent a significant number of

22   women from obtaining abortion.  A significant number of

23   women were likely to be deterred from obtaining an

24   abortion.

25        The Sixth Circuit talked about a woman being

1    effectively barred from obtaining an abortion.  The Seventh

2    Circuit found an undue burden created when the regulation

3    actually prevents women from having abortions.  The Eighth

4    Circuit says the same thing.

5         The Eighth Circuit is very interesting.  The

6    single-parent notification was struck down, single-parent

7    notification without a judicial bypass was struck down.  It

8    was struck down because of the precise analogy to spousal

9    notification.  They couldn't get the abortion after giving

10   it, so they wouldn't give it.  That's what all the

11   statements in there.

12        The Eighth Circuit is saying these young women are not

13   going to be able to get abortions.  They are going to be

14   prevented from getting abortions.  Some minors, an abortion

15   would be in their best interest, but she could not qualify

16   for the abuse exception.  Therefore, they are obviously

17   implying she could not get an abortion.  Many minors who

18   are abused could not use the abuse exception for fear of

19   discovery.  They're prevented from getting an abortion.

20   The whole list of what they talk about there.  All of these

21   young women are prevented from getting an abortion.  That's

22   what Casey is about.

23        How many prevented?  That's the second part of the

24   deal.  You get to the equation, two parts to the question.

25   First, what's the group of women who are affected?

1   Secondly, what's a large fraction of that group?

2        Well, there have been Courts that have dealt with

3   numbers in this.  Twelve percent was not enough for the

4   Seventh Circuit in Taft.  Ten percent was not enough for

5   the Seventh Circuit in A Woman's Choice, which I point out

6   that Planned Parenthood has misread at Note 17 of their

7   Reply Brief.  They read it exactly opposite of what it

8   actually says.  Fourteen percent was not enough in Tucson's

9   Women's Center.  A hundred percent is enough.  That tells

10  us, maybe not too helpfully, that the number is somewhere

11  between 14 and 100 percent.

12       We look at the phrase itself.  It's a rather

13  mathematical phrase, and the Courts say it should be taken

14  at face value.  It's clearly deliberate.  It uses ordinary

15  terms.  Uses the word "large."  The word "large" can be

16  contrasted with the word "medium" and "small."  We take

17  from that that "large" means something over 50 percent.

18            THE COURT:  But it doesn't use the term

19  "majority."  Does it?

20            MR. GUHIN:  It does not.  It does not, Your

21  Honor.  It uses the word "large fraction."

22            THE COURT:  "Majority" would have been clearer if

23  they wanted over 50 percent.

24            MR. GUHIN:  That's true.  There are ways in which

25  the Supreme Court could have made Casey more clear.  I

1    certainly agree with that, Your Honor.

2         But we think the use of the term "large fraction" does

3    convey something -- does convey that that fraction, that

4    the numbers can't be small.  They have to be large.  They

5    can't be small.  That's what the phrase says.

6         So how does the rule work in South Dakota?  The group

7    affected is all women.  That's what Planned Parenthood

8    says.  On Page 46 of its Brief it says, "All of Plaintiffs'

9    patients would have to make two trips to the Sioux Falls

10   Health Center at least 72 hours apart."

11        So the critical question is has Planned Parenthood

12   shown a large fraction of all its women clients would be

13   prevented from obtaining an abortion?  The answer is

14   clearly no.  They don't even allege it.  They didn't allege

15   it in their first Brief of 19,984 words.  They didn't

16   allege it in their Reply Brief.  They don't even allege it

17   this afternoon.

18        What they say is that, well, Casey in the Eighth

19   Circuit, they actually have relied on the concept of large

20   fraction, but actually this phrase is simply obiter dictum.

21   They really want this Court to say something like large

22   fraction, as used in Casey in the Eighth Circuit, has no

23   meaning.  We just think that's impermissible.  The Supreme

24   Court meant something genuine, real, and put a requirement

25   on the lower Courts to employ the large fraction idea.

1        If you look at Page 26 and 27 of their Brief, what

2   they seem to say is what you do is you look at the burdens

3   on women with the fewest financial resources and the other

4   burdens, and then it's inescapable that South Dakota's laws

5   constitute a substantial obstacle.  This is no rule at all.

6   This is I know it when I see it.  Of course that was never

7   a rule in obscenity law.  It's not a rule in abortion law.

8   Of course it can't be a rule at all.  There's nothing there

9   doctrine-wise.

10        The essential point I think I'm trying to make here is

11   the burden is on Planned Parenthood to make the clear

12   showing that it's likely to succeed.  It simply can't do

13   that without setting out an intelligible legal rule.  It

14   has not done that.

15        Another way to look at what Planned Parenthood is

16   saying today, if you accept their what I think is their

17   implicit argument, although I'm still not sure what their

18   argument is, that if you compare Casey and the facts at

19   issue, then some result emerges.  Even in that case, still

20   Planned Parenthood can't show that the burdens in this case

21   are significantly greater than burdens in Casey or in other

22   cases.

23        In fact, one of the amazing things about this case is

24   if you look at the Affidavits and the language Planned

25   Parenthood uses in its own Brief, how eerily similar it is

1    to the District Court Opinion in Casey, the one that the

2    Supreme Court reviewed.  Practically the same thing.

3        The facts in Casey, ostensibly there was a two-trip,

4    24-hour delay statute.  In fact, the District Court found

5    the actual delays for most women would be two days to three

6    weeks, well within the range of what we're talking about

7    here this morning.  In all cases there would be two trips.

8    In some cases there would be 300 miles one way.  It would

9    be 1,200 miles to get an abortion for two trips.

10        It would be particularly burdensome for women with the

11    fewest financial resources.  There was substantial

12    discussion about that in the District Court decision in

13    Casey, in my recollection.  The Supreme Court -- neither

14    the Supreme Court, nor the District Court, ignored that

15    point.

16        The problem of battered women was emphasized by the

17    District Court and then decided by the United States

18    Supreme Court.  Particularly burdensome for women who don't

19    have sick leave who live in rural areas.

20        The same kinds of things, almost the same phrases, in

21    many cases the same phrases that Planned Parenthood uses in

22    its Affidavits here today.

23            THE COURT:  Does Pennsylvania have

24    second-trimester abortions available?

25            MR. GUHIN:  I don't recall.  I don't recall,

1    Your Honor.

2            THE COURT:  And if they do, isn't that different

3    than here?

4            MR. GUHIN:  Well, it would only make a difference

5    if Planned Parenthood could show that a substantial number

6    of people weren't able to get the first trimester abortion,

7    but we're back to the problem, the proof problem that

8    Planned Parenthood has.  It just simply has not been able

9    to show there are very many people in that class.

10        We know that some women in the 12th and 13th weeks do

11   get abortions from Planned Parenthood, but we don't know

12   how their coming to the clinic would be adjusted by the

13   existence of this law.  We don't know how many of those

14   women would be able to get an abortion under the new law.

15   They didn't set any of that out.  It's not the job of the

16   Court to do that.  It's not my job.  It's their job.  They

17   have failed in their burden of proof.  If they want to make

18   that proof, let them try.  But they didn't.  They have not

19   even tried that.  They simply made a bald allegation.

20           THE COURT:  I think the facts in Casey indicated

21   that Pennsylvania had multiple abortion doctors available

22   within the state.

23           MR. GUHIN:  It did.  But in the end what it said

24   was they were talking about 300-mile trips.  They were

25   talking about exactly the same kinds of problems here;

 1    particularly burdensome for fewest financial resources;

 2    battered women; live in rural areas; can't get sick leave;

 3    want to hide their abortion from a significant other.

 4         The Eubanks case looked at the question in the context

 5    of a 24-hour delay and said something that may be pertinent

 6    here.  Delay makes the abortion marginally more difficult

 7    to obtain, but unlike spousal consent requirement, does not

 8    fundamentally alter any of the significantly preexisting

 9    burdens facing poor women who are distant from abortion

10    providers.

11         The fact of the matter is this statute really doesn't

12    make much difference with regard to the kind of burden that

13    they're talking about.  It already exists.  That's the

14    situation South Dakota confronts.

