# In the United States District Court

*for the*

# District of South Dakota
# Southern Division

Case No. Civ. 11-4071 KES

PLANNED PARENTHOOD MINNESOTA, NORTH DAKOTA, SOUTH DAKOTA and
CAROL E. BALL, M.D.,

*Plaintiffs,*

v.

KRISTI NOEM, Governor, JASON RAVNSBORG, Attorney General, KIM MALSAM-
RYSDON, Secretary of Health, and JEFFREY A. MURRAY, M.D., President of Board of
Medical and Osteopathic Examiners, in their Official Capacities,

*Defendants,*

ALPHA CENTER and BLACK HILLS CRISIS PREGNANCY CENTER,

*Intervenors.*

---

**BRIEF SUBMITTED by INTERVENORS ALPHA CENTER and BLACK HILLS CRISIS
PREGNANCY CENTER IN SUPPORT OF MOTION TO DISSOLVE THE BALANCE OF THE
PRELIMINARY INJUNCTION ENTERED BY ORDER DATED JUNE 11, 2013, ECF 129**

---

HAROLD J. CASSIDY, ESQ.*
THE CASSIDY LAW FIRM, LLC
750 Broad Street, Suite 3
Shrewsbury, New Jersey 07702
Phone: (732) 747-3999
Fax:   (732) 747-3944
E-mail: hjc@haroldcassidy.com
*Pro hac vice*

RORY KING, ESQ.
BANTZ, GOSCH & CREMER, LLC
305 Sixth Avenue S.E., P.O. Box 970
Aberdeen, South Dakota 57402
Phone: (605) 225-2232
Fax: (605) 225-2497
E-mail: Rking@BantzLaw.com
*Attorneys for Intervenors*

*On the Brief:*
Harold J. Cassidy, Esq., Joseph R. Zakhary, Esq.,
Thomas J. Viggiano, III, Esq.,  Derek M. Cassidy, Esq.

## TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

PRELIMINARY STATEMENT AND NATURE OF THE ACTION . . . . . . . . . . . . . . . . . . . . 1

    A.    The Current Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    The Purpose of South Dakota's Anti-Coercion Statute:
           The Protection of the Pregnant Mother's Constitutional
           Right to Her Relationship with Her Child. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Preliminary Injunction Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Intervention and New Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.    The Third-Party Counseling Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    The Facts that Required the Remedial Legislation . . . . . . . . . . . . . . . . . . . . . 4

          1.    The Prior Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          2.    Plaintiffs' Deficient Practices Discovered in the First Litigation . . . . . . . . 5

    B.    Admissions in Discovery and Facts that Occurred or
           Obtained After Entry of the Preliminary Injunction . . . . . . . . . . . . . . . . . . . . 7

          1.    The Nature and Purpose of an Abortion. . . . . . . . . . . . . . . . . . . . . . . . 7

                (a)  The Primary Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                (b)  The Unique Nature of an Abortion. . . . . . . . . . . . . . . . . . . . . . . 8

          2.    Pregnant Mothers are Coerced and Pressured into
               Abortions Performed at Plaintiff Planned Parenthood
               and Other Abortion Clinics Whose Interests Conflict
               with Those of the Mothers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

i

3.      The Bad Practices and Conflicts of Interests at Abortion Clinics Exacerbate the Coercion . . . . . . . . . . . . . . . . . . . . . . . 12

4.      The RPHC Counseling is Essential for the Protection of the Mother's Right . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Introduction: Changed Circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

POINT I:      The Pregnant Mother has a Fundamental, Intrinsic Right to Maintain Her Relationship with Her Child Protected Under the Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

POINT II:     The Plaintiffs Lack Third-Party Standing to Litigate the Rights of Pregnant Mothers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

POINT III:    The Mandatory Third-Party Counseling is Both a Reasonable and Necessary Exercise of the State's Authority to Protect the Fundamental Rights of Pregnant Mothers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

A.      The RPHC Counseling is Necessary to Protect the Fundamental Liberty of Pregnant Mothers . . . . . . . . . . . . . . 29

1.      Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2.      Equal Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

(a)      "Voluntary" Termination . . . . . . . . . . . . . . . . . . . 32

(b)      The Criminal Homicide Exception . . . . . . . . . . . 35

B.      Reconciling *Casey* and *Roe* with *Lehr* and SD1217 . . . . . . . . . . 35

C.      The RPHC Counseling Does Not Violate Free Speech Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

D.      The RPHC Counseling Does Not Violate Plaintiffs' Equal Protection Rights . . . . . . . . . . . . . . . . . . . . . . 40

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page**

*Adams v. Nadel,*
 124 N.Y.S. 2d 427 (N.Y. Sup. Ct. 1953 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Aetna Ins. Co. v. Kennedy*,
 301 U.S. 389 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Baker v. Carr*,
 369 U.S. 186 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 34

*Barrows v. Jackson*,
 346 U.S. 249, 255 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Board of Regents et al. v. Roth,*
 408 U.S. 564 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Brown v. Kansas City Live, LLC,*
 931 F.3d 712 (8th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Burgess v. the Superior Court of Los Angeles*,
 831 P.2d 1197 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Caban v. Mohammed*,
 441 U.S. 380 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Caplin & Drysdale v. United States,*
 491 U.S. 617 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Carrington v. Rash*,
 380 U.S. 89 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Clark v. Jeter*,
 486 U.S. 456, 461 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34

*Craig v. Boren*,
 429 U.S. 190 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Draper v. Jasionowski*,
 858 A.2d 1141 (N.J. App. Div. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Elk Grove Unified School Dist. v. Newdow*,
542 U.S. 1 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Farley v. Mount Mary Hospital Assoc., Inc.*,
337 N.W.2d 42 (S.D. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Federated Dept. Stores, Inc. et al. v. Moitie, et al.*,
452 U.S. 394 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*F.S. Royster Guano Co. v. Virginia*,
253 U.S. 412  (1920)          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Gonzales v. Carhart*,
550 U.S. 124 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Graham v. Richardson*,
403 U.S. 365 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Griswold v. Connecticut*,
381 U.S. 479 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Hagens v. Lavine*,
415 U.S. 528 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Harper v. Virginia*,
383 U.S. 66 (1966)      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Harris v. McRae*,
448 U.S. 297 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Harrison v. United States*,
284 F.3d 293 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Hughson v. St. Francis Hospital*,
92 A.D.2d 131 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re A.C.*,
573 A.2d 1235 (D.C. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Certification of Question of Law from U.S. District Court (Farley)*,
387 N.W.2d 42 (S.D. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In the Matter of J.M.J.*
    368 N.W. 2d 602 (S.D. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Johnson v Zerbst,*
    304 U.S. 458 (1938)    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Jones v. MetroHealth Med. Ctr,*
    89 N.E.3d 633 (Ohio Ct.App. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*June Medical Services, v. Russo,*
    ___ U.S. 140 S.Ct. 2103,(2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 28, 41

*Ledford v. Martin,*
    359 S.E.2d 505 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Lehr v. Robertson*,
    463 U.S. 248 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24, 35

*Loving v. Virginia,*
    388 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Matter of D.D.D.*,
    294 N.W.2d 423, (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Matter of Everett*,
    286 N.W.2d 810 (S.D. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Meyer v. Nebraska,*
    262 U.S. 390 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 23

*Michael H. v. Gerald D.,*
    491 U.S. 110 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Miller ex rel. Miller v. Dacus,*
    231 S.W.3d 903 (Tenn. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*M.L.B. v. S.L.J.*,
    519 U.S. 102 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Moore v. City of East Cleveland,*
    431 U.S.494 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

vi

*Morrisey v. Brewer,*
    408 U.S. 471 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Movie Systems, Inc. v. MAD Minneapolis Audio Distributors,*
    717 F.2d 427 (8ᵗʰ Cir.  1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*NIFLA, et al., v. Becerra, et al.,*
    ___ U.S. ___  138 S.Ct. 2361,(2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 39, 41

*Nold v. Pinyon,*
    105, 31 P.3d 274 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ob-Gyn Associates of Albany v. Littleton,*
    386 S.E.2d 146 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Omaha Indemnity Co., et al., v. Wining, et al.,*
    949 F.2d 235 (8ᵗʰ Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Pickett v. Brown,*
    462 U.S. 1 (1983)      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Pierce v. Society of Sisters,*
    268 U.S. 510 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Planned Parenthood of S.E. Pa. v. Casey,*
    505 U.S. 833 (1992)      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 35, 36, 38, 39

*Planned Parenthood v. Hodges,*
    917 F.3d 908 (6ᵗʰ Cir. 2019)(*en banc*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Planned Parenthood Minn., N.D., S.D., et al. v. Rounds et al.,*
    530 F.3d 724 (8ᵗʰ Cir. 2008) (*en banc*) (*Rounds* I) . . . . . . . . . . . . . . . . . 4, 8, 37, 38, 41

*Planned Parenthood, et al., v. Rounds, Alpha Center, et al.,*
    653 F.3d 662 (8ᵗʰ Cir. 2011) (*Rounds* II) . . . . . . . . . . . . . . . . . . . . . . . 4, 20, 25, 38, 41

*Planned Parenthood, et al., v. Rounds, Alpha Center, et al.,*
    686 F.3d 889 (8ᵗʰ Cir. 2012) (*en banc*) (*Rounds* III) . . . . . . . . . . . . . . . . . 4, 20, 38, 41

*Planned Parenthood, et al., v. Rounds, Alpha Center, et al.,*
    650 F.Supp. 2d 972 (U.S. Dis. Ct., D.S.D., S. Div. 2009) . . . . . . . . . . . . . . . . 4, 35, 41

*Plyer v. Doe*,
    457 U.S. 202 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Powers v. Ohio*
    499 U.S. 400, 410 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Prince v. Massachusetts,*
    321 U.S. 158 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Quilloin v. Walcott,*
    434 U.S. 246 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Randall v. United States*,
    859 F.Supp. 22  (D.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Reynolds v. Sims*,
    377 U.S. 533 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Roberts v. Patel*,
    620 F.Supp. 323 (N.D. Ill. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Roe v. Wade*,
    410 U.S. 113 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 37

*Santosky v. Kramer*,
    455 U.S. 745 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24, 30, 35

*Shapiro v. Thompson*,
    394 U.S. 618 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Singleton v. Wulff,*
    428 U.S. 106 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Skinner v. Oklahoma,*
    316 U.S. 535 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Smith v. Organization of Foster Families*,
    431 U.S. 816 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 31

*Stanley v. Illinois*,
    405 U.S. 645 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 35

*State v. Vargas,*
    869 N.W.2d 150 (S.D. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Synder v. Massachusetts,*
    281 U.S. 97 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tex. Med. Providers Performing Abortion Services v. Lakey,*
    667 F.3d 570, 576-77 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Troxel v. Granville,*
    530 U.S. 57 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 31

*Tuan Anh Nguyen v. I.N.S.,*
    533 U.S. 53 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Turner v. Safley,*
    482 U.S. 78 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Walker v. Mart,*
    790 P.2d 735 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 37

*Weber v. Aetna,*
    406 U.S. 164 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 40

*Wiersma v. Mapleleaf Farms,*
    543 N.W.2d 787 (S.D. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Wooley v. Maynard,*
    430 U.S. 705 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Yick Wo v. Hopkins,*
    118 U.S. 356, (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Zablocki v. Redhail,*
    434 U.S. 374 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## STATUTES