15         In the end, to us it's clear that Planned Parenthood

16    failed to produce sufficient evidence or any evidence at

17    all that a large fraction of all of its Sioux Falls clients

18    would be prevented from having an abortion by the

19    regulations we're talking about.

20         Andrea Adams talked about some women might be

21    prevented from getting an abortion.  A number of women, she

22    talked about, were close to 13.6 weeks, but she doesn't

23    specify how many, and she doesn't specify how this would

24    happen.  "A number of women" is completely without any

25    value in making the kind of analysis to get to a large

fraction.

Lenore Walker used a phrase like "a woman" might be prevented from obtaining an abortion.  Again, that doesn't help.

Misty Parrow said make it impossible for "some patients" to obtain an abortion.  Well, that's not very helpful either.  What does "some" mean?  One out of a hundred?  10 out of 15?  Who knows?  We just don't know.  They failed their burden to put on the evidence.

The second alternative, which they may be arguing, some effect less than prevention constitutes a fraction.  Well, again, they don't identify what the large fraction is.  They don't make any large fraction argument at all, so we, of course, say they've waived that.

And they don't identify how the burdens are different.  How do they make that -- how do they distinguish the burdens in South Dakota from the burdens in Arizona and the burdens in Pennsylvania or the burdens in any other place that failed to find an undue burden?  They simply don't do it.

Your Honor, if there aren't anymore questions on that subject, I would turn to the risk factors sections.

THE COURT:  Sure.

MR. GUHIN:  The idea of the risk factors assessment is the doctor will assess the woman who is

considering abortion for her individual risks, and then
inform the woman about the risks which are relevant to her
particular situation.  The purpose is obviously to enhance
the health of women, something everybody in this room ought
to be able to agree on.

The risk factors assessment that's really at dispute
here today is necessary so the patients can be properly
informed about the risks relevant to their own unique
circumstances.  It's not a new deal.  As a matter of fact,
back in 1973, 38 years ago, Planned Parenthood researchers
said, "I can identify and I have identified characteristics
that are going to make it difficult for certain classes of
people after their abortions."  Let's see, identified low
self-esteem, high alienation, delay in seeking abortion.
It said, "If we did a test for these people, then we could
help them out after their abortions."

This is back 38 years ago Planned Parenthood had this
information.  A test was identified, and a test could have
been taken for a dollar a patient.  Planned Parenthood
failed to adopt that.  Well, here we are 38 years later.
There's much more research.

Dr. Calhoun and Dr. Shuping testified that both
pro-life and pro-abortion researchers agree on more things
which will affect women after their abortions.  Coercion?
If a woman is coerced, she's likely going to have a bad

1    effect after the abortion.  Wantedness of the child;

2    whether the woman expects to be able to cope adequately;

3    whether she feels guilt or doesn't feel guilt; whether she

4    has ambivalence.  Some examples of things.

5        So the purpose is to identify the risk factors that

6    are going to apply to particular women.  Planned Parenthood

7    says this risk factor statute has been before the District

8    Court in Nebraska and Nebraska struck it down, so the South

9    Dakota Legislature must have had a bad purpose when it

10   adopted it.  But, in fact, Nebraska didn't defend its

11   statute by expert testimony.  South Dakota is defending it.

12   South Dakota is vigorously defending it.  That provision

13   never had a fair chance.  It won't have a fair chance

14   without some expert testimony behind it.  We're giving it

15   to it.

16       Planned Parenthood argues that it's impossible to do

17   what the statute implies.  Here is what I understand from

18   what Planned Parenthood tells us in its own Affidavits.

19   The forms that Planned Parenthood in Sioux Falls uses

20   today, and are going to use tomorrow, are prepared by

21   National Planned Parenthood.  They can't be changed by

22   these folks in Sioux Falls.  The forms prepared by National

23   Planned Parenthood already list medical risks.  There's a

24   checklist.  They go down that checklist with the women.

25       What National Planned Parenthood will have to do is

1    they'll have to prepare another form of related

2    psychological risks.  They'll have to create a second

3    checklist.  It's particularly appropriate, we think, as it

4    happens here, that the nation's largest provider of

5    abortions should be doing so, and particularly

6    inappropriate that they should protest against doing it.

7    They have the resources, $30 million income apparently last

8    year.  They are the nation's largest provider of abortions.

9    They are the natural candidate to do this.

10        And as it happens, they come to this Court as

11   Plaintiffs demanding that they not be required to do that.

12   What do they claim?  They claim there's too much literature

13   to research.  Well, the basic research can be done, as we

14   know, in a portion of an instant, a tenth of a second,

15   fifteenth of a second.

16        Then they say not all journals can be searched

17   electronically.  It seems to us that the reasonable reading

18   of the statute is you can do the whole deal electronically.

19   You can search by fields.  You can return by the electronic

20   means, get the text, look at the text.  That's really the

21   only reasonable reading of this statute.

22        Planned Parenthood says, well, we don't know how to

23   frame an adequate search for the effects of abortion.  I'll

24   back up a little bit and look at this allegation.  It is

25   truly amazing.  Again, this is the nation's largest

 1    provider of abortions.  I don't know, a million?  They

 2    ought to know, number one.  Number two, I think they told

 3    us they are the most knowledgeable about abortions.  What

 4    does that mean?  They must have access to this information.

 5    They must have already done it.

 6         Dr. Calhoun, at Paragraph 28 of his Affidavit, says a

 7    computer-assisted search can be effectively constructed,

 8    automatically updated to provide a systematized screening

 9    of risk factors identified in the scientific literature, in

10    addition to examining systematic reviews, metaanalysis, and

11    other research.

12         There's strong evidence that Planned Parenthood ought

13    to be able to do this.  "Well, we're going to get too many

14    documents," Planned Parenthood says.  I think their bottom

15    line was something like 3,500 documents.  Let's say that's

16    true.  Well, I'm not sure that's a lot different than any

17    individual lawsuit that's been in our offices or their

18    offices or perhaps even before this Court.  We get a lot of

19    documents in these cases.  They have to be analyzed.  They

20    have to be dealt with.

21         Again, this is Planned Parenthood.  Planned Parenthood

22    should know about most of these documents walking in.  They

23    have been doing these studies, we were told, anyway.  How

24    can they avoid the obligation to know about these studies?

25         The final thing they claim is they're forced to convey

untruthful and misleading information.  In their Briefs

they get to the breast cancer controversy.  They say they

shouldn't have to talk about that at all.  But, in fact,

this is going to be a useful sort of exercise.  There is

information on the Internet and other easily accessible

places that there is an association of maybe causation

between abortion and breast cancer.  Is that true or not

true?

Well, women know about this.  They know about the

other things people say about abortion, because abortion is

a hot item.  So when there's a side effect or alleged side

effect, that will make the news.  It may not make the news

for some disease that I have.  But it will make the news

with regard to abortion.

So it's a good idea if the doctors say, well, here is

the deal on abortion.  Here is the deal on breast cancer

and abortion.  I've seen the studies.  These studies don't

work.  Planned Parenthood doctors and most doctors -- this

is what they actually believe.  Most doctors don't believe

X, Y, and Z have anything to do with it.  Now let's go on

to other stuff.  That's all they have to do there.  If they

don't believe it, they don't have to say abortion causes

breast cancer.

THE COURT:  But under that section of the

statute, it says that the doctor is supposed to disclose

1    any of the information that's statistical information

2    that's been published after 1972 and at least one

3    peer-reviewed journal, and as we know, medicine and

4    findings change quite a bit.  The statute would require to

5    disclose things that from '72 to '80 fit that definition of

6    being in a peer-reviewed journal, and they may have been

7    discredited after that.  So if it's been discredited, isn't

8    it untruthful or misleading?

9          MR. GUHIN:  The only obligation, if there's sort

10   of a generic class like that, a doctor can certainly say

11   researchers used to think X, Y, and Z.  Researchers don't

12   think that anymore.  Researchers now think A, B, and C.

13   That's really all it has to go on.  It doesn't have to say

14   what researchers thought in 1975 or 1980 is correct if they

15   don't believe that today.