SDCL § 21-5-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

SDCL § 22-16-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 35

SDCL §22-16.1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 30, 35

SDCL §22-17-13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 25

SDCL § 25-5A-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

SDCL § 25-5A-6(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

SDCL § 25-5A-6(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

SDCL § 25-5A-9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

SDCL § 25-5A-22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

SDCL§ 25-5A-23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

SDCL§ 25-5A-24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

SDCL § 34-23A-1(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SDCL § 34-23A-1.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SDCL § 34-23A 1.5   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SDCL § 34-23A-1.6   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

 SDCL §34-23A-2 to 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

SDCL § 34-23A-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

SDCL § 34-23A-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

SDCL § 34-23A-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

SDCL § 34-23A-10.1  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2

SDCL § 34-23A-10.1(1)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 16

x

SDCL § 34-23A-10.1(1)( c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

SDCL § 34-23A-10.1(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

SDCL § 34-23A-10.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SDCL § 34-23A-53 to 62 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SDCL § 34-23A-54 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

SDCL § 34-23A-54(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

SDCL § 34-23A-54(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

SDCL § 34-23A-54(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

SDCL § 34-23A-54(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 17

SDCL § 34-23A-54(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 30

SDCL § 34-23A-55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SDCL § 34-23A-56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 39

SDCL § 34-23A-56(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 41

SDCL § 34-23A-56(3)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SDCL § 34-23A-56(3)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SDCL § 34-23A-56(4)( c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

SDCL § 34-23A-57 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 41

SDCL § 34-23A-59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 29

SDCL § 34-23A-60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

SDCL § 34-23A-61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

SDCL § 34-23A-74 to 88 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 27

SDCL § 34-23A-80 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

SDCL § 34-23A-85 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8

SDCL § 34-23A-86   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SDCL § 34-23A-88 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**CONSTITUTIONAL AUTHORITIES**

The Constitution of the United States of America . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Article III of the Constitution of the United States of America . . . . . . . . . . . . . . . . . . . . 26, 27

The Fourteenth Amendment to the
        Constitution of the United States of America. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 21

**OTHER LEGAL AUTHORITIES**

Report of the South Dakota Task Force
        to Study Abortion, December 2005. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 7, 8, 24, 37

South Dakota House Concurrent Resolution No. 1004 (2015) . . . . . . . . . . . . . . . . 2, 23, 25, 37

**OTHER AUTHORITIES**

*Adoption  Practice, Issues, and Law, 1958-1083,*
        17 Fam. L.Q. 173, 175-77 ( 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Reproductive and Sexual Coercion,* The American College of
        Obstetricians and Gynecologists, Committee Opinion
        554, 2013       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>PRELIMINARY STATEMENT AND NATURE OF THE ACTION</u>

### A.  The Current Motion

Plaintiffs claim South Dakota's Anti-Coercion Abortion Statute (SDCL §34-23A-53 to 62; 74 to 88) violates the Fourteenth Amendment. Intervenors and State Defendants move to vacate what remains of the original Preliminary Injunction (PI).  ECF39.  By orders dated June 27, 2012 (ECF82), and June 11, 2013 (ECF129), the PI was dissolved, except for the mandatory third-party counseling provisions of SDCL §34-23A-56(3) and 59.  The PI was premised on the assumption that Plaintiffs had standing to litigate the interests of all pregnant mothers. Overwhelming changes of circumstances, and the immediate and complete destruction of the fundamental rights of pregnant mothers, require dissolution of the remaining PI.

### B.    The Purpose of South Dakota's Anti-Coercion Statute: The Protection of the Pregnant Mother's Constitutional Right to Her Relationship with Her Child

SDCL §34-23A-53 to 62 is expressly intended to better ensure that consents obtained from a pregnant mother authorizing termination of her constitutionally protected relationship with her child by an abortion, are informed, voluntary and free from coercion and pressure. *See*, SDCL §34-23A-54(1)-(5); §34-23A-55; §34-23A-85, 86, 88.  SDCL §34-23A-54(3) states: "... there is a need to protect the pregnant mother's interest in her relationship with her child and her health by passing remedial legislation."  SDCL §34-23A-54(5) states: "It is a necessary and proper exercise of the state's authority to give precedence to the mother's fundamental interest in her relationship with her child over the irrevocable method of termination of that relationship by induced abortion."

The 2011 Anti-Coercion Abortion Statute continues South Dakota's longstanding efforts to protect that interest.  In 2005, South Dakota passed the Informed Consent Abortion Law (SDCL

§34-23A-10.1; 34-23A-1(4); 34-23A-10.2), finding a special need to protect the pregnant mother's interest in her relationship with her child.  SDCL §34-23A-1.4; 1.5.

South Dakota's Task Force to study abortion rendered a 71-page report emphasizing the need to protect that interest of pregnant mothers against coercion. Exhibit 57,  Harold Cassidy, 3/12/20 ("Cassidy3"); Report of the South Dakota Task Force to Study Abortion, December 2005, ("Task Force Report"), 34-41; 52-56.  In 2015, the South Dakota Legislature passed a joint resolution reaffirming the need to protect the interests of pregnant mothers against involuntary abortions. Exhibit 31, Harold Cassidy, 3/10/20 ("Cassidy1"); House Concurrent Resolution No. 1004 (2015), 3-11.

## PROCEDURAL HISTORY

### A.  The Preliminary Injunction Order

Despite recognizing "There is a compelling state interest in protecting a woman from being forced against her will to have an abortion" (ECF39,12), the Court ruled that the third-party counseling provisions likely violated the free speech rights of the women, (ECF39,7-16; ID#1052-61), and the "undue burden" standard of *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) (ECF39,16-27; ID#1061-72).

The Court did not have the benefit of the evidence, testimony, changed circumstances and clarification of law available on this Motion.

### B.  The Intervention and New Issues

Alpha Center and Black Hills Pregnancy Center were granted intervention on December 27, 2011 (ECF54). Intervenors raised new issues not considered by the court: (1) Plaintiffs do not possess third-party standing to litigate the rights of pregnant mothers; (2) pregnant mothers have a

2

fundamental liberty interest in maintaining their relationship with their children; (3) Intervenors have standing to litigate that interest of the mothers; and (4) Due Process *requires* the state to provide that protection whenever a state authorizes termination of that relationship.  *See*, Answer to Fifth Amended Complaint, ECF192, 16-23 (ID# 3132-3139).

### C.  The Third-Party Counseling Provisions

South Dakota's third-party counseling requirements relate to the critical primary decision a pregnant mother faces: whether or not to maintain her relationship with her child.  "Such counseling, education and assistance provided by these pregnancy help centers is of significant value to the pregnant mothers in helping to protect their interest in their relationship with their children." §34-23A-54(4).

The third-party counseling requirements represent the recognition that an abortion "is the employment of a medical procedure to achieve a non-medical objective: the termination of a pregnant mother's relationship with her child." Declaration of Glenn Ridder, MD, 4/7/20, ¶6; Declaration of Katherine Hartmann, MD, PhD, at ¶¶17, 34-40.  Plaintiffs admit that a mother's relationship with her child can give her great joy and fulfillment, and the decision of whether to terminate or keep that relationship is not a medical question. Cassidy1Ex1, Dep. of Plaintiff Dr. Carol Ball, 49:11-22; Cassidy1Ex3, Ball, 52:8-13; Cassidy1Ex4, Dep. of Plaintiffs' Physician, Dr. Nicola Moore, 142:20-144:3; *see*, Ridder, 4/7/2020, ¶¶6,7; Hartmann, ¶¶29, 126-127; 19, 37-38.

The legislature recognized two distinct and separate issues, each requiring distinct and separate counseling to protect the mothers' interests.  First, there is counseling necessary concerning the critical primary question of whether she should keep her relationship with her child.  *If* she decides she must terminate her relationship, counseling about how it is terminated becomes necessary:

3

termination by a court order in an adoption, or termination by terminating the life of the mother's child by abortion.  Ridder, 2020, ¶¶ 6-21; Hartmann, ¶¶ 34-40.

Thus, under SDCL §34-23A-57, no physician can take a consent for an abortion without: (1) advising the mother she must obtain counseling at a RPHC, (SDCL §34-23A-56(3)(a)); and (2) obtaining a signed statement from the mother stating where she obtained the RPHC counseling, and date, time, and name of the counselor (SDCL §34-23A-56(3)(b)).

## STATEMENT OF FACTS

### A.  The Facts that Required Remedial Legislation

SDCL §34-23A-54(1)(2)&(3) set forth some of Plaintiffs' negligent practices which necessitated remedial legislation.

### 1.  The Prior Litigation

In *Planned Parenthood Minn., N.D., S.D. v. Rounds,* 530 F.3d 724 (8th Cir. 2008) (*en banc*), the Eighth Circuit upheld South Dakota's Human Being Disclosure,"that the abortion will terminate the life of a whole, separate, unique, living human being."  Upon remand, the District Court ordered Plaintiffs to use the exact language of the statute (SDCL §34-23A-10.1(1)(b)). *Planned Parenthood, Minn., N.D., S.D. v. Rounds,* 650 F.Supp. 2d 972, 976-77 (D.S.D. 2009).  Plaintiffs appealed, not wanting to use the language of the statute. The Eighth Circuit affirmed.  *Planned Parenthood, v. Rounds*, 653 F.3d 662 (8th Cir. 2011).  Upon rehearing *en banc*, the court overruled the District Court's opinion striking the Suicide Disclosure.  *Planned Parenthood, v. Rounds,* 686 F.3d 889 (8th Cir. 2012) (*en banc*). Plaintiffs' complete disregard for the interests of the pregnant mothers evidenced the need for the Anti-Coercion Statute.

4

## 2.  Plaintiffs' Deficient Practices Discovered in the First Litigation

If a woman called Planned Parenthood in Sioux Falls to inquire about an abortion, a desk clerk scheduled surgery without the woman seeing or speaking with a physician or other personnel. Declaration of Patricia Giebink, MD,¶14; Cassidy3Ex2, Deposition of Andrea Adams, 2/15/06 ("Adams1"), 15:5-23; Cassidy3Ex3, Dep. of Katherine Looby, 2/3/06, 33:18-34:1; 71:6-73:24; 36:17-37:8; Cassidy3Ex4, Dep. of Jaime, 4/5/06, 23:20-24:16. Declaration of Brittany Weston, ¶20. During that phone call, Plaintiffs required the pregnant mother to decide between a medical and surgical abortion. Cassidy3Ex3, Looby, 71:6-73:24.  When Plaintiffs' Sioux Falls clinic is closed, a "call center" in St. Paul, Minnesota schedules surgery to be performed in South Dakota. Cassidy1Ex30, Adams, 49:3-51-5.

Planned Parenthood assumes that every pregnant mother had made a decision to have an abortion before she arrives at their clinic. Giebink, ¶23; Cassidy1Ex33, Adams, 3/13/14 ("Adams2"), 117:6-18; Declaration of Abby Johnson, 11/22/19, ¶15; Task Force Report, P.37.  "The consent was a formality and the counseling more so." Giebink, ¶23. That assumption is part of the National Model which Planned Parenthood Federation of America (PPFA) requires all of its affiliates to use.  Johnson, ¶¶8-21,15.