16         THE COURT:  If the purpose is to make the woman

17   informed of truthful information, why do you have to

18   disclose something that is no longer considered to be

19   truthful?

20         MR. GUHIN:  I think because of the nature of

21   abortion, because abortion is so highly publicized.  I

22   think the breast cancer thing is just a perfect example.

23   That story is out there.  Many women believe that abortion

24   is connected to breast cancer.  Breast cancer and abortion

25   are together.  It's a good idea for the doctor to confront

1    that.  He can confront groups of things like that at one

2    time, if he wants to, if he can do it reasonably, and I

3    imagine he can.

4        I think what Planned Parenthood's approach here is

5    extremely unimaginative.  They simply have not -- they

6    tried to construct ways to make it just awfully difficult

7    for them to do, but they really don't have to do it that

8    way.  They can talk about doctors used to think A, B, and C

9    were associated with abortion.  We don't think that

10   anymore.  We think other things.  They can do that in

11   classes.  They don't have to go into any detail on that.

12   So in that respect I think it's useful.

13       Whether or not this would work for something else, I

14   don't know.  I do know that because a special category of

15   abortion, and it's highly publicized, a highly emotional

16   aspect, it makes much more sense here than it might

17   somewhere else.

18       That concludes my presentation.  Ms. DeVaney will

19   finish up.

20            THE COURT:  Thank you.

21            MS. DeVANEY:  Thank you.  May it please the Court

22   and counsel.  In addressing the two provisions that are

23   remaining, the pregnancy help center consultation

24   requirement and the coercion assessment requirement, I'd

25   like to go back to a question that the Court asked the

```
 1   other counsel about whether or not any of these provisions

 2   at issue have ever been enacted or addressed by other

 3   states.

 4        My answer to that is slightly different in that the

 5   information that is at issue with regard to the pregnancy

 6   help center consultation requirement is nothing new.  It's

 7   information that has been addressed for years by the Courts

 8   with regard to informed consent for abortion, information

 9   about resources, and information about coercion.  So those

10   aren't new concepts that have never been addressed before

11   by the Court.

12        What is new is the structural mechanism that the State

13   has chosen in which to carry out those objectives, that

14   being a pregnancy help center.

15             THE COURT:  Just to be clear, there's no other

16   state statute that requires women to actually go to a

17   different location, to a pregnancy help center, and consult

18   with them before she's able to get an abortion.  Correct?

19             MS. DeVANEY:  Not that I'm aware of, Your Honor.

20             THE COURT:  Okay.

21             MS. DeVANEY:  So when you consider it in that

22   fashion, I think the first thing the Court should do is

23   first look at is what is actually required by the Act.

24   What does the pregnancy help center requirement consist of,

25   and what does it not consist of?
```

1        When you look at the Act itself, it requires two

2   things and only two things.  It requires that the woman go

3   to the pregnancy help center to receive information about

4   the resources, the education, the assistance that is

5   available to her to assist her in carrying a child to term.

6        The second thing that it requires is the opportunity

7   for her and the opportunity for the pregnancy help center

8   to interview her about her circumstances in order to try to

9   determine whether or not her decision is subject to

10  coercion.

11       But the statute itself does not require her to

12  disclose personal circumstances that she does not wish to

13  disclose.  It does allow the pregnancy help center

14  counselor to ask her questions, presumably.  That's the

15  interview language.  But there's nothing in the Act that

16  requires her to disclose anything, if she chooses not to.

17            THE COURT:  Well, she has to tell them she's

18  seeking an abortion.

19            MS. DeVANEY:  Yes.  Well, it really boils down to

20  two things which are part of the scheduling appointment

21  that she makes when she visits there.  Obviously she's

22  pregnant.  That will be revealed, otherwise she wouldn't be

23  there, and that she has sought an abortion, because that's

24  the reason why she's required to go to the pregnancy help

25  center.  Two facts that she's already had to disclose to

1    the abortion providers.

2        But beyond that, it's her choice, and the most

3    reasonable --

4            THE COURT:  Except the statute says she must

5    consult at a pregnancy help center.

6            MS. DeVANEY:  Yes.  But when you look at what the

7    consultation requires in the Act, it's those two things.

8    She needs to hear the information, be provided the

9    information about the resources and the assistance that are

10   available, and then have the pregnancy help center

11   interview her about whether or not she's coerced.  If she

12   does not want to volunteer or offer any information about

13   her pregnancy or the circumstances surrounding that, the

14   Act itself does not mandate that she do that.

15           THE COURT:  But it says that she has to have a

16   private interview to discuss her circumstances.  Don't you

17   think a reasonable interpretation of that is that she has

18   to describe her circumstances?

19           MS. DeVANEY:  No.  And the reason I don't is when

20   you look at the rest of the statute in totality, the

21   coercion assessment is not a mandatory component of the

22   abortion process.

23           THE COURT:  Why does it use the word "must" and

24   "shall"?

25           MS. DeVANEY:  You are looking at Subsection 3,

 1    Your Honor?

 2              THE COURT:  3(a).

 3              MS. DeVANEY:  It says she "shall."  "The

 4    pregnancy help center shall inform her about what

 5    education, counseling, and other assistance is available."

 6              THE COURT:  And she "must" have a consultation.

 7    Those both sound like mandatory words to me.

 8              MS. DeVANEY:  Are you looking at Subsection 6?

 9              THE COURT:  3(a).  "That prior to the day of any

10    scheduled abortion, the pregnant mother must have a

11    consultation."

12              MS. DeVANEY:  Right.  Well, it's clear she must

13    go to a pregnancy help center.  It's clear they shall

14    inform her --

15              THE COURT:  And she "must have a consultation" is

16    what it says.  Not that she just goes there.  That she must

17    have a consultation.

18              MS. DeVANEY:  Well, Your Honor, I would submit to

19    you that a reasonable interpretation of the statute, an

20    interpretation that the Court must apply in terms of

21    attempting to save the constitutionality of the statute,

22    when you read that, it suggests that the pregnancy help

23    center may certainly conduct an interview, is the words

24    they're using, but nothing in here requires her to tell

25    them anything.

1       If you look in conjunction with what then follows from

2  that, it would be different if the woman could not go back

3  to the abortion provider and get an abortion if she did not

4  come back with an assessment from the pregnancy help center

5  that says, "We have talked to her, and we have determined

6  there is no coercion here present."  But that's not what

7  the statutory scheme requires.

8       They may, and that's certainly not a mandatory term,

9  do some sort of written provision, written assessment of

10  that discussion, and provide it to the abortion provider,

11  but they're not required to.

12      Similarly, when you look at what she is then required

13  to do when she goes back to the abortion provider --

14          THE COURT:  But she doesn't have the option to

15  just not go.

16          MS. DeVANEY:  She has to go.

17          THE COURT:  Right.  She's required to go.

18          MS. DeVANEY:  That's clear from the statute.  I

19  don't dispute that.  But when she goes back to the abortion

20  provider, all she has to do is say that she has been to the

21  pregnancy help center, if I can find the actual provisions,

22  and certify that she has been there.  That's the end of it.

23  If you look even at the legislative sponsors, I think

24  that's what was contemplated in terms of what is being

25  required here, because there was some discussion about that

1    in the debates before the Legislature when this was passed.

2         So if she doesn't have to certify -- I think what I

3    had written down that Plaintiffs' counsel said, when

4    talking about this provision, is that the interview must be

5    sufficient to determine if coercion is present.  Nowhere in

6    the statute are those terms.

7         There's nothing in here that says this interview, the

8    result of it must be sufficient in order to make this

9    coercion assessment.  The coercion assessment is not a

10   mandatory thing in the scheme of the statute.

11        So the most constitutionally reasonable construction

12   of this provision is that this is an opportunity for her to

13   go and have this discussion about coercion, but she does

14   not have to disclose anything, other than, as you said and

15   pointed out, and as we've conceded in our Brief, the basic

16   facts that she is pregnant and that she has sought an

17   abortion.

18        That leads to the question of why this approach?  Why

19   did the Legislature choose to use this structural mechanism

20   in order to accomplish these goals, rather than, as the

21   Plaintiff suggests, just letting the abortion providers

22   continue to fulfill or attempt to carry out these

23   objectives?