The pregnant mother was required to sign a consent for a surgical (Form 601) or medical abortion (Form 600), and pay for it before she was permitted to speak with a "patient educator" or physician. Giebink,¶14; Cassidy3Ex6, Looby, 75:10-21; Cassidy3Ex7, Deposition of Jaime, 4/5/2006, 33:1-37:5; Cassidy3Ex8, Adams1, 16:18-17:7; Cassidy3Ex9, Adams1, 69:-18; Cassidy3Ex10, Deposition of Kylene Guse, 33:17-24; Cassidy3Ex11, Adams1, 39:1-21;Cassidy3Ex12, Looby,78:1-10; 88:1-11; Cassidy3Ex13, Deposition of Carol Ball, 2/13/06 ("Ball1"), 127:10-24; Cassidy3Ex14,

Adams1, 47:10-50:13; Cassidy3Ex15, Looby, 83:10-84:25.

After the pregnant mother signed the consent and paid, she had a short meeting with a "patient educator." Giebink, ¶14. "Patient educators" volunteered no information about what help was available if the pregnant mother considered keeping her child. Cassidy3Ex17, Looby 116:10-15;Cassidy3Ex18, Dep. of Pamela Nelson, 4/5/2006, 95:4-8; Cassidy3Ex19, Adams1, 65:17-19; Cassidy3Ex20, Guse, 60:6-18. "Patient educators" confirmed that the pregnant mother signed the consents without asking if she read or understood them. Cassidy3Ex21, Adams1, 69:2-21; Cassidy3Ex22, Guse, 69:33-70:10.

Plaintiffs had no training program for "patient educators," and no counselors on staff. Cassidy3Ex34, Looby, 193:21-195:6; Cassidy3Ex35, Looby, 20:6-13; Giebink, ¶29.

Planned Parenthood's "patient educators:" (a) knew nothing about molecular biology, human embryology, genetics, the Carnegie Stages of fetal development, or any relevant science; (b) could not assess for pre-existing risk factors for psychological harm; (c) did not know the standards for disclosure; (d) acknowledged that those matters are never discussed among clinic personnel; and (e) did not know if scientists can observe organs in the "embryo" or "fetus." Cassidy3Ex36, Looby, 23:17-24:12; Cassidy1Ex37,Looby, 6:10-7:5; 7:17-8:6; 15:18-16:8; 17:20-18:12; Cassidy1Ex38, Looby, 197:4-202:19; Cassidy1Ex39, Looby, 230:2-20; Cassidy1Ex40, Adams1, 8:4-12; 121:7-17; 122:20-124:4; 118:1-119:1; 119:25-120:8; 117:12-25; 114:25-115:9; Cassidy1Ex41, Guse, 61:15-62:23; 88:17-89:25; Cassidy1Ex42, Jaime, 23:10-14; 74:22-76:24; 96:16-97:6; Cassidy1Ex43, Nelson,12:15-13:2; 98:6-100:2; 142:11-17; 143:16-146:23; 150:15-152:15; Giebink, ¶29.

The doctor who performed the abortion did not volunteer any information about the unborn child.Cassidy3Ex44, McCreary,185:16-186:15;Cassidy3Ex45, D'Ascoli,45:6-21;Cassidy3Ex46,Van

Oppen, 219:12-13;17-18; Giebink, ¶24; Declaration of Brittany Weston,12/16/2019,¶¶28-37, 39-46; Task Force Report, P.14.

The doctor spent five to ten minutes with the pregnant mother, the time required to perform the abortion.  Cassidy3Ex47, McCreary, 205:2-9; 233:16-234:3;  Cassidy3Ex48, Ball1, 46:19-22; 58:19-23; Giebink, ¶25; Weston,¶29.

There was no physician-patient relationship, the surgery being scheduled and a consent taken without ever meeting the doctor, who never saw the patient before or after the abortion. Cassidy3Ex49, McCreary, 206:10-207:1; 233:16-234:3; Cassidy3Ex50, Van Oppen, 77:7-15; Cassidy3Ex51,D'Ascoli,46:25-47:22;Cassidy3Ex52,Ball1, 46:6-47:11; 122:23-123:3; Cassidy3Ex53, McCreary, 205:2-207:1; 232:5-233:11; Giebink, ¶¶16-30; Weston, ¶¶24-46; Task Force Report, Pp.16-17.

**B.**    **Admissions in Discovery and Facts Occurring or Obtained After Entry of the Preliminary Injunction**

**1.  The Nature and Purpose of an Abortion**

**(a)  The Primary Decision**

"An abortion is an extraordinary medical procedure unlike any other in all of medicine.  It is the employment of a medical procedure to achieve a non-medical objective: the termination of a pregnant mother's relationship with her child." Ridder, 4/7/20, ¶6; Hartmann,¶17, 34-40; Declaration of Miriam Grossman, MD, ¶16.

It is widely recognized, and Plaintiffs admitted, that "the right that a mother has to keep her relationship with her child is one of the greatest rights that a mother would have in her lifetime,"  and that relationship "can give great joy and benefit to the mother."  Cassidy1Ex1, Ball, 3/14/14 ("Ball2"),

7

49:11-22; Task Force Report, Pp.65-67; SDCL § 34-23A-85; Grossman, ¶16; Declaration of Patricia Casey, MD, ¶34; Declaration of Priscilla Coleman, PhD ¶17.

The primary critical decision a pregnant mother faces is whether she should keep her relationship with her child. Ridder, ¶¶6, 7; Hartmann, ¶¶34-40; Casey, ¶¶2,56-59; Coleman, ¶17; Grossman, ¶¶13,16.

Plaintiffs admitted that the pregnant mother' decision, whether to keep or terminate her relationship with her child, is one of the greatest, most difficult and consequential decisions she will face in all of life.  Cassidy1Ex2, Ball2, 49:23-50:17; Ridder, 6/28/11, ¶¶12-15; Casey, ¶¶34;63; Hartmann, ¶¶124-127; Coleman ¶17; Grossman ¶¶8-17; Johnson ¶14.

Plaintiffs acknowledged that the mother's decision whether or not to keep her relationship with her child is not a medical decision. Cassidy1Ex3, Ball2, 52:8-13; Ex. 4, Cassidy1, Moore, 142:20-143:9; Ridder, ¶¶7, 8; Hartmann, ¶¶34-40; Casey, ¶¶34-35;54;56.

Dr. Moore admitted she has no expertise to counsel a pregnant mother about whether to maintain or terminate that relationship. Cassidy1Ex4, Moore, 143:11-144:3.

Thus, the primary question faced by the pregnant mother is not a medical question.

### (b)  The Unique Nature of an Abortion

An abortion terminates the life of a whole, separate, unique, living human being.  *Rounds,* 530 F.3d 724 (8th Cir. 2008) (*en banc*); Task Force Report, P.13.

Plaintiffs admit that a physician who has a pregnant mother as a patient, has two patients, the mother and her child, and has a duty to both.  Cassidy1Ex5, Ball2, 63:15-64:20; Ridder*,* ¶15; Hartmann, ¶¶30-31.  Plaintiffs admit that the physician has a duty to disclose the risks of a proposed procedure to the child by disclosing them to the mother who makes a decision for both patients.

Cassidy1Ex20, Ball2, 59:8-17; 60:21-61:7; 62:24-63:10;  Ridder, ¶¶14-18; Hartmann, ¶32.   This

dual duty is imposed by medical standards and by law.[1]  Ridder, *Id.*; Hartmann, ¶31.

Therefore, the physician who proposes to perform an abortion proposes to terminate the life

of one of her patients.  It is a criminal homicide in South Dakota to intentionally kill a human being

in utero any time after conception.  SDCL§22-16-1.1.  Dr. Ball admitted that killing the child in

utero, at any age of gestation, is a criminal homicide, and the only thing that immunizes her from

prosecution is the signed "consent." Cassidy1Ex7, Ball2, 65:13-66:1; SDCL§22-16-1.1 (doctor's

immunity depends on obtaining consent).

Thus, the consent for an abortion: (1) authorizes the physician to terminate the pregnant

mother's constitutionally protected relationship with her child; (2) authorizes the termination of the

life of one of the physician's patients; and (3) immunizes the physician from criminal prosecution for

what is otherwise a criminal homicide. Ridder, ¶¶14-18; Hartmann, ¶29.

There is no greater need in all of medicine for the State to insure that a consent for an

abortion is truly voluntary and informed.  Ridder, ¶18; Hartmann, ¶29.  Yet, Dr. Ball testified that

she thinks it is no more important for a consent for an abortion to be voluntary and informed, than

---

[1]*Hughson v. St. Francis Hospital*, 459 N.Y.S.2d 814, 816 (N.Y. 1983) ("both the mother and child *in utero*...are each owed a duty, independent of the other").  The doctor has a duty to provide the mother with information regarding the risks the proposed treatment would have for the child. *Id.* If the physician fails to make proper disclosure, the child born alive has a negligence claim against the physician for injuries causally related to the negligence of defendants.  *Harrison v. United States*, 284 F.3d 293, 301 (1ˢᵗ Cir. 2002) (Mass.); *Roberts v. Patel*, 620 F.Supp. 323, 326 (N.D. Ill. 1985); *Walker v. Mart*, 790 P.2d 735, 739 (Ariz. 1990) (*en banc*); *Nold v. Pinyon*, 31 P.3d 274, 289 (Kan. 2001); *Draper v. Jasionowski*, 858 A.2d 1141, 1146 (N.J. App. Div. 2004); *Ledford v. Martin*, 359 S.E.2d 505, 507 (N.C. 1987);  *Miller ex rel. Miller v. Dacus*, 231 S.W.3d 903, 910-11 (Tenn. 2007); *Jones v. MetroHealth Med. Ctr*, 89 N.E.3d 633, 662-663 (Ohio Ct.App. 2017);  *Randall v. United States*, 859 F.Supp. 22, 31-33 (D.C. 1994); *In re A.C.*, 573 A.2d 1235, 1239 1246 n.13 (D.C. 1990).   This two-patient concept is recognized in other malpractice contexts. *See, e.g.,  Burgess v. the Superior Court of Los Angeles*, 831 P.2d 1197, 1203 (Cal. 1992) (*en banc*); *Ob Gyn Associates of Albany v. Littleton*, 386 S.E.2d 146, 147 (GA. 1989); *In re Certification of Question of Law from U.S. District Court (Farley)*, 387 N.W.2d 42 (S.D. 1986) (a wrongful death malpractice action for the death of a stillborn child).

a consent to suture a cut finger. Cassidy1Ex7, Ball, 67:19-68:23.

      **2.**      **Pregnant Mothers are Coerced and Pressured into Abortions Performed at Plaintiff Planned Parenthood and Other Clinics Whose Interests Conflict with Those of the Mothers**

Pregnant mothers are coerced or pressured into abortions performed at Plaintiffs' Sioux Falls clinic. *See*, Declarations of B.H.; Brittany Weston; Alyssa Carlson; Giebink, ¶¶16-30; *see also,* Declaration of S.C., (who was pressured into an abortion at Plaintiffs' St. Paul clinic by clinic personnel).

B.H.'s coerced abortion was performed at Plaintiffs' clinic *after* the scheduled effective date of South Dakota's Anti-Coercion Statute. She lost her child because Plaintiffs obtained an injunction that prevented her from getting the help she desperately wanted to protect her rights that *she* wanted protected. She states, "Planned Parenthood didn't represent me and my interests, and they do not represent the interests of other women like me." B.H., ¶¶32-34.