24        The reason is because there has been a demonstrated

25   record that they have failed to do that.  I think that

 1    stems from the fact that there's a fundamentally different

 2    approach that the abortion providers have in comparison to,

 3    for example, the pregnancy help centers.  That becomes

 4    apparent in numerous places throughout their Brief where

 5    they keep referring to a statement where they say, "They

 6    are forced to go to another entity that is opposed to their

 7    decision."

 8         That's precisely the problem, Your Honor.  The

 9    abortion providers have in the past and continue to abide

10    by the notion that the woman's decision is already made up

11    at the time she calls the clinic to schedule the abortion,

12    which totally defeats the whole point of the informed

13    consent process.  If you assume her decision is made up by

14    the time she calls the clinic to schedule an abortion, then

15    what's the point of doing any informed consent?

16         When you look at the current practice of what

17    information --

18         THE COURT:  Well, Mr. Guhin argued that the women

19    that are seeking an abortion are very well-informed of the

20    law, and they understand what a three-day waiting period

21    would be, and that they can conform their schedule so that

22    they meet all of those requirements.  So why do you think

23    women wouldn't have done research on --

24         MS. DeVANEY:  My understanding, Your Honor, when

25    he said they were informed was specifically with regard to

```
 1    the three-day waiting requirement.  That's a far different

 2    question than all the other information that they are

 3    supposed to receive during the informed consent process

 4    after they go to the abortion provider.  That was my

 5    understanding of his comment, that that pertained to the

 6    three-day delay once there has been -- this has already

 7    been publicized about a new law requiring a three-day

 8    delay, that that's a concept that can be grasped and that

 9    women can know about, which is different from --

10            THE COURT:  Hasn't it also been publicized that

11    there are pregnancy help centers, and if that's what they

12    wanted to find was help to deal with their pregnancy,

13    wouldn't they be able to make that choice on their own and

14    find the information and get to a pregnancy help center?

15            MS. DeVANEY:  Ideally that would be good if that

16    was, in fact, happening.  The problem is, it's not.  Here

17    is why.  When they call the abortion -- call the abortion

18    clinic to schedule their abortion, the only thing they're

19    told under the current practice, and I'm reading from the

20    telephone script, which is my understanding based on our

21    previous litigation and the discovery that was conducted as

22    far as how they receive the resource information.  This was

23    attached to the Declaration, and it was Ball Deposition

24    Exhibit 4.

25            What happens now is they call the abortion clinic to
```

1    schedule an appointment, and they are read a recorded

2    script.  I don't know if this part is recorded, but it's a

3    script that is written down.  The script says, "I am

4    required to inform you that Medicaid benefits may be

5    available to you for prenatal care, childbirth, and

6    neonatal care."  That's it.

7        First of all, the use of "Medicaid" specifically is

8    not in the statute.  The statute refers to medical

9    assistance and benefits.  It's somewhat broader than that.

10   But I guess that's beside the point.

11       What I'm trying to suggest is this is the sole limited

12   sentence that women hear currently about resources that are

13   available when she calls to schedule an abortion.  That's

14   it.  Unless when she goes to the clinic, she happens to

15   specifically ask for more information, and then only the

16   small percentage of patients that might do that might get

17   some additional information from Planned Parenthood.

18       But Planned Parenthood is not the expert in pregnancy

19   resources for carrying a child to term.  The pregnancy help

20   centers are the ones that have that information and have

21   been in existence for many years for precisely that

22   function.

23       So it was a reasonable and rational decision for the

24   Legislature, in order to remedy this defective current

25   structural mechanism that isn't working because the

```
 1    information isn't getting to enough women about what
 2    resources are available prior to them making their
 3    decision, to require them to go to the pregnancy help
 4    center and actually get the information in writing,
 5    verbally, from the people who are expert in helping women
 6    in these situations before they make their decision.
 7              THE COURT:  So in the United States Supreme Court
 8    Opinion of Hill, the Court recognized that there's a
 9    broader right to be left alone, and that women that are
10    going to get an abortion don't need to have their
11    sensibilities bombarded on their way into the abortion
12    clinic.  How would you distinguish Hill from here?
13              MS. DeVANEY:  Hill was a case where the First
14    Amendment rights of the speaker were at issue, and that was
15    what the Court was addressing.  There was some dicta in
16    that case where the Court recognized the privacy interest
17    that someone receiving medical care might have in, as you
18    stated, from being bombarded with that type of information.
19         But it was not a case where a requirement such as
20    this, where the requirement to go in a limited context in
21    which this Act requires it, to receive this information.
22    So it isn't controlling as far as the issue that's before
23    the Court here.
24              THE COURT:  If the person goes to the pregnancy
25    help center, they're not able to just avert their eyes
```

1    because they're required to be there.  Go ahead.

2            MS. DeVANEY:  First off, I think we need to

3    distinguish the type of activity we're talking about in the

4    Hill case and cases like Madsen, where you're dealing with

5    sidewalk protestors, leaflets, that sort of thing, when you

6    are dealing with type of information that was likely being

7    provided to those women or those people at issue, as

8    opposed to the limited information, again, we have to go

9    back to the Act and look at solely what this Act requires.

10       Plaintiffs' argument seems to be centered around the

11   notion they're assuming all of this stuff that's going to

12   be happening that's not.  They're going to be giving them

13   these anti-abortion messages, improper information or

14   inaccurate information about abortion or medical risks and

15   that sort of thing, when that's not what the Act requires.

16       The Act only requires them to talk about resources

17   available if they decide to carry their pregnancy to term.

18            THE COURT:  Does the Act limit what information

19   will be provided?  I mean you are talking about what is

20   required.  Is there any limit on what can be disclosed,

21   other than they can't talk about religion?

22            MS. DeVANEY:  That was one that I was going to

23   mention.  It specifically prohibits them from discussing

24   religion.  A component of that may be some of the concern

25   with the anti-abortion information that may have been at

1    issue with the Hill sidewalk protestors.

2         THE COURT:  But the fact that you can't talk

3    about religion doesn't mean that you can't discuss

4    anti-abortion philosophy.  Does it?

5         MS. DeVANEY:  Well, but this is a facial

6    challenge as to what the Act requires, and the Act doesn't

7    require that.  Then the Court is engaging in the type of

8    speculation that was prohibited in cases like Grange, for

9    example, which directed Courts to not assume that things

10   were going to happen as a result of a statutory requirement

11   when it hasn't even gone into effect.

12        So in a facial challenge I think the Court must rule

13   based on only what is required in the Act, not on some

14   assumption or speculation that the pregnancy help centers

15   are going to go beyond that directive.

16        The other thing I think you can properly take into

17   account here, and should, are the policies that the

18   pregnancy help centers that have registered thus far have

19   enacted.  I don't know if the Court has had a chance to

20   take a look at them.

21        But they specifically prohibit -- they have two

22   different procedures set up for dealing with women that

23   come to the clinic because of this specific Bill's

24   directive versus other women that walk in the door that

25   have not been to an abortion clinic and are coming there

1     because they are required to do so.

2            THE COURT:  And at this point there are three

3     clinics that have registered?

4            MS. DeVANEY:  To my knowledge, yes, Your Honor.

5            THE COURT:  There may be more that register that

6     end up having different policies?

7            MS. DeVANEY:  At this point, again, we don't know

8     that.

9            THE COURT:  But how can I rely on the three that

10    have registered and their policies?  Because they could

11    change their policies tomorrow.

12           MS. DeVANEY:  Because that's the evidence before

13    the Court.  Again, it's assuming or speculating that

14    something might happen that hasn't.  All you can do is base

15    your decision on what evidence is before the Court, and

16    that is that they have enacted a policy which strictly

17    prohibits them from discussing anything other than these

18    two specific topics that are required by the statute and

19    prohibits them from going beyond that to talk about the

20    abortion procedure itself or medical risks of abortions and

21    those sort of things that the Plaintiffs have raised

22    concerns about.