S.C. testifies "I think it is outrageous that Planned Parenthood claims to represent the interests of women like me ... they never bothered to find out what my interests really were ... Planned Parenthood does not respect my right to keep and raise my child ... ." ¶24.

Brittany Weston describes the shocking callousness of Plaintiffs' "patient educators" and doctors who violated her interests. Weston, ¶¶20-46.

Pregnant mothers are routinely coerced into abortions at abortion clinics. Declarations of Amrutha Bindu Mekala, Margie Ayers, Crystal Roden, Jean Corbett, Megan Watson and Vixie Miller. Pregnant mothers are routinely pressured into abortions and often the abortion clinic staff pressures them. Declarations of Linda Huffstetler, Julia Holcomb Misely, Allyson Bowlin, Amanda McAdams, Ruth Ruch, Bonnie Steen, Denise Cota, R.N., Lisa Hartman, Janet Hurguy, and Alexandra

Szmeit; Coleman, ¶32; Hartmann, ¶79.

Some pregnant mothers coerced into abortions are so traumatized they commit suicide. Declaration of George Zallie (who found his 21-year-old daughter hanging from her bedroom fan at the family's home).  Women who were encouraged to have an abortion after a forcible rape, testify that the abortion was like a second rape, only far worse than the first.  Lisa Hartman, ¶10; Amanda McAdams, ¶14 .

Studies show a leading cause of death among pregnant mothers is murder, and most of those murders are performed by their male partners.  Coleman, ¶35;  *See*, 79 documented cases of pregnant mothers murdered because they refused to have an abortion,  Coleman, Exhibit D.

In an exhaustive survey of 987 post-abortive women, over half stated their abortions were coerced or pressured, 34% stated that abortion clinic personnel pressured them to have an abortion, and 84.6% wished that just one person offered the support they needed to carry their baby to term. Coleman ¶61.

In 2013, the American College of Obstetricians and Gynecologists issued Committee Opinion 554, "Reproductive and Sexual Coercion," stating that "pregnancy coercion" is a serious cultural problem which includes threats or acts of violence to compel the women to terminate a pregnancy. Coleman, ¶38; Hartmann, ¶114.  *See*, *State v. Vargas*, 869 N.W.2d 150 (S.D. 2015).

Coerced abortions are so widespread that in 2009 the "Center Against Forced Abortions" ("CAFA") was created, and  CAFA's national network of attorneys provide *pro bono* legal services for pregnant mothers who seek help because they are being coerced into an abortion.  CAFA has saved between 10,000 to 20,000 pregnant mothers from coerced abortions. Declaration of Allan Parker, ¶¶2-16.

11

Intervenors have for many years provided pre-abortion and post-abortion counseling.  The number of pregnant mothers who are subjected to coercion and pressure to have abortions is staggering.  Declarations of Kimberly Martinez; Stacey Wollman; Leslee Unruh, 5/1/2020; Unruh, 7/1/2011; Erica Miller; Travis Lasseter.

Pregnancy help centers throughout the nation counsel large numbers of women victimized by coerced abortions.  Declarations of Yvonne Florczak-Seeman; Kay Kiefer; Jean Corbett; Denise Cota; Cynthia Collins; Marjorie Hjemfelt.

Good Counsel, Inc., which provides free maternity housing, has counseled thousands of post-abortive women, a significant percentage of whom were coerced or pressured into abortions.  Declaration of Christopher Bell.  Almost all of the mothers Good Counsel houses are homeless because they were forced out of their homes for refusing to have an abortion.  Bell, ¶4.  Many other shelters provide living arrangements for pregnant mothers because they are being coerced to have abortions.  Declaration of Sandra Ramos.

Dorothy Wallis has worked with many hundreds of pregnancy help centers, where post-abortive women report that: they were coerced by threats of violence; abortion clinic personnel pressured them into an abortion; or no one would help them keep their babies.  Declaration of Dorothy Wallis, Ex.A, p.10-11.

Pregnant mothers are pressured to terminate their relationship with their children, even if they resist an abortion.  Declarations of Renee Gelin; Patricia Collings.

**3.   The Bad Practices and Conflicts of Interest at Abortion Clinics Exacerbate the Coercion**

The bad practices employed by Plaintiffs' Sioux Falls clinic (Statement of Facts A2) follows

the national model required to be used by PPFA affiliates which are also employed by other abortion clinics. Giebink, MD, Susan Thayer, Abby Johnson, Annette Lancaster, Ramona Trevino; Noemi Padilla; Carol Everett; Dana Behrhorst. Thus, there is no physician-patient relationship, surgery is scheduled over the phone, it is assumed that the mother decided to have an abortion before she arrives, consent is taken for surgery and payment is made without any counseling and no regard is given to the mother's interest in her relationship with her child.  Giebink, Thayer, Johnson, Lancaster, Trevino, Padilla, Everett and Behrhorst.  No affiliate is permitted to change any of these procedures without permission of PPFA.  Thayer, ¶8; Giebink, ¶¶13-21.

Planned Parenthood and other clinics pressure their staffs to "sell" abortions, and steer, mislead and pressure ambivalent pregnant mothers to have abortions.  Giebink, ¶¶22,23; Thayer ¶¶11-16; Johnson ¶¶16-24; Lancaster  ¶¶12-16; Trevino  ¶¶5-15; Padilla ¶¶16-19; Everett ¶¶3-9; Behrhorst, ¶¶7-11.  As to Plaintiffs' clinic, *see*,  B.H.; Weston; Ayers; S.C.; Giebink.

It is so common for abortion clinics to perform abortions on mothers who are ambivalent that pregnant mothers seek help to stop medical abortions after they are started.  A network of physicians arose to help these women stop medical abortions and give birth to children they want.  Declaration of Mary Davenport, MD.  Abuses at abortion clinics are so rampant that an organization developed a program to obtain attorneys for pregnant mothers victimized by abortion clinics. Declaration of Mark Crutcher.

A large percentage of pregnant mothers want help to keep their children, but the clinics instead steer them to an abortion. Thayer, ¶22; Johnson, ¶¶16-22; Unruh, 5/1/20, ¶¶18-19; Everett, p.14; Trevino, ¶¶8-11.

Patricia Giebink is the last South Dakota physician who performed abortions at Plaintiffs'

Sioux Falls clinic.  She was chastised for lost revenue because she provided counseling that led women to forgo surgical procedures, told that counseling pregnant mothers considering an abortion was not her job, and was fired for counseling them.  Giebink, ¶¶16-30.

Plaintiffs cannot recruit a South Dakota doctor to perform abortions at its Sioux Falls clinic. Consequently, abortions are scheduled one day a week and an abortion doctor flies in from out of state for the day.  Cassidy1Ex11-14, Ball2, 21:8-13;22:1-22; 5:18-20; 12:16-20:19.  There is no physician-patient relationship (Thayer, ¶14; Giebink ¶28) and Plaintiffs perform unethical itinerant surgery.  Ridder, ¶¶35-38; Hartmann, ¶66.

Plaintiffs did not screen for coercion or pressure.  Giebink, ¶¶13,14, 30; Thayer, ¶13; B.H.; Weston; Carlson; S.C.

Even when it is obvious that a pregnant mother is being pressured or coerced into an abortion, the clinics still push her to an abortion.  Thayer, ¶24; Johnson, ¶¶16-22; Lancaster, ¶¶13-15; Weston; B.H.; Vixie Miller.

Many pregnant mothers who arrive at an abortion clinic believe an abortion violates their ethical or religious beliefs. Everett, p. 9; Thayer, ¶¶23, 27; Johnson, ¶23; Lancaster, ¶11. Planned Parenthood and other clinics manipulate these pregnant mothers to convince them that an abortion is moral, or that "God will forgive them."  Everett, p. 9-13; Johnson, ¶23.

Pamphlets were developed to teach abortion "educators" how to use passages in the Bible to convince religious women to have an abortion.  At NAF conferences, panelists who stated they were atheists laughed about different ways to convince religious women that God will forgive their abortion.  Everett, p. 9-10; Johnson, ¶23; Lancaster, ¶11.

Dr. Ball was a member of NAF's Board of Directors from 2006 to 2014.  Since 1994 there

14

have been no standards, policies or procedures in patient education promoted at the NAF conferences that she disagreed with. Cassidy1Ex29, Ball2, 22:9-35:24.

Exhibit D to the Report of Carol Everett (attached to her Declaration) is a transcript of an annual NAF seminar for "counseling" women at an abortion clinic. The presenters discuss "The God Thing," all admit they do not believe in God, mock the women's belief in God, and debate the best way to convince religious women that it is acceptable to God to have an abortion. These deceptive techniques are rampant in the abortion industry. Everett, p.12.

Planned Parenthood patient educators in Sioux Falls are "trained" to discuss religious beliefs with religious women considering an abortion. Ex1, Harold Cassidy, 3/11/2020 ("Cassidy2"); Ball2, 146:20-152:5 *See also*, Cassidy2Ex2, training manual (submitted under seal). Dr. Ball testified she is an atheist, but "someone who identifies themselves as an atheist ... is an appropriate person to discuss religious beliefs with a woman who is grappling with a decision because she thinks it may be inconsistent with her personal value structure and her church's teachings." Cassidy1Ex9, Ball2, 150:18-152:5.  Dr. Moore does not believe in God, but thinks it's appropriate for an atheist to counsel a devout Christian woman about God and her deeply held religious beliefs.  Cassidy1Ex10, Moore, 156:14-158:21.

South Dakota's Anti-Coercion Statute requires a physician to screen for six specifically identified risk factors including whether she "views an abortion to be in conflict with her personal or religious values."  SDCL §34 23A-56(4)(c).

Plaintiffs admit that if a pregnant mother has any one of those preexisting risk factors, and she has an abortion, she is at increased risk for psychological harm. Cassidy1Ex8, Ball2,177:5-179:13. Dr. Moore admitted the potential harm included depression, sadness, anger, post-traumatic stress

disorder, anxiety, suicide ideation and suicide.  Cassidy1Ex32, Moore, 130:4-133:17.

The majority of pregnant mothers at Planned Parenthood clinics have one or more of those six preexisting risk factors.  Thayer, ¶23; Johnson; Lancaster; Trevino; Casey, ¶57; Hartmann, ¶134.

Plaintiffs and other abortion providers, although contemptuous of women's religious beliefs, presume to lecture religious women about their religious beliefs to convince them to have an abortion.

Despite Plaintiffs losing three decisions in the Eighth Circuit, and ordered to make the Human Being Disclosure (SDCL §34-23A-10.1(1)(b)) using the precise language of the statute, Plaintiffs supply an unintelligible statement that does not approximate the disclosure required.  *See*, Plaintiffs' disclosure form. Cassidy1Ex35. Bruce Carlson, MD, PhD; SDCL §34-23A-80.

Because of Plaintiffs' defiance of court orders, non-compliance with the statute, and Plaintiffs' conflict of interests, the scope of the RPHC counseling was expanded.  SDCL §34-23A-74 to 88; Ridder, ¶¶25-28; Casey, ¶¶20-28..