23           THE COURT:  Out of the three pregnancy help

24    centers that have signed up, one of them is here in

25    Sioux Falls.  One of them is 350 miles away in Rapid City.

1    The other one is probably 400 miles away.  Correct?

2             MS. DeVANEY:  As far as I know, Your Honor,

3    that's correct.

4             THE COURT:  So if a woman wanted to utilize the

5    services of a place, other than the Alpha Center here in

6    Sioux Falls, that would require them to drive 350 miles to

7    400 miles to one of the other two pregnancy help centers

8    that are located -- or that are listed?

9             MS. DeVANEY:  I think not necessarily.  The Alpha

10   Center in their policies, if you look at those, they also

11   have affiliations with numerous physicians located

12   throughout the state, which it's my understanding is they

13   are available and would be available to carry out the

14   counseling required under this 1217 provision.

15       I think as a practical matter, it's most likely going

16   to be the Alpha Center that will be handling the bulk of

17   this, because they are the ones that are located here in

18   Sioux Falls.  If a woman is informed at the time she calls

19   to make her appointment at the abortion clinic, that part

20   of the requirement under the law is that she obtain a

21   consultation at a pregnancy help center.  She can schedule

22   that appointment at the same time that she's going to come

23   here to have her initial consultation with the abortion

24   doctor.  So it can be carried out at the same time that the

25   initial consultation is carried out there.

1          So in that respect, as a practical matter, I don't

2     think it will cause an additional significant burden.

3          Back to then I guess what the framework of the

4     arguments and the specific legal challenges that the

5     Plaintiff has made with regard to this requirement, it's

6     important to keep in mind the directive in Casey.  That

7     directive is that the right to choose an abortion is not a

8     right to be insulated from all others in doing so.

9          Casey recognized that the state is allowed to adopt

10    structural mechanisms in order to get the message out to

11    women, even if it is a message that encourages carrying a

12    child to term over abortion.  The State is allowed to do

13    that under the Casey framework.  If the abortion providers

14    have demonstrated that they have not --

15          THE COURT:  But in Casey, the information the

16    State was giving to women wasn't face to face.  Was it?

17    Wasn't it literature?

18          MS. DeVANEY:  There it was literature.  That's

19    correct.  That's what I said earlier, Judge.  The

20    information here we're talking about isn't any different,

21    the information that is being required.  What is different

22    is the structural mechanism in which the State has chosen

23    to carry it out.

24          THE COURT:  But isn't the difference with

25    literature and a face-to-face meeting, that with literature

```
 1    you can effectively avert your eyes by just putting the

 2    literature down without reading it?

 3              MS. DeVANEY:  You can.  But that is also -- I

 4    think that's precisely the point, precisely the objective

 5    why the in-person visit was required, because the message

 6    wasn't getting out, and Casey did not recognize or did not

 7    hold that the woman has the unwilling listener right to not

 8    hear this information.  That has been rejected by Casey in

 9    the Court upholding the requirement of that information.

10        There have been other Courts since Casey that have

11    looked at provisions in which, instead of just offering the

12    written materials to the woman, the woman was mandated to

13    take the actual materials.  Those were two other District

14    Court cases, I believe, that upheld those requirements;

15    Karlin v. Foust was one of them; Summit Medical Center v.

16    Riley.  So the whole unwilling listener argument --

17              THE COURT:  But there's never been an instance

18    where it's been upheld, where they were mandated to sit and

19    listen to the information.  Was there?

20              MS. DeVANEY:  It's not been presented to a Court,

21    as far as I know.  I think as Mr. Guhin pointed out, that

22    in itself doesn't mean the requirement can't be upheld,

23    just because it's a new approach.  It still must be

24    analyzed under the rationale that was employed in the Casey

25    cases and subsequent cases that upheld requirements that
```

 1    that type of information be delivered.

 2         Also in our Brief we pointed out the Department of

 3    Health statistics which show that the vast majority of the

 4    women aren't availing themselves of the opportunity to

 5    access this information when they are read this recorded --

 6    this script on the telephone when they call in to get the

 7    information about resources.

 8         So it's a reasonable, rational decision for the

 9    Legislature to try a new approach in order to ensure that

10    she does actually see the information and hear the

11    information before she goes on to make her decision.

12         The Plaintiffs attempt to characterize the pregnancy

13    help center consultation requirement as a compelled speech

14    issue.  It's not.  For the reasons we explained earlier, it

15    does not compel specific speech, unlike the cases that the

16    Plaintiffs rely upon in their Brief.

17         Why are they attempting to characterize this as a

18    First Amendment issue?  Because they want those strict

19    scrutiny standards to be triggered.  Because if they don't,

20    they can't meet their burden.  If it's analyzed as a

21    straight privacy issue and an undue burden issue, which

22    I'll get to in a minute, then the State's reasoned and

23    rational legislative determination will prevail.

24         When you look at the statements that deal with

25    compelled speech, and I think the one the Plaintiffs rely

1  the most heavily on, because it's the only thing that comes

2  close to the type of speech that is required in this case,

3  which is very minimal, as I explained, the State's

4  interpretation and the interpretation we urge the Court to

5  adopt, which is that the woman does not have to disclose

6  any private or personal circumstances that she does not

7  wish to disclose.

8      So we're really just talking about her revealing that

9  she's pregnant and has sought an abortion when she

10  schedules her appointment there.  That is the type of

11  speech which does not trigger First Amendment strict

12  scrutiny.  Plaintiffs seem to be operating under the notion

13  that whenever speech is compelled, that First Amendment

14  strict scrutiny standards must apply.

15      Even in abortion cases, and the perfect example is

16  Rounds that we just dealt with.  Both Rounds and Casey

17  where doctors were compelled to give certain information,

18  the Court specifically ruled out applying that strict

19  scrutiny standard.  Rounds at Page 734 stated that if those

20  First Amendment concerns aren't triggered, then there is no

21  need to go into the strict scrutiny analysis.

22      When you look at what the woman is actually required

23  to do here, we do submit this is a regulation of conduct,

24  not of speech.  She is being required to go to the

25  pregnancy help center.  That is clear.  But regulating her

1    conduct, and her conduct is seeking an abortion, which the

2    State is entitled to regulate.  What this really is is a

3    concern about privacy and the concern about whether or not

4    that constitutes an undue burden.

5        So when you turn to it and analyze it in that fashion,

6    that brings us to -- before I get there, I would like to

7    respond briefly.  The Plaintiff suggested in their Reply

8    Brief that the State has conceded that even if a strict

9    scrutiny standard would apply, if the Court would determine

10   this was compelled speech, that the State could not meet

11   that.  We didn't concede that.  We never conceded that in

12   the Brief.

13       The State does have a compelling interest in ensuring

14   that a woman's decision is well-informed and in promoting

15   the rights of the unborn.  Casey didn't analyze the speech

16   at issue in that case under the strict scrutiny standard,

17   so the fact that they may not have used the word

18   "compelling" does not mean that the Court cannot find those

19   interests to be compelling.

20       Casey determined that the strict scrutiny standard

21   didn't apply to the speech at issue in that case.  It is

22   narrowly tailored, because there are only very minimal

23   things she's required to disclose, and that's that she's

24   pregnant and has sought an abortion.

25       The other available means allowing the pregnancy help

1    centers to carry out these objectives have not proven

2    effective.  That's why the State and the Legislature has

3    determined using the pregnancy help center is necessary to

4    obtain those objectives.

5         Moving on then to the informational privacy claims.  I

6    think the most pertinent case at issue that lays out the

7    standards to apply is the Whalen case, which has been

8    discussed here.  As I stated earlier, we were talking about

9    the Hill case.

10        I think the Plaintiffs' argument assumes a couple

11   things that can't necessarily be assumed.  One is that all

12   prospective women who have called an abortion clinic

13   seeking an abortion want to desperately avoid the pregnancy

14   help centers.

15        The testimony of the women before the Legislature

16   suggest that is not the case.  The Legislature heard

17   testimony of women who were begging for an ear to listen

18   more carefully to what they had to say, women that felt

19   they were being coerced, and that they were basically being

20   rushed through this process at the abortion clinic.