Dr. Ball admitted that physicians are required to know the applicable standards for disclosure in each state in which the physician practices.  Cassidy1Ex15, Ball2, 29:23-30:14.  However, she didn't know the difference between the "reasonable patient" and"professional" standards or what standard is required in South Dakota, despite the fact the statute she attacked as unconstitutional recited the standard.  Cassidy1Ex15, Ball2, 30:15-25; SDCL §34-23A-1.6; Ridder, 4/7/20, ¶¶38-43; Hartmann, ¶85.

Plaintiffs admit that the informed consent process requires the physician to "take whatever steps necessary" to determine that the patient understands the information before accepting a consent. Cassidy1Ex16, Ball2, 48:22-49; 10; Hartman, ¶¶23-24; Ridder, 2020, ¶43.

SDCL §34-23A-10.1(3) requires the physician to certify that the physician is satisfied that the

16

pregnant mother understands the disclosures. Dr. Ball certifies that the pregnant mother understands the disclosures despite the fact she doesn't discuss them with the pregnant mother (Cassidy1Ex17, Ball2, 76:6-15; 76:18-77:5;Hartman, ¶86; Ridder, 4/7/20, ¶¶43-49), and Plaintiffs' written materials deny the required disclosures or makes them unintelligible. Cassidy1Ex35, (disclosure form); Cassidy1Ex22, Adams2, 125:8-126:6.

Plaintiffs' failure violates the law.  SDCL §34-23A-56 requires physicians to discuss the disclosures with the pregnant mother to determine that she understands them.

Dr. Ball admitted that she did not know what the risk of death was for a healthy 21-year-old pregnant mother if she carried to term, but tells those women they are ten times more likely to die if they carry to term, than if they  have an abortion.  Cassidy1Ex20, Ball2, 86:6-87:25.  The risk of death for a healthy young pregnant mother who carries to term is no greater than the rate of death for an abortion.  Hartmann, ¶¶57-63.

4.   **The RPHC Counseling is Essential for the Protection of the Mother's Right**s

There are two fundamentally different questions faced by pregnant mothers which require two fundamentally different kinds of counseling, and the critical primary question is not a medical question (Facts, B1, P7-10).  The legislature concluded that the "counseling, education and assistance provided by these pregnancy help centers is of significant value to the pregnant mothers in helping to protect their interest in their relationship with their children."  SDCL §34-23A-54(4).

The decision of the pregnant mother is made under great stress, while her decision-making abilities are compromised, requiring special counseling.  Coleman, ¶¶43; 54; Casey, ¶¶36-38; Grossman, ¶¶8-17.

17

"The touchstone of the 1217 client counseling is the protection of the pregnant mother's autonomy to make her own decision which she feels is best for her and her child."  Unruh, 25/1/20, ¶14.  The RPHC Policy and Procedure Guidelines ("Guidelines"), mandatory by statute, state:

> "The entire (counseling) session must be welcoming and warm, and one that reaffirms her autonomous decision making without any signs of disapproval of her desires or preferences." Guidelines, Exhibit 2, Ridder, 4/7/2020, III (A)(1)(b).

> "It is inconsistent with the purposes of the counseling session for a counselor to attempt to persuade a pregnant mother who truly wants an abortion to forgo an abortion.  Likewise, since the central purpose of the counseling is to help the mother to keep her relationship with her child, if that is her true preference, it is inconsistent...for a counselor to advocate that the mother terminate her relationship by an adoption...Nor should the counselor say anything that can be interpreted to constitute disapproval of the pregnant mother keeping her child.  Such expressions and approaches are inconsistent with the entire purpose of the counseling which is to reinforce the pregnant mother's autonomous decision making." Guidelines, III (A)(1)(a); *see also*, Unruh, 5/1/20, ¶¶14-16.

The RPHCs, unlike Plaintiffs, provide excellent help and counseling in all areas of concern related to the primary decision faced by the pregnant mother.

First, they are fully staffed to provide experienced counseling that allows the mother to express her true desires concerning her child.  Unruh, 5/1/20, ¶¶5-26; Erica Miller, ¶¶1-34; Unruh, 7/1/11, ¶¶12-23; Martinez, ¶¶7, 9-14; Wollman; Hjemfelt; Lasseter.  Alpha Center alone has 21 licensed personnel qualified to provide the 1217 counseling, and is capable, within the 72-hour wait period, of providing counseling to ten times the number of women on whom Plaintiffs perform abortions each week.  Erica Miller, ¶25.  The quality of the physical offices at Alpha Center is among the best in the nation.  *See*, video attached to Unruh, 5/1/20; Miller.

Second, they have expertise in assessing for coercion and pressure, and provide assistance to

18

resist coercion, including free legal services.  Ridder, 4/7/20, Exhibit 2, (Guidelines); Exhibit 3, (Addendum to Guidelines); Unruh, 5/1/20, ¶¶5-26; Miller, ¶¶14-34.

RPHCs save pregnant mothers from being coerced into an abortion.  Dec. of M.S.; Natalie Pfaff; Joyce Zulkosky, R.N.; Erica Miller.  Mothers who lost their children to coerced abortions would be saved if given the opportunity to go to a RPHC.  Declarations of Jace Hanicsh, Patrick Hanisch.

Third, RPHCs provide accurate and helpful counseling concerning the Human Being and Relationship Disclosures, not properly disclosed by Plaintiffs.  Compare (Plaintiffs' Disclosures) Cassidy1Ex35, with Addendum to Guidelines, Ridder, Exhibit 3.

Fourth, RPHCs provide services and information about help from 114 sources for women who want to keep their children.  Exhibit 1 (Resource List), Erica Miller;¶¶6-34; Unruh, 5/1/20; Unruh 7/1/11; Martinez; Wollman.

Fifth, RPHCs have decades of experience counseling thousands of post-abortive women, providing unique insight to help assess for coercion and pressure, and understanding the psychology of their decision-making.

Sixth, unlike Plaintiffs, the interests of RPHCs are in harmony with those of the pregnant mother who desires to keep her child.  The primary purpose of the counseling is to help the pregnant mother keep that relationship, if that is her true preference.  Guidelines, IIIA. The RPHC is not paid based on any particular outcome and not permitted to steer the mother to any particular outcome.

Seventh, a pregnant mother's decision at the RPHC    if one is made at all    is neither final, nor irrevocable after she leaves the RPCH.  In contrast, for pregnant mothers who want their children but are taken to an abortion clinic, surgical abortions are fatal and irrevocable and medical abortions

are almost always irreversible.  Hartmann, ¶142.

The RPHC counseling is necessary to provide protection of the mother's interests in her relationship with her child.  An abortion clinic is the last place that a pregnant mother should be making "the primary decision."  Hartmann, ¶¶34-40; 143 *et seq*; Coleman, ¶85; Ridder, ¶¶6-52; Casey, ¶¶20-28;56-61.

## LEGAL ARGUMENT

### Introduction: Changed Circumstances

A Preliminary Injunction (PI) is an interlocutory order and on a motion to dissolve it, the Court is not "bound by a strict standard of changed circumstances," but can rely upon any "subsequent changes in the facts or the law, or for any good reason." *Movie Systems, Inc. v. MAD Minneapolis Audio Distributors*, 717 F.2d 427, 430 (8th Cir.1988); *Omaha Indemnity Co., v. Wining*, 949 F.2d 235, 239 (8th Cir. 1991). Nonetheless, there has been an overwhelming change of material circumstances that demonstrate good cause for the dissolution of the PI.

First, relevant court opinions have issued since entry of the PI: *Planned Parenthood, v. Rounds,* 653 F.3d 662 (8th Cir. 2011); *Planned Parenthood, v. Rounds*, 686 F.3d 889 (8th Cir. 2012)(*en banc*); *NIFLA, v. Becerra,* 138 S.Ct. 2361 (2018); *June Medical Services v. Russo,* 140 S.Ct. 2103 (2020).

Second, the complaint has been amended five times.

Third, there have been twenty amendments to the original statute, which materially affect this Court's original legal analysis.  *See*, list of amendments in Cassidy1, Section III.

Amendments in 2012, 2013, 2015, 2016 & 2018 directly relate to the third-party counseling: (1) requiring the counseling be performed by persons with certain professional licenses; (2) RPHCs must file annual reports; (3) excluding as a RPHC any entity which places children for adoption; (4)

20

adherence to mandatory RPHC policy and procedure guidelines; (5) imposing criminal sanctions for violating confidentiality; (6) authorizing the DOH to impose certain sanctions on the RPHC; and (7) expanding the scope of RPHC counseling to include the Human Being and Relationship Disclosures. A related 2019 statute makes it a crime to coerce a pregnant mother to have an abortion.  SDCL §22-17-13.

Fourth, multiple orders dissolved the PI relating to most provisions of the statute, demonstrating lack of irreparable harm.

Fifth, RPHCs intervened and introduced four issues not considered by the Court (p. 2-3 above).

Sixth, there have been subsequent events, new facts obtainable and Plaintiffs made material admissions in discovery. (Statement of Facts, B.)

In short, the statute is not the same statute scrutinized in 2011, the complaint and claims Plaintiffs assert are not the same, the answer and affirmative defenses are not the same, new court decisions dictate a different result, and new facts and subsequent events demonstrate that every material fact assumed by the court when it entered the PI, have proven incorrect.

## POINT I

### The Pregnant Mother has a Fundamental, Intrinsic Right to Maintain Her Relationship with Her Child Protected Under the Fourteenth Amendment

A pregnant mother has a fundamental liberty interest to maintain her existing relationship with her child, and her personal interest in her child's life and well-being.

### A.

It is axiomatic that the term "liberty" extends beyond mere freedom from physical restraint. *Board of Regents, et al. v. Roth*, 408 U.S. 564, 572 (1972); *Meyer v. Nebraska*, 262 U.S. 390, 399

(1923).

To determine whether an "interest" is one protected by Due Process the Court must first describe the conduct asserted to be a liberty. *Washington v. Glucksberg*, 521 U.S. 702, 722-23 (1997); *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972); *Graham v. Richardson*, 403 U.S. 365, 374 (1971). Protected are  interests "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934).  The Court has:

> "'continual insistence upon respect for the teaching of history [and] solid recognitions of the basic values that underlie our society...'"  *Michael H. v. Gerald D*., 491 U.S. 110, 122-123; quoting *Griswold v. Connecticut*, 381 U.S. 479, 501 (1965) (Harlan, J., concurring).

Employing these criteria   "tradition and history," "the conscience of our people," and "recognition of the basic values that underlie society," the Court has recognized as interests protected by Due Process those fundamental to bringing up children... "as essential to the orderly pursuit of happiness by free men." *Meyer*, 262 U.S. at 399.  There has been significant debate over the precise definition of  "deeply rooted traditions."  *See Moore v. East Cleveland*, 431 U.S. 494, 502 (1977); compare Justice Scalia, *Michael H.*, 491 U.S. 110, with dissents of Justices Brennan, *Id.* at 136, and White, *Id*. at 157.