21        So we can't just assume everybody who has called the

22   Planned Parenthood Clinic to schedule an abortion is very

23   adamantly opposed to going to a pregnancy help center.

24   Now, there certainly may be some women, but we certainly

25   can't assume all women or even a large fraction of women

1   would be opposed to that requirement.

2       It also -- they are also assuming, as I mentioned

3   earlier, that the pregnancy help center consultations will

4   go beyond what the statute requires in the terms of the

5   type of information and discussions that are held there.

6       When you apply the Whalen balancing test, if that's

7   the appropriate way to characterize it, it's essentially a

8   totality, I would call it, a totality of the circumstances

9   test.  To look first at what the Government interest is,

10  and here it's clearly a strong and compelling interest in

11  ensuring informed consent for abortion, and promoting the

12  life of the unborn.

13      Then you look at the privacy provisions that are in

14  place and determine whether or not they are adequate to

15  secure that private information.  First off, the obvious

16  thing is that the Act itself prohibits the pregnancy help

17  centers from disclosing this information.

18          THE COURT:  But if they do disclose the

19  information, there's nothing in the statute that would

20  penalize them in any manner.  Is there?

21          MS. DeVANEY:  Not in this specific statute, Your

22  Honor, no.

23          THE COURT:  Is there a different statute that

24  would penalize them?

25          MS. DeVANEY:  I'm not aware of a criminal statute

1    that would apply.  There may very well be licensing

2    provisions.  This actually reminds me of another point.

3        The Plaintiffs are assuming there will be no licensed

4    personnel conducting these counseling sessions at the

5    pregnancy help center, when, in fact, that is also not the

6    case.  The policies of the pregnancy help centers require

7    it to be done by the licensed counselors they have on

8    staff.

9        The only reason they would not be is if somebody

10   wasn't available in order to carry out the mandate in a

11   more expeditious manner than a client advocate with a

12   certain amount of training can conduct it.  I kind of

13   digressed away from your question.

14       For the licensed people that are doing the counseling,

15   there may be licensing sanctions that we submit could be

16   triggered in the event of a confidentiality or privacy

17   breach.  There may also be civil liability against those

18   individuals as a result of such a breach.

19           THE COURT:  There's no civil liability against

20   the pregnancy help center itself, though?

21           MR. DeVANEY:  Not as a result of the Act.

22   Whether or not there could be some other type of legal

23   remedies against the center, I think is a question that I

24   don't know if I have a clear answer to that.  But I think

25   certainly the individuals conducting the counseling could

1    be held accountable.

2         When you look at the cases in which Courts have

3    addressed these issue, one of them is Whalen.  There were

4    two other Federal, not Supreme Court cases, but two other

5    Courts.  It was the Tucson case and the Ft. Wayne case the

6    Plaintiffs discussed in their Briefs.  There are some

7    distinctions there I would like to point out to the Court.

8         When you look at the Whalen case, there you have the

9    requirement that people's prescription information be

10   duplicated in triplicate, and all of those forms be

11   provided to the State Department to oversee to assist with

12   this investigative function.  There you are talking about

13   17 state employees and 24 investigators that the Court

14   mentioned having access to this information.  It was

15   identifying information, of course.

16        Here when you look at what is happening at the

17   pregnancy help center, first of all, that information,

18   whatever information is obtained at the pregnancy help

19   center is not shared with any State government agency.  The

20   only way anything is going to end up in the hands of a

21   State agency is if a doctor decides to send over this

22   discretionary coercion assessment to the abortion provider.

23        If that happens, then all the confidentiality

24   provisions in Chapter 34-23A are triggered.  All of those

25   provisions have language in those statutes that require

1    them to use nonidentifying patient numbers or

2    nonidentifying patient information that goes to the

3    Department of Health.  So we don't have that concern about

4    patient identifying information, at least with regard to

5    this large dissemination to a group of people.

6         The Plaintiffs keep referring to the pregnancy help

7    center counselor as a member of the public.  Your Honor, I

8    think it's just completely unfounded to suggest that a

9    private interview with one counselor at a pregnancy help

10   center is the equivalent of public dissemination, because

11   it's not.  It's being required to talk to one counselor at

12   a pregnancy help center.

13        The pregnancy help center policies, again, if you

14   refer to those, specifically require the only person at the

15   center that will have their name will be the counselor that

16   meets with the woman, and the executive director, and that

17   that information is secured, locked away, and nobody else

18   has access to it.  Anything else they obtain will be kept

19   in files with, again, a number rather than a name.

20        In the Tucson case the Court was concerned about --

21   there were two ways of disclosure that the Court found to

22   be concerning.  One was, again, this access to the

23   Department of Health employees, and, again, that was

24   patient-identifying information, which we don't have at

25   issue here.  The other thing was the fact that a private

1    contractor would review all of their ultrasounds which had

2    patient-identifying information.  There were not sufficient

3    safeguards with regard to the private contractor in terms

4    of how that material was going to be handled or dealt with

5    there.

6        So the Court in Tucson did look to the contract

7    provisions of the private contractor in making this

8    totality of the circumstances review of whether sufficient

9    safeguards were necessary.  The Plaintiffs seem to suggest

10   that all of these things have to be mandated in the statute

11   itself.  But when other Courts have addressed this, they

12   have looked beyond just the terms of the statute, and

13   they've looked at the other things that are in play.

14       The Ft. Wayne case that the Plaintiffs cite had a

15   provision in the statute that prohibited disclosure that

16   was much more problematic than the one we are dealing with.

17   In fact, it was kind of written in the reverse.  What it

18   said was that the information shall not be disclosed if

19   otherwise prohibited by law, which then required you to go

20   look for some other provisions in the law that prohibited

21   the disclosure.

22       Whereas this Act says they may not release it unless

23   it's in accordance with the law.  So the Act itself

24   prohibits the disclosure and clearly prohibits the

25   disclosure, unless there are some other provisions of law

 1    that require it to be disclosed.  So that's a different

 2    provision than what was at issue in the Ft. Wayne case.

 3        As the Court pointed out, there does not appear to be

 4    a criminal sanction with regard to this statute.  There's

 5    also no criminal sanction in Chapter 34-23A for the

 6    confidentiality provisions that the abortion providers must

 7    abide by.  There is also no criminal sanction for the

 8    confidentiality provisions in the adoption counseling

 9    statutes in Chapter 25-5A.

10        So if those provisions have not been struck because of

11    confidentiality concerns, then there's no reason the Court

12    should strike the provisions pertaining to the pregnancy

13    help centers, because you would essentially have to assume

14    that the counselor at the pregnancy help center is somehow

15    less trustworthy and more apt to violate the law than a

16    patient educator at the abortion clinic or the counselor

17    counseling the woman giving up her child for adoption.

18        Whalen specifically says that the Court should not

19    make those determinations based on speculation that

20    somebody is going to violate a law that prohibits

21    disclosure.

22            THE COURT:  I'm not aware of any challenge being

23    made to either of those provisions, where the Court refused

24    to strike the statutes because of the confidentiality

25    issue.

1          MS. DeVANEY:  I'm not aware of that either,

2     Judge, and I think the reason is because the rationale of

3     those statutes is this is a benefit for the woman.  That's

4     the way the pregnancy help center requirement should be

5     evaluated, instead of assuming that it's some burdensome

6     requirement that all women would be adamantly opposed to.

7          It provides another tool to the abortion doctors in

8     order to assist them in making this coercion assessment,

9     which they are required to do, and are already required to

10    do ethically.

11         Turning then to the undue burden claim.  Those matters

12    have been briefed.  Essentially Plaintiffs make arguments

13    that are based on hypothetical scenarios, speculations

14    about how the pregnancy help centers are going to carry out

15    the statutory mandate, which the Court is prohibited from

16    relying upon under the Grange decision, for example.

17    Again, there are a couple case references I'd like to

18    respond to that the Plaintiffs made in their Reply Brief.