Regardless of the criteria employed, a mother's interest in her relationship with her child is protected as a fundamental liberty, *Santosky v. Kramer*, 455 U.S. 745, 753, 759, and that fundamental liberty interest is protected throughout pregnancy.  *Lehr v. Robertson*, 463 U.S. 248, 260 n.16 (1983).  That liberty interest in parental relationships is derived from "intrinsic human rights." *Smith v. Org. of Foster Families* 431 U.S. 816, 845 (1972). That the mother's relationship is a protected fundamental liberty is supported by all applicable criteria   "tradition and history;" the dictates of the natural and inalienable rights of both mother and child; "the conscience of our people," and the

"recognition of the basic values that underlie society."  Although closely related, a mother has three identifiable interests protected throughout pregnancy under the Due Process Clause: (1) her interest in her existing relationship with her child; (2) her personal interest in her child's life and welfare; and (3) her interest in her family as a unit.  *See Santosky*, 455 U.S. 745; *Quilloin v. Walcott*, 434 U.S. 246 (1978); *Smith*, 431 U.S. 816; *Prince v. Mass.*, 321 U.S. 158 (1944); *Stanley v. Ill.*, 405 U.S. 645, 651-652 (1972); *Pierce v. Soc. of Sisters*, 268 U.S. 510, 534-535 (1925).  The relationship of mother and child, especially during pregnancy, is one traditionally cherished and protected, and one which embodies some of the most basic values upon which our entire society is built.  Nothing would shock the conscience of our people more than a declaration that the most important, most intimate, most unique, and most vulnerable of all familial relationships would go unprotected by a Constitution which holds these relationships as the touchstone and core of civilized society. (*State of South Dakota Concurrent Resolution*, No.1004, 2015, p.8 (Cassidy1Ex31)). "Respect for human life finds ultimate expression in the bond of love the mother has for her child..." *Gonzales v. Carhart*, 550 U.S. 124, 159 (2007).

## B.

The relationship between parents and their children is protected as a fundamental liberty. *Santosky*, 455 U.S. at 753, 758-759.  *Troxel v. Granville*, 530 U.S. 57, 65 (2000) observed that it is perhaps the oldest recognized liberty interest, first recognized in *Meyer*, 262 U.S. 390, 399 (1923), and *Pierce*, 268 U.S. 510, 534-535 (1925).  This liberty has its source "in intrinsic human rights, as understood in 'this Nation's history and tradition.'" *Smith*, 431 U.S. at 845 (quoting *Moore*, 431 U.S. at 503).

The interest protected is the interest in the relationship itself, as demonstrated by cases addressing the circumstances in which the relationship of a biological father is recognized as

protected.  Compare, *Stanley*, 405 U.S. 645; and *Caban v. Mohammed*, 441 U.S. 380, 389 n.7 (1979) (making the point explicitly and finding father's interests protected) *with Quilloin*, 434 U.S. at 248, and *Lehr*, 463 U.S. at 261 (father's interest not protected).

In contrast, the pregnant mother's interest in her relationship with her child is always protected as fundamental.  This is because "the mother carries and bears the child, and in this sense her parental relationship is clear."  *Lehr*, 463 U.S. at 260 n.16 (quoting *Caban*, 441 U.S. at 397 (Stewart, J., dissenting)).[2]  "Fathers and mothers are not similarly situated with regard to the proof of biological parenthood." *Nguyen v. I.N.S.*, 533 U.S. 53, 63 (2001) (citing *Lehr*).

Because the parents' rights are fundamental, the Due Process Clause forbids a state to terminate a parent's relationship with her child unless it can prove by clear and convincing evidence the parent is unfit.  *Santosky*, 455 U.S. at 757-759.

While *Santosky* arises in the context of an "involuntary" termination, the state cannot circumvent requirements of Due Process by statutorily authorizing terminations it terms "voluntary," without ensuring that the mother's consent to terminate is truly voluntary and informed.  Likewise, the state cannot circumvent the requirements of Due Process by termination pre-birth, whether the state designates them "voluntary" or "involuntary."

A mother's relationship with her child during pregnancy is so intimate that the unique bond between them creates a human relationship which may be the most rewarding in all of human experience.  Task Force Report, p.55; 65.

> "If there are any self-evident and universal truths that can act for the
> human race as a guide or light in which social and human justice can

---

[2]Interrelated with the pregnant mother's right to maintain her relationship with her child is her fundamental right to procreate.  *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942).  If it can be said that her right to procreate is satisfied upon conception, that right, being "one of the basic rights of man" (*Id.*), is rendered meaningless if the mother's resulting relationship with her child in utero is left unprotected.

> be grounded, they are these: ... that the cherished role of a mother and her relationship with her child, at every moment of life, has intrinsic worth and beauty; that the intrinsic beauty of motherhood is inseparable from the beauty of womanhood; and that this relationship, its unselfish nature and its role in the survival of the race is the touchstone and core of all civilized society.   Its denigration is the denigration of the human race."  *State of South Dakota Concurrent Resolution*, No. 1004, 2015, p.8. (Cassidy1Ex31)

South Dakota protects this interest of pregnant mothers: (1) against involuntary termination in the context of adoption; (2) by South Dakota's Wrongful Death Statute, which deters involuntary terminations at any age of gestation (*Farley v. Mount Mary Hospital Assoc., Inc.*, 387 N.W.2d 42 (S.D. 1986); *Wiersma v. Mapleleaf Farms*, 543 N.W.2d 787 (S.D. 1996); SDCL §21-5-1); (3) by deterrence of the State's statute making it a criminal homicide to kill a child at any age after conception (SDCL §22-16-1); and (4) by making coercing a mother to have an abortion a crime (SDCL §22-17-13).

South Dakota's 2005 Informed Consent Abortion Statute required a physician to disclose, prior to taking a consent, "that the pregnant woman has an existing relationship with that unborn human being and that the relationship enjoys protection under the United States Constitution..." SDCL §34-23A-10.1(c). The Plaintiffs in this case filed suit claiming that disclosure was unconstitutional as a false statement of fact and law. *Planned Parenthood Minn., N.D., S.D., et al. v. Rounds, et al.*, 4:05-c-04077-KES, ECF 145, p.12-13. The District Court granted Plaintiffs Summary Judgment and, on appeal, Plaintiffs again argued that the disclosure was false. *Rounds*, Docket No. 09-3233, ID 3652535 (Plaintiffs' Brief, p.29-47).

The Eighth Circuit reversed, upholding the provision. *Planned Parenthood et al., v. Rounds, et al.*, 653 F.3d 662 (8th Cir. 2011). If that disclosure was false, as Plaintiffs contended, the Eighth Circuit would have affirmed the District Court. By virtue of the fact Plaintiffs fully litigated that

issue, and there was no ruling in their favor, that ruling is *res judicata* in this case between the same Plaintiffs and same Intervenors. *Federated Dept. Stores, Inc., et al. v. Moitie, et al.,* 452 U.S. 394 (1981). "A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in the action." *Id*. at 398; *Brown v. Kansas City Live, LLC*, 931 F.3d 712, 714 (8ᵗʰ Cir. 2019) (citing *Federated Dept. Stores*); *cf. Laase v. County of Isanti*, 638 F.3d 853 (8ᵗʰ Cir. 2011).

## POINT II

### The Plaintiffs Lack Third-Party Standing to Litigate the Rights of Pregnant Mothers

The District Court assumed Plaintiffs possessed third-party standing to litigate the Constitutional rights of all pregnant mothers, including those whose interests conflicted with those of Plaintiffs, despite the fact that the statute was intended to protect the pregnant mothers against Plaintiffs' derelictions and conflicts of interest.  The sole basis for the PI was the Court's ruling that the statute's protections for the pregnant mothers' rights    including protection against Plaintiffs' negligence    likely violated the rights of those same mothers.  Order, ECF39, ID#1049-1072.

Third-party standing is the exception to the general rule that a litigant has no standing "to vindicate the constitutional rights of some third party." *Barrows v. Jackson*, 346 U.S. 249, 255 (1953).  Ordinarily, "a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal interests and rights of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991).

To establish third-party standing, the Plaintiff must demonstrate the Plaintiff suffered an injury-in-fact which satisfies Article III case-or-controversy requirements; and must establish a close relationship with the third-party with a congruence of interests, that the third-party lacks ability to

26

assert her own rights, and the litigation has an impact on the third-party's interests. *Caplin & Drysdale v. United States*, 491 U.S. 617, 624, n.3 (1989).

This Court entered the PI without identifying any "injury-in-fact" of Plaintiffs. The only injury Plaintiffs assert is that the statute violates their Equal Protection Rights because obtaining consents for an abortion is treated differently from other procedures (Sixth Claim), and an undefined theory of "view point discrimination" (Seventh Claim). ECF196, ID#3083, 3084. These contentions are frivolous (*see*, discussion Point III D),[3] and Plaintiffs also do not satisfy the prudential considerations.

## A.

The Court must determine that the litigant "is fully, or very nearly, as effective a proponent of the right" as the third party whose interests he purports to represent, *Singleton v. Wulff*, 428 U.S. 106, 115 (1976), *Baker v. Carr*, 369 U.S. 186, 204 (1962), *Craig v. Boren*, 429 U.S. 190, 194 (1976), and has a "congruence of interests" with the third-party. *Powers*, 499 U.S. at 414.

In this case, there is a conflict between the interests and mission of the Plaintiffs and the mother's fundamental right to maintain her relationship, which the statute seeks to protect. That includes protecting mothers against the negligence and dereliction of the Plaintiffs. SDCL §34-23A-54; §34-23A-74 to 88. The Plaintiffs' sole mission is to terminate that relationship. Statement of Facts, A(2); B(1)(2) & (3). Plaintiffs' physicians have no relationship with the pregnant mother, perform unethical itinerant surgery on women that was scheduled over the phone, and promote abortions even when the mothers don't want them.

The PI was entered at Plaintiffs' request, under the guise that the PI promoted the mothers' interests, thereby enjoining the protections the mothers needed against the Plaintiffs' negligence,

---

[3] A frivolous claim cannot satisfy Article III standing. *See, Hagens v. Lavine*, 415 U.S. 528, 536-38 (1974).

including   remarkably   the mother's cause of action against Plaintiffs for that negligence. SDCL §34-23A-60 & 61.  As a result, women like B.H. lost the protection of the statute and lost their children they wanted.

In essence, Plaintiffs argued on "behalf" of the mothers that the mothers could not be protected against Plaintiffs' own wrong-doing.  Plaintiffs' conflicts render them, not only "ineffective" advocates of the mothers, but adversaries of the mothers' rights.

While *Singleton* found that an abortion doctor possessed third-party standing, that holding was based upon its unique facts. *Singleton*, at 113-117. The doctor in *Singleton* had a concrete injury: not being paid for past services. His interest in being paid was in harmony with the interests of the women who wanted their medical bills paid by government insurance. Here, plaintiffs cannot claim an injury because they didn't get to perform abortions on mothers who do not want them because RPHC counseling helped those mothers keep their children.

Whether interests are aligned depends upon the facts and interests in a particular case. *June Medical*, 140 S.Ct., at 2153 ("...the idea that a regulated party can invoke the rights of a third party for the purpose of attacking legislation enacted to protect the third party is stunning") (Alito, dissenting). *See also*, *Id.* at 2147-48 (Thomas, dissenting).[4]

The conflict of interests between Plaintiffs and B.H. resulted in B.H. losing her child she wanted. Conflicts of interest preclude recognition of standing. *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 15, 17-18 (2004); *see also June Medical*, 140 S.Ct. at 2174 (Gorsuch, dissenting).