19         On the confidentiality concern, they refer to the

20    Miller case and the Court striking down the parental-notice

21    provision of that statute.  In that case the disclosure

22    that was being referred to there was the scenario where if

23    the minor reported the abuse, and then the abortion

24    provider was required to report the abuse to either law

25    enforcement, the State's attorney, or some authority, then

1    inevitably the parent would find out about it once the

2    abuse proceedings were instigated, because they're entitled

3    to find out who filed the report.  Once they found out it

4    was filed by the abortion doctor, they would know about the

5    abortion, and, therefore, the exception was really

6    meaningless because they would find out, anyway.

7         The pregnancy help center provision is different in a

8    couple contexts.  One, there is not the concern about that

9    inevitable disclosure, because that statutory scheme is not

10   at issue there.  Second, the type of disclosure and the

11   concern of the Court when you're dealing with the abuse

12   scenario, the concern was that the abusive parent would

13   find out about this, which, of course, nobody would want to

14   happen.

15        Here we are not talking about the abuser finding out.

16   We're talking about a disclosure to one pregnancy help

17   center counselor, whose mission is to assist the woman in

18   dealing with this crisis that she is in.  So the concern is

19   different and is not as great in that context.

20        With regard to the claim about will they expeditiously

21   carry out this requirement, they cite the Bellotti case.

22   What's important, and what I wanted to point out to the

23   Court there, the Plaintiffs cite the Bellotti case

24   suggesting that there has to be something in the Act itself

25   guaranteeing that they will expeditiously carry out this

 1    requirement in order for it to withstand a facial

 2    challenge.

 3         That is not, in fact, the case.  The statute at issue

 4    in Bellotti did not have an expeditiousness requirement in

 5    the statute itself.  What happened there is they certified

 6    a question to the State Supreme Court, when the case went

 7    back on remand, about how the matter would be carried out

 8    by the judiciary, and the Supreme Court, in answering the

 9    questions that were certified, said that the judiciary

10    would promptly carry out the requirement of the statute.

11         The Court then, when it was conducting the analysis,

12    said that those types of things helped to alleviate the

13    concerns about the expeditiousness.  The intervenors in

14    that case took issue with the Supreme Court, relying simply

15    on the assurances of the Supreme Court, rather than actual

16    requirements in the statute.

17         What the Supreme Court says was in the absence of any

18    evidence as to the operation of judicial proceedings, we

19    must assume, and because they were dealing with the facial

20    challenge where the law hadn't gone into effect yet, we

21    must assume the Supreme Court's judgment is correct.  Those

22    safeguards, therefore, avoid much of what was objectionable

23    about the expeditiousness concern.

24         Likewise, here we have the pregnancy help center

25    policies, which are appropriate for the Court to look at,

1    because that's the evidence before the Court, which they

2    have indicated they will carry out immediately and within

3    24 hours, and those provisions are all set out within their

4    intake policies.

5         I would like to turn briefly to the coercion

6    definition, unless the Court has some other questions on

7    the pregnancy help center requirement.

8         I noted you asked a question of Plaintiffs' counsel,

9    "Does the state have a compelling interest in ensuring that

10   women are not coerced?"  Absolutely, the State has a

11   compelling interest in ensuring that.  Plaintiffs admit

12   that not only -- actually I don't believe they did admit

13   that there was a compelling interest.  But what they at

14   least admitted, that they are ethically obligated to make

15   this assessment, anyway, regardless of the enactment of

16   1217.

17        So as a starting point, it seems like the whole

18   discussion really centers around the definition.  The Court

19   can uphold the requirement that the abortion doctor assess

20   the woman and make sure that she is not coerced, even if

21   the Court were to find the definition of coercion

22   unconstitutionally vague.

23        Moving then to the actual definition, there again, the

24   Court must, according to the precedent of the Court, adopt

25   a construction -- a reasonable construction to save the

1    constitutionality of the statute.  When you read it, what

2    it clearly was meant to do is to enforce the notion that

3    coercion can be more than physical.  It can include

4    psychological components, the persuasion, the influence

5    from others.

6        If it stopped there and didn't have the last phrase,

7    it could be more problematic.  But when it says "against

8    her desire," it ultimately leads back to the common sense

9    definition of coercion that everybody applies, and that

10   their doctors have presumably been applying when they sign

11   off on whether or not her decision was coerced, that it has

12   to be her will, her desire.

13       You can have other people talk to you and persuade you

14   and influencing you.  If that causes you to truly change

15   your mind in what you want to do, then you aren't coerced.

16   But if the influence of others is causing you to do

17   something against your desire, then that's coercion.

18       The doctors at the abortion clinics have been signing

19   off on statements on their Informed Consent Forms already,

20   prior to the passage of this Act, to certify that women

21   aren't coerced.  So presumably they have to have been

22   applying a definition, as you pointed out, prior to the

23   enactment of this statute.

24           THE COURT:  The question I had, I was thinking

25   about the definition of coercion that is there.  I thought

1    about Defendants that have been charged criminally.  I can

2    tell you they all have a desire to continue on as not

3    guilty rather than guilty, but sometimes their lawyer has

4    talked to them and pointed out the evidence that's against

5    them and may have influenced them or persuaded them that,

6    in fact, it would be in your best interest to plead guilty,

7    because if you go to trial, you're probably going to be

8    convicted.

9         The Defendant, when they come in, may still have a

10   desire to be not guilty, but they've been persuaded or

11   influenced that it's in their best interest to plead

12   guilty, and, in fact, the evidence would convict them if

13   they did go to trial.  The Court would find that it's a

14   voluntary, uncoerced plea on their part.

15        The concern I have is with the use of the word

16   "desire."  It would be one thing if it was "against her

17   will" or that she was "overborne," her free will was

18   "overborne."  But people may still maintain desires that

19   they have, even though all of the evidence convinces them

20   otherwise.  They may still maintain that desire that they

21   want to carry their child, but all of the evidence has

22   convinced them that they should give up that desire and

23   choose a different course.

24        So that's a concern I have is the use of the word

25   "desire" is a pretty broad term.

1          MS. DeVANEY:  Well, what we had submitted to the

2      Court in our written Brief is that that term should be

3      interpreted as synonymous with "will."  Because what it

4      ultimately means is it has to be her decision, not the

5      people that are influencing her or persuading her.

6          So that's the most reasonable construction that would

7      permit the statute's constitutionality to be upheld.

8          THE COURT:  But I looked up the definition of

9      "desire" in the dictionary, and it doesn't include "will"

10     or "free will" as a definition.  I'm not sure that the

11     State in their Brief can just substitute a different word.

12         MS. DeVANEY:  Well, unfortunately the Court --

13     it's not a question of which word would we prefer to have

14     there or which word would the Court prefer to convey the

15     meaning, but what word the Legislature actually chose.  And

16     can you read the entire provision in its entirety to come

17     up with a reasonable construction that is not

18     unconstitutionally vague?

19         Again, if you focus on the context in which the entire

20     sentence is written, I think it suggests that it ultimately

21     has to be her desire, and "desire" is meant to be

22     synonymous with her "will."

23         THE COURT:  So go back to Section 3(1), where it

24     says, "The physician and the pregnant mother, prior to

25     scheduling a surgical or medical abortion, the physician

 1   shall do an assessment of the pregnant mother's

 2   circumstances to make a reasonable determination whether

 3   the pregnant mother's decision to submit to an abortion is

 4   the result of any coercion, subtle or otherwise."

 5        What does "subtle or otherwise" mean?  It can't mean

 6   what "coercion" is, because there would be no reason to put

 7   the words in.

 8        MS. DeVANEY:  Well, I would submit, Your Honor,

 9   again, it was meant to reference these other types of

10   psychological methods of coercion that the definition

11   encompasses.  That is the most reasonable reading of the

12   statute that would be consistent with how abortion doctors

13   have, in fact, been applying their ethical duty to assess

14   for coercion.

15        As I stated initially, Judge, that is the fundamental

16   crux of that requirement, regardless of whether problems

17   are found with regard to the definition itself.  The

18   requirement that they have to assess for coercion should be

19   upheld.

20        THE COURT:  And since the doctors are already

21   assessing for coercion, was there any evidence in the

22   record that that assessment hasn't been sufficient?