_____

[4]*June Medical* observed that prior courts recognized standing of physicians where they had expertise that rendered them effective advocates for a particular issue. *Id.* at 2118-2120.  However, here the physicians have no expertise in the area of concern, the physician's interests conflict with those of the pregnant mothers, the RPHCs are far better advocates for the relevant rights of the mothers, and the South Dakota Statute, unlike Louisiana's, does not prohibit the physician from performing an abortion.

**B.**

By application of these principles, Intervenors possess standing to litigate the pregnant mothers' right to maintain their relationships with their children protected by the statute. The RPHC counseling is necessary to protect those rights of the mothers which are perfectly aligned with Intervenors' interests as guardians of those rights. SDCL §34-23A-59;  Statement of Facts, B1(a).

## POINT III

### The RPHC Counseling is Both a Reasonable and Necessary Exercise of the State's Authority to Protect the Fundamental Rights of Pregnant Mothers

### A.    The RPHC Counseling is Necessary to Protect the Fundamental Liberty of Pregnant Mothers

South Dakota has expressly authorized a physician to terminate a pregnant mother's constitutionally protected relationship by an abortion.  SDCL §34-23A-2-5.

No state can authorize such termination without providing minimum Due Process protections and Equal Protection of the law. South Dakota's Informed Consent and Anti-Coercion Abortion Statutes impose the minimum safeguards necessary to protect the mothers' Due Process and Equal Protection Rights.

### 1.  Due Process

An abortion is the employment of a medical procedure to achieve a non-medical objective: the termination of the pregnant mother's relationship with her child.  Statement of Facts, B(1).  The intentional killing of a human being in utero, at any age, is a criminal homicide,[5] but South Dakota immunizes a physician who performs an abortion on the condition that he obtains a voluntary consent.

---

[5]Thirty-seven states and the federal government make it a criminal homicide to kill an unborn child in utero, and in 27 of those states the killing of the child at any age after conception is a homicide.  *See,* Parker, ¶4, FN1.

29

SDCL §22-16-1.1.  *See* Statement of Facts, B(1)(b).

Such a consent constitutes a waiver of one of the most important fundamental rights a mother has in all of life.   South Dakota's statute is necessary to protect against such waivers being involuntary. SDCL §34-23A-54(5).

No state can expressly authorize an uninformed or involuntary termination of a fundamental right.  The state is obligated to ensure that a consent to terminate or waive such a right is informed and voluntary, especially where the state authorizes what would otherwise be a criminal homicide to achieve that waiver.

> "It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' " *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938) (quoting *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937)).

For example, without voluntary informed consent, a state cannot terminate or authorize the termination of a parent's relationship with her child on the basis of the child's best interest, but must establish unfitness by clear and convincing evidence.  *Santosky v. Kramer*, 455 U.S., at 753. Those Due Process requirements apply even if the state is not the party seeking the termination.  *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996).  Few acts authorized or performed by the state are "so severe and so irreversible" as the termination of a mother's relationship with her child. *Id.*, at 118 (citing *Santosky*, at 758-759).

Far less intrusions and impairments of far less consequential rights are deemed unconstitutional. State regulation that merely weakens the rights of some compared to the protection accorded those of others, is unconstitutional. *Shapiro v. Thompson*, 394 U.S. 618, 633-38 (1969). Restrictions on the right to marry have been found unconstitutional.  *Zablocki v. Redhail*, 434 U.S. 374 (1978); *Loving v. Virginia*, 388 U.S. 1 (1967); *Turner v. Safley*, 482 U.S. 78 (1987).

Plaintiffs argued that some women seek abortions by their own volition, so their being required to counsel at a RPHC is an "undue burden" on their right to an abortion. The District Court agreed. ECF39, ID#1061-1072.

All of the pregnant mothers have a right to their relationship, so the RPHC counseling is relevant for all of them. The termination at an abortion clinic is permanent. The record reflects the reality that probably most pregnant mothers are coerced or pressured to have an abortion, or are ambivalent or conflicted by their values, or want to keep their children but need assistance they don't know how to obtain. Statement of Facts, B(2), B(4). The bad practices at abortion clinics result in these mothers losing the children they want. *Id*., at B(3). The severity of the loss of these mothers far outweighs the inconvenience of a counseling session to other women who may want an abortion. It is routine in medicine to require all patients to go through counseling even though only some may benefit. Hartmann, ¶136.

Plaintiffs argue that some of the mothers may not want the counseling and, therefore, Plaintiffs must block the rights of those who need and welcome the counseling, like B.H. However, one person cannot be granted a right that, by its nature, defeats a recognized fundamental right of another. *Smith v. Org. of Foster Families*, 431 U.S. 816 (1977) (foster family doesn't have rights at the expense of natural parents); *Troxel v. Granville*, 530 U.S. 57 (2000) (grandparents can't be given rights that infringe rights of a mother). Plaintiffs cannot terminate the rights of pregnant mothers who want their children, because they claim some women may suffer an inconvenience. *See*, III B below. There is no recognized right of one "patient" which requires the state to forgo all reasonable protections of the fundamental liberties of another "patient." Hartmann, ¶136.

When entering the PI, this Court did not have the benefit of the record now before it, resulting in incorrect assumptions of fact. For instance, the counseling at Plaintiffs' clinic is inadequate to

31

protect the relevant interests of the mothers, and cannot substitute for the regulated RPHC counseling which advances the mothers' interests the legislation seeks to protect. ECF39, ID#1061-1072.  It is erroneous to assume, as the Court did, that all of the pregnant mothers who arrive at the abortion clinic want abortions.  ECF39, ID#1063, n.9.  It is erroneous to assume that the RPHC counseling would be "confrontational."  ID#1065.  *See*, Mandatory Guidelines; Statement of Facts, Section B. Every factual argument raised by Plaintiffs (*see*, #1061, n.6) has proven to be false.

### 2.  Equal Protection

"Equal protection" is "a pledge of the protection of equal laws."  *Yick Wo v. Hopkins,* 118 U.S. 356, 369 (1886).  Those who are similarly situated must be similarly treated.  *Plyer v. Doe*, 457 U.S. 202, 216 (1982); *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920).  Thus, the classification which defines the excluded individuals must bear a rational relationship to the purpose of the law (*Plyer*, at 216), or where fundamental personal rights are involved, the classification must be justified by a compelling state interest.  *Weber v. Aetna*, 406 U.S. 164, 175 (1972); *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Therefore, in any Equal Protection analysis the Court must identify: [1] the class created by the law; [2] the purpose of the law; [3] "what State interest the classification promotes;" and [4] "what fundamental personal rights might the classification endanger." *Weber*, at 173.

### (a) "Voluntary" Termination

South Dakota imposes strict protections for a pregnant mother's fundamental right to maintain her relationship with her child, by ensuring that "voluntary" termination of that right is truly voluntary and informed.  However, until passage of its 2011 Anti-Coercion Statute, voluntary terminations were protected only in the context of adoption.

A pregnant mother considering termination of her rights has the same rights and interests at

stake, whether termination is achieved by abortion or adoption.  Under South Dakota's adoption statutes, the petition constituting a request by a mother to terminate her rights cannot be filed until five days after the birth of her child.  SDCL §25-5A-4.  The petition must contain the reasons why the mother wants to give up her rights, and express written consent for the termination of her rights. SDCL §25-5A-6 (5) & (7).  South Dakota requires special counseling before a mother can consent to giving up her rights.  SDCL §25-5A-22. The counselor must determine that the waiver of rights is voluntary, without undue influence of others; that all other alternatives were examined; explain the likely emotional losses involved; disclose the legal right to counsel; discuss the permanent consequences of the decision; and must assess the ability of the mother to understand the consequences.  SDCL §25-5A-23. That counseling must take place at least fifteen days before termination, unless it is not possible.  *Id.*  A report must be submitted to the court certifying that all of these matters were discussed with the mother, and the mother must sign a statement verifying that she understood the counseling.  SDCL §25-5A-24.

The court must hold a hearing (SDCL §25-5A-9) and must determine that the consent is knowing, informed and voluntary.  *See*, *Matter of D.D.D.*, 294 N.W.2d 423, 426 (S.D.1980).  A judgment terminating a mother's rights must be vacated, even if the court found that her decision was informed and voluntary, if the record does not support those findings.  *In the matter of J.M.J.* 368 N.W. 2d 602 (S.D. 1985)

Under certain circumstances, the mother may revoke her consent.  In *Matter of Everett*, 286 N.W.2d 810 (S.D. 1979).

None of those protections were afforded pregnant mothers who were brought to Plaintiffs' clinic.  The Supreme Court has recognized that a mother who conceives out of wedlock may be under significant stress and vulnerable to the influence of others, so that her decision-making is

33

compromised.  Thus, state-imposed deadlines for these mothers to make certain decisions have been found to be unconstitutional.  *Clark v. Jeter*, 486 U.S.456, 463-64 (1988) (noting mother's "emotional strain");  *Pickett v. Brown*, 462 U.S. 1, 12-13 (1983).

Without the protections of South Dakota's Anti-Coercion Statute, pregnant mothers who wind up at Plaintiffs' abortion clinic would have no counseling at all concerning the primary social decision, would have surgery scheduled over the phone by a clerk or "call center," and sign a consent without any counseling of any kind.  The abortion clinic, not a court, irreparably terminates the mother's relationship. In contrast, no adoption agency whose interests, like those of abortion clinics, conflict with those of the pregnant mother, can terminate the mother's relationship, a power only entrusted to a court, which is duty-bound to ensure the mother's decision is fully informed and voluntary following a hearing.

The RPHC counseling is the most critical component of South Dakota's Anti-Coercion Statute.

Where a right or benefit is protected by the state, a classification which excludes some individuals from protection of a fundamental interest must be strictly scrutinized. *Harper v. Virginia*, 383 U.S. 663, 665 (1966).  This principle has been expressed and applied in many ways. "Classifications affecting fundamental rights are given the most exacting scrutiny." *Clark,* 486 U.S. at 461; *Carrington v. Rash*, 380 U.S. 89 (1965).  Even where a statute merely provides greater protection for some, relative to others, a compelling interest must justify the classifications. *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964); *Baker v. Carr*, 369 U.S. 186 (1962).

There is no interest of any state, let alone a compelling one, that can justify a state's failure to protect against the destruction of the rights of pregnant mothers in the context of abortion, when that state provides extensive protections for mothers with the same rights in the adoption context.

### (b) The Criminal Homicide Exception

South Dakota protects the relationship of all pregnant mothers with their children by making it a criminal homicide to kill the child in utero.  SDCL §22-16.1;§22-16-1.1.  However, the statute creates a class of mothers who are denied that protection.  Mothers who go to Plaintiffs' abortion clinic, either by their own volition or otherwise, are denied the protection of the statute, as the physician is expressly authorized to terminate the life of the mother's child. SDCL §34-23A-3,4,&5.

The physician's immunity from criminal prosecution is conditioned on the physician obtaining a consent.  SDCL §22-16.1-1. South Dakota's requirement for the RPHC counseling is a minimal effort to ensure that such a consent is voluntary and informed.

It is difficult to imagine a more vile Equal Protection violation, than a state authorization of the termination of a mother's child's life without ensuring that the consent which immunizes the physician from criminal prosecution is truly voluntary and informed.

### B.  Reconciling *Casey* and *Roe* with *Lehr* and SD1217

Plaintiffs claim the "Undue Burden" Standard announced in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) *prohibits* the state from providing the protection of a pregnant mother's fundamental right to her relationship with her child.