23        MS. DeVANEY:  Yes.  Thank you.  I did not mention

24   that initially.  But in our submissions to the Court, we

25   submitted portions from deposition transcripts from the

1   2005 litigation which lays out how that is currently being

2   carried out at the Planned Parenthood Clinic.  It is very

3   cursory.  That is a reason why the coercion assessment was

4   made more clear and emphasized in HB 1217.

5          THE COURT:  I guess what I was asking, is there

6   evidence that even with a cursory review of coercion that

7   there are women that are claiming that they are being

8   coerced after the new requirement went into effect?

9          MS. DeVANEY:  After the new requirement.

10         THE COURT:  I mean after the doctor started

11  asking about coercion.

12         MS. DeVANEY:  That's not a new requirement.  As

13  far as I know, they've had that on their -- well, I don't

14  know when they put that on their Informed Consent Forms.

15  But that specific language isn't in the prior informed

16  consent statute, to my knowledge.  So this is the first

17  time it's actually been enacted.  But there are forms we

18  know we were using before that had a signature line where

19  they would sign off as to whether or not the woman was

20  being coerced.

21      The problem is in practice and in effect, they were

22  not spending an adequate amount of time with women to do

23  that.  It was a very cursory examination, a question, "Are

24  you firm in your decision?"  "Yes."  That's it.  We go on.

25  Nothing more is explored upon that.

1          There were women that testified in front of the

2     Legislature that they were crying, that they were

3     expressing concern about that.  The provider went ahead and

4     gave them the abortion, anyway.

5          So that's what prompted the Legislature to enact a

6     specific requirement in the statute requiring the coercion

7     assessment to be done, and attempted to create a definition

8     that encompassed more than just physical-type coercion, but

9     other psychological aspects, as well.

10         Thank you, Your Honor.  That's all I have, unless you

11    have any further questions.

12              THE COURT:  No.  That's it.  Thank you.  Did the

13    Plaintiffs have any reply?

14              MS. LIU:  Yes, Your Honor.  I would just like to

15    address a few things that the attorneys for the State

16    mentioned in their reply.

17         First, with respect to the pregnancy help center

18    mandate, Your Honor, they seem to hinge their entire case

19    on their reading of the statute that women don't have to

20    say anything to the pregnancy help centers.

21         In addition to the language that is clear from

22    Section 3, Your Honor, I would direct you to language in

23    Section 6.  Section 6, Your Honor, says, "A pregnancy help

24    center shall be permitted to interview the pregnant mother

25    to determine whether the pregnant mother has been subject

 1   to any coercion to have an abortion."  So I'm not really

 2   sure how the pregnancy help centers can make this

 3   determination if the woman refuses to say anything.

 4       I would also note that if she doesn't have to say

 5   anything to the pregnancy help center, then what proper

 6   legislative purpose, much less any supposed compelling

 7   interest, could this mandate possibly serve?  Indeed, our

 8   patients are already required under current law to be

 9   referred to a pregnancy help center.  So this would be

10   purely redundant.

11       Indeed, I submit there is no proper purpose.  That the

12   State's arguments make clear this is just intended to

13   impose a third trip on our patients and to impose further

14   hurdles to abortion, which is clearly impermissible.

15       I would like to address, also, Your Honor, their

16   efforts to distinguish themselves from the counselors at

17   issue in the Hill case.  Hill involved sidewalk counselors.

18   The law prohibited education, counseling, or the handing of

19   information, which is what the State submits the pregnancy

20   help centers will do here, and in that case there was

21   absolutely no evidence that those sidewalk counselors were

22   ever abusive or confrontational.  They were not

23   characterized as harassing or protestors, as the State

24   suggested.  I would refer the Court to Page 710 of that

25   decision.

1      I would also note that the Supreme Court there, even

2   in the face of countervailing First Amendment rights of the

3   sidewalk counselors, which are not present here, in other

4   words, the pregnancy help center has no First Amendment

5   right here, in that case the Court recognized that the

6   patient's privacy interests in avoiding interactions with

7   these type of counselors took precedence.

8      Third, and just briefly, Your Honor, counsel for the

9   Attorney General's Office discussed the fact that the cases

10  do not necessarily require expedition or confidentiality on

11  the face of the statute.  I would refer the Court to the

12  Miller decision at Page 1460 where the Eighth Circuit was

13  abundantly clear that the State may not impose a

14  parental-notice requirement without also providing

15  confidential expeditious mechanisms by which a mature and

16  best-interest minor can avoid it.

17     So I think it is clear from this case, and also from

18  prior Supreme Court cases, that, indeed, expeditiousness

19  and confidentiality are required on the face of the

20  statute.

21     In addition, Your Honor, the State goes to great pains

22  to try to minimize the numerous false statements that the

23  legislators made, not only on the floor of the Senate and

24  the House, but also in each of the committees to push the

25  Act through.  In no other case am I aware, Your Honor, have

1    Plaintiffs demonstrated such an utter disregard for

2    existing law, that the Legislature engaged in such an utter

3    disregard for existing law, and engaged in so many numerous

4    and blatant false statements to enact a law that would

5    restrict abortion.

6        Among other things, they said that we, Plaintiffs, do

7    not meet with women until they are on the surgery table;

8    that we don't tell them about their risks of abortion; that

9    we don't do any consultation or education.  These were just

10   a few of the false statements they used to push the Act

11   through.

12       I would note that we are required by law, by the very

13   law they enacted, the same sponsor enacted in 2005, to do

14   exactly all of these things, and we are, Your Honor,

15   subject to criminal penalties if we fail to comply with

16   this law.

17       Now, the State says that they don't know if we are

18   meeting these requirements.  Well, this is just another

19   false statement.  As our opening Brief at Footnote 3 makes

20   clear, Your Honor, we are routinely inspected by the State

21   to ensure we are in compliance with these requirements.

22       Since this law went into effect three years ago, we

23   have been inspected, I think, on a twice yearly basis to

24   ensure compliance with all laws regulating abortion,

25   including this one.

1          I would submit, Your Honor, for the Attorney General's

2     Office to sit here and say that they don't know whether a

3     highly regulated and monitored abortion provider is

4     complying with the State's criminal laws is absurd.

5          Finally, Your Honor, with respect to the same

6     physician requirement, they have said they think it is

7     constitutional, however you read it, meaning that if you

8     read it to require the same doctor at both visits, it is

9     still constitutional.

10         I would just point the Court to Page 36 of their own

11    Brief where they say that that reading should be rejected

12    because it is "hostile to the constitutionality of the

13    statute."  As Gonzales points out, "The elementary rule is

14    that every reasonable construction must be resorted to in

15    order to save a statute from unconstitutionality."

16         I submit that is a concession that if the law is read

17    to require the same physician, that it would be

18    unconstitutional.  Indeed, the State did not attempt to

19    muster any evidence or argument to suggest otherwise.

20         Thank you, Your Honor.

21              THE COURT:  Thank you, counsel.  I'm going to

22    take it under advisement, and I'll issue a written opinion.

23    We'll be adjourned.  Thank you.

24                   (End of proceedings)

25

1  UNITED STATES DISTRICT COURT
   DISTRICT OF SOUTH DAKOTA :SS     CERTIFICATE OF REPORTER
2  SOUTHERN DIVISION

3

        I, Jill M. Connelly, Official United States
4  District Court Reporter, Registered Merit Reporter,
   Certified Realtime Reporter, and Notary Public, hereby
5  certify that the above and foregoing transcript is the
   true, full, and complete transcript of the above-entitled
6  case, consisting of Pages 1 - 96.

7        I further certify that I am not a relative or
   employee or attorney or counsel of any of the parties
8  hereto, nor a relative or employee of such attorney or
   counsel, nor do I have any interest in the outcome or
9  events of the action.

10       IN TESTIMONY WHEREOF, I have hereto set my hand
   this 25th day of July, 2011.
11

12                  /s/ Jill M. Connelly
                    _____
13                  Jill M. Connelly, RMR, CRR
                    Court Reporter
14                  United States Courthouse
                    400 S. Phillips Avenue
15                  Sioux Falls, SD 57104
                    Phone:  (605) 330-6669
16                  E-mail:  Jill_Connelly@sdd.uscourts.gov

17

18

19

20

21

22

23

24

25