However, all courts are duty-bound to follow the *Santosky*, *Stanley*, and *Lehr* line of cases, and this court is bound by the decision of the Eighth Circuit reversing the District Court's decision in *Rounds* in which the District Court held that the Relationship Disclosure was not truthful and relevant. The Plaintiffs are barred by the doctrine of *res judicata* to relitigate that decision of the Eighth Circuit.  As a result, the *Lehr* line of cases, *Rounds* and South Dakota's Anti-Coercion Statute which follows them, must be reconciled with the proper understanding of *Casey*, which partially reaffirmed *Roe v. Wade*, 410 U.S. 113 (1973).

35

When the plurality in *Casey* reaffirmed *Roe,* it did so without conviction in the correctness of *Roe* as legal authority.

> "We do not need to say whether each of us, had we been members of the Court when the valuations of the state interest came before it as an original matter, would have concluded, as the *Roe* Court did, that its weight is insufficient to justify a ban on abortions...we are satisfied that the immediate question is not the soundness of *Roe's* resolution of the issue, but the precedential force that must be accorded to its holding." *Casey*, at 871.

The *Casey* plurality reaffirmed *Roe* in the mistaken assumption that no liberty of the mothers would be impaired:

> "*Even* on the assumption that the central holding of *Roe* was in error, that error would go only to the strength of the *state interest* in *fetal protection*, not to the recognition afforded by the constitution *to the women's liberty.*"  (505 U.S. at 858) (emphasis added).

Consequently, *Casey* created the "Undue Burden" Standard without the pregnant mothers' most important liberty interest being raised or considered. As a result, *Casey* incorrectly presumed abortions resulted in no harm to the mother's liberty. Yet, *Casey's* plurality indicated that if they understood that *Roe* interfered with a recognized liberty of the women, *Roe* could not survive a *stare decisis* analysis. *Casey* intended to protect, not to prohibit protection of, a pregnant mother's fundamental liberty.

Every factual assumption made in *Roe* has proven to be incorrect: that the primary question faced by the mothers was a "medical" one; that there would be a normal physician-patient relationship; that consents for an abortion would be voluntary and informed; that motherhood was inherently distressing.  *Roe*, 410 U.S. at 153.  *Roe's* romanticized image of the abortion doctor has proven extremely naive.  Planned Parenthood is not the Mayo Clinic.

*Roe* also stated, in a very confused discussion, that it was unknown whether the unborn child

was a human being.  The Court conflated concepts of science (whether the "fetus" was a human being or mere "potentiality"), with what value society placed on their lives, and the legal question of whether the children possessed constitutional rights.  The Court, professing it could not answer the first two, decided the third question in the negative.  *Roe*, 410 U.S. at 156-162.  *See*, Concurrent Resolution, Section 2, (3)(a) to (h); Task Force Report, IIA(1), 8-9. Forty-seven years of scientific advancement has established that the child in utero is a whole, separate, unique, living human being throughout gestation.  *Planned Parenthood v. Rounds*, 530 F.3d 724 (8th Cir. 2008)(*en banc*).

*Roe* never addressed the threshold basic issue any Due Process inquiry requires, to carefully define the conduct that is asserted to be a protected liberty.  *Washington v. Glucksberg*, 521 U.S. 702, 722-723 (1997).

As discussed (Statement of Facts, B1), an abortion involves a physician terminating the life of one of the physician's patients to achieve a non-medical objective, the termination of the mother's protected relationship.

An abortion is not the exercise of a right, but the waiver or termination of one of the basic rights of mankind.

There was no "voluntary" termination of parental rights at common law.  Waiver of parental rights by adoption is a creation of statute.  *See*, *Adams v. Nadel*, 124 N.Y.S. 2d 427, 430 (N.Y. Sup.Ct. 1953); *Adoption Practice, Issues, and Law*, 1958-1983, 17 Fam. L.Q. 173, 175-77 (1983). The *Roe* Court, overnight, in one swoop, made mandatory a new second method of such waiver, one with no provisions for protecting the fundamental rights being waived.

*Roe* incorrectly assumed that the mother lost nothing of value for herself, and *Casey* followed suit when, in fact, an involuntary or uninformed consent for an abortion is a most fatal and destructive force against the mother's intrinsic liberty.

37

South Dakota is compelled to protect the mother's fundamental interest in her relationship with her child. By requiring the RPHC counseling, South Dakota has provided a balance between protecting the intrinsic rights of all mothers, while permitting those who truly want an abortion to obtain one.

### C.       The RPHC Counseling does not Violate Free Speech Rights

The District Court held that the RPHC counseling violated the mothers' right to free speech. ECF39, ID#1052-1061.  However, even if Plaintiffs had standing to litigate the mothers' interests, the counseling provisions do not violate the free speech rights of the mothers, but advance their true liberty interests.  The Court relied upon *Wooley v. Maynard*, 430 U.S. 705 (1977), which is a "pure" speech case involving a state requiring someone to speak the state's ideological message.

The strict scrutiny standard imposed in *Wooley* was rejected and found to have no application in the context of obtaining a consent for a medical procedure, *Rounds,* 530 F.3d at 733-734 (2008) (*en banc*).  The Eighth Circuit explained that *Casey* imposed a simple rational basis test for speech in connection with the regulation of medicine.  Therefore, statements of fact required by a statute to properly obtain a consent before a physician can conduct surgery, merely need to be truthful, non-misleading and relevant to the procedure.  *Rounds,* 530 F.3d at 733-734, citing *Casey*, 505 U.S. at 884. Because abortion involves submission to more than a medical procedure, even non-medical and legal disclosures, like the relationship disclosures, were relevant and only subject to that rational basis standard of review.  *Rounds III*, 653 F.3d 662 (8th Cir. 2011).

Subsequently, the Eighth Circuit emphasized, again, that the state's compelled speech need only be a "reasonable" regulation of medicine. *Rounds*, 686 F.3d at 893 (2012) (*en banc*) (citing *Rounds,* 530 F.3d at 734-35, and *Tex. Med. Providers Performing Abortion Services v. Lakey*, 667 F.3d 570, 576-77 (5th Cir. 2012)).

38

The U.S. Supreme Court clarified the reasoning behind *Casey's* rational basis test in *NIFLA v. Becerra,* 138 S.Ct. 2361 (2018).  Requiring a doctor to disclose a specific statement of fact does not involve "pure" speech because the state is regulating conduct which only "incidentally involves speech."  *NIFLA*, 138 S.Ct. at 2372.

Those cases, of course, involve specifically identified substantive messages required of a physician.  Plaintiffs complain that the South Dakota statute requires the pregnant mother to also speak.

However, all patients are required to communicate with a physician and cannot refuse to speak. No physician can take a consent unless the patient speaks to the physician and says enough for the physician to conclude that the patient's consent is voluntary, and the patient understands the nature, risks and alternatives of the procedure.  *See*, Cassidy1Ex16, Ball2, 48:22-49:10; Hartmann, ¶¶22-24; Ridder, ¶¶43-52; SDCL §34-23A-56.

The RPHC counseling involves an informed, voluntary consent process, only it is limited to the same primary social question involved in "voluntary" terminations in the context of adoption.  In the adoption context, the pregnant mother is required to obtain counseling before she can consent to the termination of her relationship with her child and the pregnant mother must speak with the counselor who must determine that her consent is voluntary and determine all of the other matters required, so that the counselor can submit a report to the court.  *See*, Point III A2(a).

Like all of those counseling requirements, the interaction and exchanges in the RPHC counseling, are necessary to protect the fundamental rights of the mothers.  *See*, Point III, A&B. *See*, Hartmann, ¶¶38-40.

**D.    The RPHC Counseling Does Not Violate Plaintiffs' Equal Protection Rights**

Plaintiffs claim that the statute violates their Equal Protection Rights "by treating informed consent for abortion differently than for any other medical service or procedure..."  Fifth Amended Complaint, Sixth Claim, ECF191, ID#3083-3084.

Plaintiffs have no personal constitutional right to perform an abortion.  *Planned Parenthood v. Hodges*, 917 F.3d 908 (6th Cir. 2019) (*en banc*). The State needs only a rational basis that promotes a legitimate state interest to support the different treatment.  *Weber,* 406 U.S. at 172 (1972). In fact, the state is involved in protecting the fundamental rights of the pregnant mothers against Plaintiffs' derelictions.

Nothing further is needed to justify the difference in the State's treatment for obtaining a consent for an abortion than to observe that an abortion is like no other procedure in all of medicine. It is the employment of a medical procedure to achieve a non-medical objective.  The consent: (1) authorizes the physician to terminate the mother's relationship with her child which is protected under the Fourteenth Amendment as an intrinsic right; (2) authorizes the termination of the life of a human being, one of the physician's patients; and (3) operates to immunize the physician from what would otherwise be a criminal homicide. *See*, Statement of Facts B1."Abortion is inherently different from other medical procedures..."  *Harris v. McRae*, 448 U.S. 297, 325 (1980).

The state is not only permitted to treat consent for an abortion differently from all other consents for a medical procedure, it is duty-bound to do so to protect the mother's fundamental rights. *See*, Point III A&B.

The State's requirement of the RPHC counseling does not discriminate  against Plaintiffs based on "viewpoint."  The  RPHC counseling requires skills and resources the Plaintiffs admit they

40

do not have, and the counseling protects interests different from those that Plaintiffs promote.

## CONCLUSION

Because of the changed circumstances, the clarification of the applicable law by *Rounds*, *NIFLA*, and *June Medical*, the violation of the mothers' rights and the irreparable destruction of the fundamental rights of pregnant mothers, the Court must dissolve the PI forthwith, and order Plaintiffs to comply with SDCL §34A-56(3) & 57, and refer pregnant mothers to the RPHCs before they take a consent for an abortion.

BANTZ, GOSCH & CREMER, L.L.C

By: */s/ Rory King*
Rory King, Esq.
305 Sixth Avenue, S.E.
Aberdeen, South Dakota 57402-0970
P.O. Box 970
Phone: (605) 225-2232
Fax: (605) 225-2497
Email: rking@bantzlaw.com

THE CASSIDY LAW FIRM

By: _____
Harold J. Cassidy, Esq., *Pro Hac Vice*
750 Broad Street, Suite 3
Shrewsbury, New Jersey 07702
Phone: (732) 747-3999
Fax: (732) 747-3944
Email: hjc@haroldcassidy.com

*Attorneys for Intervenors*

## CERTIFICATE OF COMPLIANCE

Intervenors' Brief in this matter, excluding the sections that are not included in the word count pursuant to LR7.1B(1), contains 11,953, which complies with the word limit option found at LR7.1B.

BANTZ, GOSCH & CREMER, L.L.C

By: _/s/ Rory King_
Rory King, Esq.
305 Sixth Avenue, S.E.
Aberdeen, South Dakota 57402-0970
P.O. Box 970
Phone: (605) 225-2232
Fax:    (605) 225-2497
Email: rking@bantzlaw.com

THE CASSIDY LAW FIRM

By: _____
Harold J. Cassidy, Esq., *Pro Hac Vice*
750 Broad Street, Suite 3
Shrewsbury, New Jersey 07702
Phone: (732) 747-3999
Fax:    (732) 747-3944
Email: hjc@haroldcassidy.com

*Attorneys for Intervenors*

42