UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| PLANNED PARENTHOOD MINNESOTA, NORTH DAKOTA, SOUTH DAKOTA and CAROL E. BALL, M.D.; | 4:11-CV-04071-KES |
| Plaintiffs, | |
| vs. | ORDER DENYING MOTION TO DISSOLVE WHAT REMAINS OF THE PRELIMINARY INJUNCTION AND DENYING AS MOOT MOTION TO EXPEDITE |
| KRISTI NOEM, Governor, JASON RAVNSBORG, Attorney General, KIM MALSAM-RYSDON, Secretary of Health, Department of Health, and JEFFREY A. MURRAY, M.D., President of Board of Medical and Osteopathic Examiners, in their Official Capacities; | |
| Defendants, | |
| ALPHA CENTER and BLACK HILLS CRISIS PREGNANCY CENTER, d/b/a Care Net Pregnancy Resource Center, | |
| Intervenor Defendants. | |

Defendants, Kristi Noem, Governor, Jason Ravnsborg, Attorney General, Kim Malsam-Rysdon, Secretary of Health, Department of Health, and Jeffrey A. Murray, M.D., President of Board of Medical and Osteopathic Examiners, in their Official Capacities (state defendants), and intervenors, Alpha Center and

Black Hills Crisis Pregnancy Center (pregnancy help center [PHC] intervenors), move to dissolve what remains of the preliminary injunction that the court granted on June 30, 2011 (Docket 39) and dissolved in part on June 27, 2012 (Docket 84) and June 11, 2013 (Docket 129). Docket 204. The state defendants and PHC intervenors also move to expedite resolution of their motion to dissolve. Docket 300. Plaintiffs, Planned Parenthood Minnesota, North Dakota, and South Dakota and Carol E. Ball, M.D. (Planned Parenthood), oppose both motions. Dockets 310, 321.

## I.     Whether Planned Parenthood Has Standing to Bring this Suit

"Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.' " *Valley Forge Christian Coll. v. Ams. United for a Separation of Church & State*, 454 U.S. 464, 471 (1982). A "case or controversy" requires "a definite and concrete controversy involving adverse legal interests at every stage in the litigation." *Gray v. City of Valley Park*, 567 F.3d 976, 983 (8th Cir. 2009) (quoting *McFarlin v. Newport Special Sch. Dist.*, 980 F.2d 1208, 1210 (8th Cir. 1992)). For a case or controversy to exist under Article III, and thus for a federal court to have jurisdiction, the plaintiff must have standing to bring suit. *Id.* Article III standing may be raised at any time during the litigation by either party or by the court. *Id.*

Whether a plaintiff has standing to bring a claim based on another's legal rights, rather than their own, is an issue of prudential standing and does not implicate Article III. *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2117

2

(2020). Courts generally allow plaintiffs to "assert third-party rights in cases where the 'enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights.' " *Id.* at 2118-19 (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (emphasis in the original)). "[T]he relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter." *Singleton v. Wulff*, 428 U.S. 106, 115 (1976).

The Supreme Court has "long permitted abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations." *June Med. Servs.*, 140 S. Ct. at 2118 (citing *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2314 (2016); *Gonzales v. Carhart*, 550 U.S. 124, 133 (2007); *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 324 (2006); *Stenberg v. Carhart*, 530 U.S. 914, 922 (2000); *Mazurek v. Armstrong*, 520 U.S. 968, 969-70 (1997) (per curiam); *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 845 (1992) (majority opinion); *Akron v. Akron Cntr. for Reproductive Health, Inc.*, 462 U.S. 416, 440 n.30 (1983), *overruled on other grounds by Casey*, 505 U.S. at 882; *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 62 (1976); *Doe v. Bolton*, 410 U.S. 179, 188-89 (1973)). This is because the abortion provider "is the party upon whom the challenged statute imposes 'legal duties and disabilities' " and is thus " 'the obvious claimant' and 'the least awkward challenger' " to laws that affect abortion access. *Id.* at 2119 (quoting *Craig v. Boren*, 429 U.S. 190, 196-97 (1976)).

Here, PHC intervenors argue, first, that Planned Parenthood would not suffer any "injury-in-fact" were the injunction to be dissolved, and that thus, it lacks third party standing. Docket 205 at 39-40. But Planned Parenthood is plainly an entity "upon whom the challenged statute imposes 'legal duties and disabilities,' " because the enjoined provisions of the South Dakota law place requirements on Planned Parenthood's physicians' practice of medicine and on the operation of clinics. *June Med. Servs.*, 140 S.Ct. at 2119; *see* SDCL § 34-23A-56(3). Further, failure to comply with the enjoined provisions would expose Planned Parenthood and its physicians to the threat of civil liability. SDCL § 34-23A-60. Thus, as the Supreme Court has repeatedly held, Planned Parenthood has standing to sue based on its own injury to enforce the Constitutional rights of its patients.

Second, PHC intervenors argue that Planned Parenthood is not an "effective proponent of the right" at issue as would be pregnant women seeking abortion or PHC intervenors themselves. Docket 205 at 40-42; *Singleton*, 428 U.S. at 115. They seem to claim that Planned Parenthood's and pregnant women's interests are at odds because Planned Parenthood challenges a law ostensibly aimed at protecting pregnant women. Docket 205 at 40. But the *June Medical Services* plurality squarely addressed this issue and found that the appearance of conflict is a "common feature of cases in which [the Court has] found third-party standing." 140 S. Ct. at 2119. Legislatures often enact restrictions on medical care and treatment to protect patients, but medical providers nonetheless continue to be the parties best positioned to challenge

those laws. *See id.* at 2119-20. Thus, the PHC intervenors' attempt to distinguish this case from the numerous instances where courts have found third party standing for abortion physicians fails.

This case is in line with decades of Supreme Court and Eighth Circuit precedent that allow abortion providers to sue to defend the rights of their patients. PHC intervenors point to no legal precedent or distinguishing facts that indicate otherwise. Thus, Planned Parenthood has standing to bring this suit and the court has jurisdiction to hear it.

## II.    Whether to Dissolve What Remains of the Injunction

### A.    Procedural Background

In 2011, the South Dakota Legislature passed the act at issue here, House Bill 1217 (HB 1217). The act is codified, following legislative amendments, at SDCL §§ 34-23A-53 through 34-23A-62. The court initially enjoined from taking effect all sections of the act except for section 5 (now SDCL § 34-23A-58, establishing registries of pregnancy help centers), subsection 1 of section 7 (now SDCL § 34-23A-53(1), defining pregnancy help center), and subsection 5 of section 9 (now SDCL § 34-23A-61(5), stating patients may not waive the act's requirements). Docket 39.

Following joint motions by the parties due to changes in the facts and law, the court later dissolved all provisions of the injunction except as to three portions of the law. *See* Dockets 82, 129. The first portion that remains enjoined, SDCL § 34-23A-56(3), states that prior to scheduling an abortion, a physician must:

[P]rovide [the pregnant woman] with written instructions that set forth the following:

(a) That prior to the day of any scheduled abortion the pregnant mother must have a consultation at a pregnancy help center at which the pregnancy help center shall inform her about what education, counseling, and other assistance is available to help the pregnant mother keep and care for her child, and have a private interview to discuss her circumstances that may subject her decision to coercion;

(b) That prior to signing a consent to an abortion, the physician shall first obtain from the pregnant mother, a written statement that she obtained a consultation with a pregnancy help center, which sets forth the name and address of the pregnancy help center, the date and time of the consultation, and the name of the counselor at the pregnancy help center with whom she consulted[.]

The second enjoined portion, SDCL § 34-23A-59, states:[1]

A pregnancy help center consultation required by §§ 34-23A-53 to 34-23A-59.2, inclusive, shall be implemented as follows:

(1) The pregnancy help center shall be permitted to:

(a) Interview the pregnant mother to determine whether the pregnant mother has been subject to any coercion to have an abortion, or is being pressured into having an abortion;

(b) Provide counseling in connection with any coercion or pressure;

(c) Inform the pregnant mother in writing or orally, or both, of the counseling, education, and assistance available to the pregnant mother to assist her in maintaining her relationship with her unborn child and in caring for the child through the pregnancy help center or any other organization, faith-based program, or governmental program;

(d) Provide a statement orally and in writing to the pregnant mother that "an abortion will terminate the life of a whole, separate, unique, living human being," and provide counseling in lay terms that

---

[1] SDCL § 34-23A-59 was modified twice after the court's 2011 order, in 2016 (2016 S.D. Sess. Laws ch. 179 § 3) and 2018 (2018 S.D. Sess. Laws ch. 205 § 16). This text represents the law in its current form. Changes to the law and their impact on the 2011 injunction order are discussed below.

explain this disclosure, and to ascertain that the pregnant mother understands this disclosure, and for the purpose of this disclosure, the definition of human being found in subdivision 34-23A-1(4) applies; and

(e) Provide statements orally and in writing setting forth the disclosures required by subsections 34-23A-10.1(1)(c) and (d) and provide counseling in lay terms that explain those disclosures. The pregnancy help center may, if it deems it appropriate, discuss matters pertaining to adoption;

(2) The pregnancy help center, its agents, or employees may not:

(a) Discuss with any pregnant mother religion or religious beliefs, either of the mother or the counselor, unless the pregnant mother consents in writing;

(b) Discuss the physical or psychological risks to a woman posed by an abortion. However, if, during the mandatory pregnancy help center consultation interview, the pregnant mother requests the opportunity to discuss the risks of an abortion with pregnancy help center personnel, the pregnancy help center may schedule a separate and distinct appointment for the pregnant mother to meet with a physician for the purpose of discussing the physical and psychological risks of abortion. Any requests shall be evidenced in writing signed by the pregnant mother;

(3) The pregnancy help center is under no obligation to communicate with the abortion provider in any way, and is under no obligation to submit any written or other form of confirmation that the pregnant mother consulted with the pregnancy help center. The pregnancy help center may voluntarily provide a written statement of assessment to the abortion provider, whose name the woman shall give to the pregnancy help center, if the pregnancy help center obtains information that indicates that the pregnant mother has been subjected to coercion or that her decision to consider an abortion is otherwise not voluntary or not informed. The physician shall make the physician's own independent determination whether or not a pregnant mother's consent to have an abortion is voluntary, uncoerced, and informed before having the pregnant mother sign a consent to an abortion. The physician shall review and consider any information provided by the pregnancy help center as one source of information, which in no way binds the physician, who shall make an independent determination consistent with the provisions of §§ 34-23A-53 to 34-23A-59.2, inclusive, the common law requirements, and accepted medical standards;

(4) Any written statement or summary of assessment prepared by the pregnancy help center as a result of counseling of a pregnant mother as a result of the procedures created by §§ 34-23A-53 to 34-23A-59.2, inclusive, may be forwarded by the pregnancy help center, in its discretion, to the abortion physician. If forwarded to the physician, the written statement or summary of assessment shall be maintained as a permanent part of the pregnant mother's medical records. Other than forwarding such documents to the abortion physician, no information obtained by the pregnancy help center from the pregnant mother may be released, without the written signed consent of the pregnant mother or unless the release is in accordance with federal, state, or local law;

(5) Commencing on September 1, 2016, the counseling authorized pursuant to this section shall be conducted in accordance with the Uniform Policy and Procedures Guidelines developed and promulgated by the South Dakota Association of Registered Pregnancy Help Centers and adopted in 2015.

Nothing in §§ 34-23A-53 to 34-23A-59.2, inclusive, may be construed to impose any liability upon a pregnancy help center. However, the failure of a pregnancy help center to comply with the conditions of § 34-23A-58.1, 34-23A-59.1 or this section for being authorized to provide the pregnancy help center counseling, if uncorrected, may result in the Department of Health removing the pregnancy help center from the state's registry of pregnancy help centers.

The third enjoined provision is that portion of SDCL § 34-23A-61(4) that is in

italics, and states:

(4) The pregnant mother has a right to rely upon the abortion doctor as her source of information, and has no duty to seek any other source of information, *other than from a pregnancy help center as referenced in §§ 34-23A-5b and 34-23A-57*, prior to signing a consent to an abortion[.]

In the 2011 order granting preliminary injunction, the court performed

an analysis under the factors laid out in *Dataphase Sys., Inc. v. C L Sys., Inc.*,

640 F.2d 109 (8th Cir. 1981) and determined that injunction of the pregnancy

help center requirement was appropriate under existing law and the facts

8

before the court. *See* Docket 39 at 4-61. This order was not appealed. PHC intervenors and state defendants now move to dissolve the injunction as to SDCL § 34-23A-59 and SDCL § 34-23A-56(3), citing alleged "overwhelming" changes of circumstances since the court issued the 2011 injunction. Docket 205 at 14.

### B.  Analysis

A preliminary injunction's purpose is to preserve the status quo until the merits of an action are resolved. *Dataphase Sys., Inc.*, 640 F.2d at 113. In determining whether to grant a preliminary injunction, the court considers "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest." *Id.* at 114. "A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants . . . dissolution of the injunction." *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000); *cf. Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992) (party moving for "modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision").

The court may determine whether to dissolve the injunction based on what is "equitable in light of subsequent changes in the facts or the law, or for any other good reason." *Movie Sys., Inc. v. MAD Minneapolis Audio Distribs.*,

9

717 F.2d 427, 430 (8th Cir. 1983). Whether to dissolve a preliminary injunction is within the district court's discretion. *See Waste Mgmt., Inc. v. Deffenbaugh*, 534 F.2d 126, 129 (8th Cir. 1976). Because this motion asks the court to dissolve the preliminary injunction due to changed law and facts—and is not an appeal of the original injunction or a motion for reconsideration—the court reviews whether dissolving the remaining injunction is "equitable in light of subsequent changes in the facts or the law, or for any other good reason." *Movie Sys., Inc.*, 717 F.2d at 430.[2] PHC intervenors and state defendants bear the burden of showing that changed facts or law merit dissolution of the remaining injunction.

### 1.    Success on the Merits: Due Process and Equal Protection

The court first addresses the PHC intervenors' assertion that "Due Process *requires*" the state to mandate counseling before a woman receives an abortion. Docket 205 at 16; Docket 351 at 9-16. This argument was not raised during the original preliminary injunction briefing because PHC intervenors did not move to intervene until after the injunction was granted.

The Due Process Clause of the Fourteenth Amendment protects against "the deprivation by state action of a constitutionally protected interest in 'life,

---

[2] PHC intervenors and state defendants urge the court to "revisit" existing precedent, specifically *Roe v. Wade*, 410 U.S. 113 (1973) and related United States Supreme Court and Eighth Circuit cases that recognize a pregnant woman's right to access abortion. Docket 271 at 3. The court declines to do so and treats all relevant Eighth Circuit and Supreme Court case law as binding. The court considers only changes to the relevant precedent since 2011 and does not consider the correctness of higher courts' decisions.

liberty, or property' . . . without due process of law." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). The protections of the Fourteenth Amendment are triggered by state action. *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 747-48 (1982) ("Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence."); *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924 (1982) ("Because the [Fourteenth] Amendment is directed at the States, it can be violated only by conduct that may be fairly characterized as 'state action.' "); *S.S. v. McMullen*, 225 F.3d 960, 962 (8th Cir. 2000) (en banc) ("[T]he constitutional right to be free from bodily harm is a right secured only against state actors, not against private ones: The purpose of the fourteenth amendment 'was to protect the people from the State, not to ensure that the State protected them from each other.' " (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989))). There is no state action present when a pregnant woman terminates her pregnancy at a Planned Parenthood clinic. Thus, the Due Process Clause does not apply and the State is not required to provide any due process protections to a woman before she undergoes an abortion at a Planned Parenthood clinic.

PHC intervenors argue that the State "expressly authorizes" abortions via its statutory scheme and that the statutory scheme constitutes "state action." Docket 351 at 14-15. Mere "authorization" via statute does not amount to state action. The existence of a statute authorizing abortion cannot be "fairly characterized as 'state action.' " *Lugar*, 457 U.S. at 924. The due process rights

of a woman are not implicated when she consults with a doctor at Planned Parenthood and the State is not required to implement procedural safeguards consistent with due process.[3]

PHC intervenors argue that Due Process protections apply here because they apply in an adoption proceeding, where the State, via a court order, severs a parent's rights to associate with and care for their child. *Santosky*, 455 U.S. at 747-48. A court order is a state action under the Fourteenth Amendment. *Cf. Shelley v. Kraemer*, 334 U.S. 1, 14 ("That the action of state courts and of judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment, is a proposition which has long been established by decisions of this Court."). In an abortion procedure at a Planned Parenthood clinic, unlike in an adoption proceeding, no court order authorizes the abortion. Thus, there is no state action.

PHC intervenors also style their argument regarding adoption counseling as an Equal Protection claim, alleging that women terminating their parental rights via adoption enjoy greater protection in the form of mandatory counseling than do women terminating those rights via abortion. *See* Docket 205 at 46-48. South Dakota law requires that, before a birth parent "petition[s] the court for the voluntary termination of parental rights," the parent must

---

[3] PHC intervenors urge the court to address the "tension" between a woman's right to maintain a relationship with her child and her right to obtain an abortion and note that no court has yet addressed this tension. Docket 351 at 16-17. No court has addressed this "tension" because it is not a tension at all. A woman's right to maintain a relationship with her child free from state interference is not in tension with her right to obtain an abortion free from state interference.

obtain "counseling regarding the termination." SDCL § 25-5A-22. As discussed above, the rights terminated in an adoption proceeding are terminated by the State through a court order. Unlike in a court-ordered adoption proceeding, the State does not terminate parental rights in an abortion. While those who are similarly situated must be treated alike, *F.S. Royster Guano Co. V. Virginia*, 253 U.S. 412, 415 (1920), a woman whose parental rights are being terminated by state action is not similarly situated to one who chooses to terminate those rights via abortion of an unborn child at a private clinic. Thus, the court finds PHC intervenors unlikely to succeed on the merits of their equal protection claim.

### 2.      Success on the Merits: First Amendment

In the 2011 injunction order, the court analyzed the pregnancy help center requirement under the strict scrutiny standard articulated in *Wooley v. Maynard*, 430 U.S. 705, 715-16 (1977), and found that the requirement "implicate[d] First Amendment protections" and was not "narrowly tailored to serve a compelling state interest." Docket 39 at 7-16 (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 733 (8th Cir. 2008) (en banc)). The court thus found that Planned Parenthood was likely to succeed on the merits of its First Amendment challenge to the pregnancy help center requirement.

### a.      Whether strict scrutiny applies

PHC intervenors and state defendants argue that strict scrutiny is not the appropriate standard here, because the pregnancy help center requirement

arises in the context of informed consent to a medical procedure. *See* Docket 205 at 51-52; Docket 271 at 31-34; Docket 351 at 21. " '[A] requirement that a doctor give a woman certain information as part of obtaining her consent to an abortion' implicates a physician's First Amendment right not to speak, 'but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State.' " *Rounds*, 530 F.3d at 733 (quoting *Casey*, 505 U.S. at 884); *see also Nat'l Inst. of Fam. & Life Advocs. v. Beccera*, 138 S. Ct. 2361, 2373 (2018). Where a physician is "merely [] required to give 'truthful, nonmisleading information' relevant to the patient's decision to have an abortion," there is no violation of the physician's First Amendment right not to speak and the court need not determine whether the requirement is narrowly tailored to serve a compelling interest, as required by the strict scrutiny test in *Wooley*. *Rounds*, 530 F.3d at 733 (quoting *Casey*, 505 U.S. at 882).

Here, the pregnancy help center requirement does not simply require a licensed physician to give a patient truthful, nonmisleading information relevant to the abortion decision. The pregnancy help center requirement implicates the *pregnant woman's* right not to speak, and requires her to disclose deeply personal information about her pregnancy to the pregnancy help center, along with her name and identifying information. The mandated counseling session implicates more than speech incidental to informed consent to abortion. *See Nat'l Inst. of Fam. & Life Advocs.*, 138 S. Ct. at 2373. No case in the Eighth Circuit or Supreme Court has held a *woman's* compelled

14

speech—rather than a licensed medical provider's—to any standard lower than strict scrutiny. The court continues to apply strict scrutiny here.

### b.    Whether the pregnancy help center requirements continue to implicate free speech

Under the strict scrutiny standard laid out in *Wooley*, the court first determines if the pregnancy help center requirement implicates a woman's free speech rights. *Wooley*, 430 U.S. at 715-16. The court reasoned in the 2011 injunction order that the pregnancy help center requirement compelled a pregnant woman to speak, implicating her speech rights, because it mandates her to "have a private interview to discuss her circumstances," which "necessarily requires questions *and* answers." Docket 39 at 9 (emphasis in the original). Even if the pregnancy help center requirement did not require a woman to speak during the interview itself, the court found that "the requirements on their face compel a patient to not only disclose that she is pregnant and is seeking an abortion, but also to disclose the name of her abortion physician . . . ." *Id.* at 10; *see* SDCL § 34-23A-59(4). Those compelled disclosures, the court found, implicate the protections of the Free Speech Clause. *Id.* at 10 (citing *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Bos.*, 515 U.S. 557, 573-74 (1995)).

Amendments to the pregnancy help center requirement since the 2011 injunction order do not ameliorate, but instead compound, the ways in which the pregnancy help center requirement implicates a pregnant woman's speech. The 2012 amendments increased the scope of counseling appointments,

adding the ability for counselors to screen whether a woman seeking an abortion has been subjected to "pressure," in addition to coercion. 2012 S.D. Sess. Laws ch. 186 § 7. That amendment broadens the scope of the counseling session and increases the personal issues that a woman may be asked to discuss.

The 2016 amendments mandate that pregnancy help center counseling be conducted in accordance with the Uniform Policy Procedures and Guidelines promulgated by the South Dakota Association of Registered Pregnancy Help Centers. 2016 S.D. Sess. Laws ch. 179 § 3. Those guidelines, in turn, require that before making an appointment, a pregnant woman give the center "her name, telephone number, name of the physician who referred her, and the address or location of the physician who referred her." Docket 246-2 at 25.

The "1217 intake form"—which pregnancy help staff are required to fill out in its entirety—also must include "sufficient space to record the following information:"

1. The reason for the phone call and the services sought by the woman;
2. Full name of the client;
3. A client identification number . . . ;
4. Client's telephone number and address;
5. Whether the 1217 client needs a translator during the counseling  session, and, if so, which language she speaks;
6. A provision by which she either gives or declines permission to call her at the telephone number provided;
7. Date of birth;
8. Whether she has tested positive for pregnancy;
9. Marital status;
10. Whether she has already had a sonogram, and if so, where;
11. First day of last menstrual period, number of weeks gestation, if known, or due date, if known;

16

> 12. Whether she has been referred to a pregnancy help center by a physician with whom she met to have an abortion? Is she seeking consultation because an abortion doctor told her she must do so; [and]
>
> 13. If so, the identity of the abortion provider . . . .

Docket 246-2 at 28-29. Even without contemplating the speech a pregnant woman would be compelled to divulge *during* a pregnancy help center interview, the pre-interview requirements alone demonstrate that the pregnancy help center requirement compels a pregnant woman to speak. During the interview itself, it is likely the pregnancy help center counselor would probe further into deeply personal issues, including how the pregnant woman's parents reacted to her pregnancy, what "her boyfriend sa[id]" when informed about the pregnancy, and what advice friends had given her. Docket 322-1 at 8, 15; Docket 322-2 at 8, 15.

PHC intervenors and state defendants identify no changed law or fact that would result in the pregnancy help center requirement ceasing to implicate pregnant women's free speech rights, and changes to the law exacerbate its effect on a woman's speech rights. Thus, the pregnancy help center requirement continues to implicate pregnant women's free speech rights and the court moves to the next prong of the *Wooley* test.

### c. Whether pregnancy help center requirement is narrowly tailored to achieve a compelling state interest

In the order granting preliminary injunction, the court acknowledged the "compelling state interest in protecting a woman from being forced against her will to have an abortion" and assumed without deciding that that interest was

17

the true goal behind the pregnancy help center requirement. Docket 39 at 12.[4] The court found, however, that the pregnancy help center requirement is not narrowly tailored towards achieving that interest. *Id.* at 12-16. The court identified "several less restrictive alternatives that are equally capable of informing the pregnant woman" to prevent her from being coerced to have an abortion. *Id.* at 13 (citing *Reno v. Am. C. L. Union*, 521 U.S. 844, 874 (1997) (holding that a statute was not narrowly tailored because there were "less restrictive alternatives [that] would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve").

---

[4] State defendants and PHC intervenors submitted a deluge of evidence to show how urgent and compelling the state's interest is in preventing coerced abortions. *See* Dockets 206-270; 272; 275-277; 352-365. Most of these filings are either not related to South Dakota and Planned Parenthood's operation in South Dakota and thus are not relevant to practices at abortion providers in the state, or are about events that occurred before the court's 2011 injunction order and thus do not present a change in circumstances. *See, e.g.*, Docket 275 (abortion clinic in St. Paul, Minnesota); Docket 207 (abortion performed in 2005); Docket 209 (abortion performed in 1994); Docket 218 (abortion clinic in Overland Park, Kansas); Docket 233 (abortion performed in New Jersey in 2001); Dockets 267-2 to 267-50 (excerpts from depositions taken in 2006); Dockets 211, 212, 213, 214 (Planned Parenthood's Bryan, Texas; Chapel Hill, North Carolina; Sherman, Texas; and Tampa, Florida clinics); Docket 216 (abortion that took place over 20 years ago and employment experience at the Planned Parenthood clinic of St. Louis, Missouri); Docket 215 (training of the National Abortion Federation that took place in 1996); Docket 302 (Planned Parenthood clinic in Sioux City, Iowa). One affidavit describes a coerced abortion in South Dakota in 2012, but Planned Parenthood disputes that its clinic failed to follow appropriate protocol with that patient. *See* Dockets 206, 347. Even assuming Planned Parenthood did fail to screen for coercion in that case, the court's analysis does not change. The court in 2011 acknowledged that the state has a compelling interest in preventing coerced abortions and continues to assume so here.

For example, SDCL § 34-23A-10.1 continues to require that before an abortion, disclosure must be made to a woman about resources available to her. While state defendants assert that the written materials are "no substitute for, or alternative to, in person, individualized counseling," the state does not explain why counseling must be mandatory for all women who choose abortion, rather than an available option for women who choose to receive counseling. Docket 271 at 13.

State defendants assert that the pregnancy help center requirement is narrowly tailored because Planned Parenthood "cannot be trusted" to comply with mandatory counseling and disclosure laws, and thus the State must require counseling at a third-party pregnancy help center before a woman may receive an abortion. Docket 271 at 12. But the State's own inspecting body, the South Dakota Department of Health (SDDOH), has never found Planned Parenthood deficient in its facilities or noncompliant with regulations.[5] Docket 325 ¶¶ 14-15, 17. The State provides no reason that a woman who is adequately informed of the existence of a pregnancy help center, her access to printed and website materials about abortion, and a host of other disclosures required by SDCL § 34-23A-10.1 cannot decide to voluntarily seek counseling from a pregnancy help center if she chooses. *Id.* The pregnancy help center requirement continues to fail to be narrowly tailored towards achieving the

---

[5] In 2018, the SDDOH initially cited Planned Parenthood following a routine annual audit. Docket 325 ¶ 17. SDDOH withdrew the citation after discussion between Planned Parenthood and SDDOH officials regarding relevant law. *Id.*

State's interests. The court finds that Planned Parenthood remains likely to succeed on the merits of its First Amendment claim.

### 3.      Success on the Merits: Undue burden

In the order granting preliminary injunction, the court next analyzed whether the pregnancy health center requirement "operate[s] as a substantial obstacle to a woman's choice to undergo an abortion 'in a large fraction of the cases in which [it] is relevant,'" and is therefore invalid. Docket 39 at 17 (quoting *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1456-58 (8th Cir. 1995) (alteration in original) (quoting *Casey*, 505 U.S. at 895)). The undue burden framework, set forth by the plurality in *Casey*, was reaffirmed by the Supreme Court in 2016 in *Whole Women's Health*. 136 S. Ct. at 2301 "[T]here 'exists' an 'undue burden' on a woman's right to decide to have an abortion, and consequently a provision of law is constitutionally invalid, if the '*purpose or effect*' of the provision '*is to place a substantial obstacle*' in the path of a woman seeking an abortion before the fetus attains viability." *Id.* (emphasis in the original) (citing *Casey*, 505 U.S. at 878). In 2020, in *June Medical Services*, a plurality of the Court again affirmed the undue burden standard. 140 S. Ct. at 2112-13. The court will analyze the pregnancy help center requirement under the undue burden standard here.

In the 2011 injunction order, the court found that the cases where the pregnancy help center requirement is relevant are those cases where (1) a woman has chosen to undergo an abortion, and (2) she would not otherwise

consult with a pregnancy help center. Docket 39 at 18-19. State defendants argue that the court under-counted the cases where the pregnancy help center requirement is relevant and that it is actually relevant when a woman is (1) only considering abortion and (2) has not yet received third-party counseling, whether or not she plans to. *Id.* The court determined in 2011 that the "plain language of the Pregnancy Help Center Requirements establish[] that a pregnant woman must consult with a pregnancy help center only if she chooses to undergo an abortion." *Id.* at 18 n.9. The court also found that a woman who has chosen to consult with a pregnancy help center on her own would not be burdened by the requirement. *Id.* The court cited *Casey*, which held that a woman who wished to notify her husband of her intent to have an abortion was not included in the "relevant" cases when analyzing a statute that required spousal notification prior to abortion. *See Casey*, 505 U.S. at 894. State defendants have failed to show any change in the law that would call into question the court's conclusion. Thus, the court continues to view the pool of "relevant" cases as those where a woman has (1) chosen to undergo an abortion and (2) would not otherwise seek pregnancy help center counseling.

The court next found that the pregnancy help center requirement poses "a substantial obstacle to a woman's choice to undergo an abortion[]" in a large fraction of the cases where it is relevant. *Id.* at 19 (quoting *Miller*, 63 F.3d at 1458). The court found that women were likely to feel "humiliate[d] and degrade[d]" because of the requirement. *Id.* The "compulsive nature" of the requirement suggests that a woman is incapable of making the decision to have

21

an abortion or seek counseling on her own and is "not intelligent enough" to make such a decision. *Id.*

The parties point to no reason why the 2011 determinations by the court are now invalid. The pregnancy help center requirement is still compulsory. SDCL § 34-23A-56(3) ("[T]he physician *shall* [p]rovide the pregnant mother with [contact information] of all pregnancy help centers that are registered . . . ."; "[T]he pregnant mother *must* have a consultation at a pregnancy help center . . . ." (emphasis added)). The compulsive nature of the counseling requirement is still likely to make a woman feel "humiliate[d] and degrade[d][,]" and cause her to feel as if the state views her as incapable of making the decision to have an abortion on her own.

Women seeking an abortion who are compelled to attend pregnancy health center counseling would still be "forced into a hostile environment," and might be reluctant to attend counseling and choose to remain pregnant instead. Docket 39 at 19. The Uniform Guidelines, incorporated into law in 2012, state as a "Fundamental Consideration" that "probably most pregnant mothers considering an abortion, would prefer to keep and raise their child[ren] . . . ." Docket 246-2 at 42. A pregnancy help center counselor enters an interview with a pregnant woman under the paternalistic assumption that the woman has not decided to seek an abortion of her own volition, but rather because she is unable to make a decision on her own and is subject to societal pressures. Pregnancy help center counselors may believe that a woman would

22

only exercise her right to abortion if she has been "forced or manipulated into killing [her] own child[] . . . ." Docket 237 ¶ 4.

Even if, as PHC intervenors and state defendants allege, the counseling session is ideologically neutral and the counselor him or herself expresses zero signs of disapproval of the pregnant woman's choice to obtain an abortion, *see* Docket 205 at 31-32, the centers' facilities show a clear ideological opposition to abortion. One pregnancy help center, intervenor Alpha Center, boasts on its website a "Memorial Garden for the Unborn" that offers "a place of hope and recovery for women and families who are suffering the aftermath of abortion." Docket 322-4; Memorial Garden for the Unborn, Alpha Center, https://alphacenterfriends.com/memorial-garden (last visited July 29, 2021). Alpha Center's memorial garden claims that women who have had an abortion must seek "forgiveness and redemption." *Id.* This evinces Alpha Center's ideological opposition to abortion: the assumption that abortion, coerced or not, results in an "aftermath" and period of mourning and necessary "forgiveness and redemption" shows that Alpha Center considers abortion, coerced or not, immoral. A pregnant woman would be subjected to that messaging by merely attending a mandatory interview at Alpha Center's facility. "[A] woman will likely be unwilling to actually consult with a pregnancy help center because she will fear being ridiculed, labeled a murderer, and subjected to anti-abortion ideology . . . ." Docket 39 at 20. Intervenors and state defendants have not shown any factual change that would alter that conclusion.

Further, a pregnant woman required to attend counseling with a pregnancy help center might be concerned about the privacy of the sensitive information she is required to disclose. She might fear repeated contact from the pregnancy help center even after her counseling appointment, because the Uniform Guidelines now require that a copy of her photo ID be kept in her file by the center. Docket 246-2 at 40-41. And as the court stated in the initial order granting preliminary injunction, she may believe, "rightly or wrongly, that her decision to have an abortion could become public information." Docket 39 at 21. Amendments to the help center requirement have made modest improvements to a woman's privacy rights, but the privacy protections at a pregnancy help center still fall far below those at a medical clinic like Planned Parenthood. Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), an improper disclosure of confidential patient information by a medical provider can result in substantial civil monetary penalties even when the entity "did not know and, by exercising reasonable diligence, would not have known" about the disclosure. 45 C.F.R. § 160.404(b)(2)(i).

While the Uniform Guidelines require that "the spirit and requirements of HIPPA [sic] shall be employed by the pregnancy help center," the act provides no civil enforcement mechanism for improper disclosures by pregnancy health centers, whether intentional, reckless, or negligent. Docket 246-2 at 34; SDCL § 34-23A-59; *see generally* Docket 246-2. Alpha Center has chosen to voluntarily comply with HIPAA in some regards, but voluntary compliance offers little to assure a pregnant woman that her data is secure. *See* Docket

24

352-1. And while the 2012 amendments to the act made it a Class 2 Misdemeanor to "knowingly and intentionally release[] any information obtained during any consultations resulting from [the pregnancy help center requirement], under circumstances not in accord with the confidentiality provisions required by [the act][,]" SDCL § 34-23A-59.2, that penalty is limited to knowing and intentional disclosures and does not protect pregnant women from negligent or unintentional disclosures. 2012 S.D. Sess. Laws ch. 186 § 9.

The lack of privacy and security protections at pregnancy help centers places an undue burden on a woman who wishes to have an abortion. A woman might decide to remain pregnant rather than risk her decision to have an abortion being shared with someone who is not supportive of that decision. A pregnant woman might reasonably be concerned that, without laws in place to encourage strong data security, a pregnancy help center may be prone to inadvertent disclosures of her sensitive information and vulnerable to data breaches.

The 2012 amendments marginally improved the quality of counseling guaranteed at a pregnancy help center, but not enough to change the undue burden calculation. The amendments added a requirement that pregnancy help centers must "ha[ve] available either on staff, or pursuant to a collaborative agreement, a licensed counselor, or licensed psychologist, or licensed certified social worker, or licensed nurse, or licensed marriage and family therapist, or physician, to provide the counseling related to the assessment for coercion . . . ." 2012 S.D. Sess. Laws ch. 186 § 4. That amendment does little to lessen

the burden on a woman seeking an abortion who would not otherwise attend counseling: she must still submit to a counselling session, against her will, at a non-medical facility that is ideologically opposed to her choice to have an abortion. Further, the requirement does not, on its face, ensure that a qualified counselor assists the pregnant woman. A "licensed nurse" who specializes in emergency room trauma but has no experience in counseling women seeking abortions, under the statute, would be permitted to conduct the counseling.

The amendments since 2011 placed an additional burden on a woman required to attend counseling by increasing the amount of time a woman is likely to be required to spend at a pregnancy help center. As incorporated in the 2012 amendments, the Uniform Guidelines authorize counseling on a broader range of topics, expanding the scope from "coercion" to both coercion and "pressure" from third parties. 2012 S.D. Sess. Laws ch. 186 § 7. While the legislature amended the definition of "coercion" following the court's 2011 order that the term was unconstitutionally vague, it left "pressure" undefined, meaning "pressure" could cover a large swath of topics that could substantially lengthen the counseling session. 2012 S.D. Sess. Laws ch. 186 § 1; *see* Docket 39 at 34-40. The 2018 amendments added a host of disclosures that counselors must provide pregnant women during the appointment, which are redundant with the disclosures provided by doctors and are likely to lengthen the counseling session. *See* 2018 S.D. Sess. Laws ch. 205. These amendments increase the burden on a woman who seeks an abortion by requiring her to attend a lengthier counseling appointment than the court contemplated in

26

2011. Some women might have to take a full or half day off of work or pay for child care to attend a counseling session, in addition to the time needed to attend the consultation with Planned Parenthood and the abortion procedure 72 hours later. That increased time, especially for women who live hours from the nearest Planned Parenthood clinic or pregnancy help center, contributes to the undue burden posed by the pregnancy help center requirement.

Even a short delay that comes from compliance with the pregnancy help center requirement might push a woman past the gestational age limit at which she may receive an abortion. The pregnancy help center requirement does not include a statutory timeframe by which a pregnancy help center must schedule a counseling appointment: a pregnancy help center could wait as long as it wished, stalling for time and hampering a woman's ability to access a pre-viability abortion. A woman could be prevented from receiving an abortion altogether because of the time she must wait to attend a counseling session.

State defendants argue that because pregnant women do not have "a right to be insulated from all others" in deciding to obtain an abortion, the state may implement the pregnancy help center requirement. Docket 271 at 4 (quoting *Casey*, 505 U.S. at 877). But *Casey* permits "regulations which do no more than create a structural mechanism by which the State . . . may express profound respect for the life of the unborn . . . if they are not a substantial obstacle to the woman's exercise of the right to choose." *Casey*, 505 U.S. at 877. This court found that the pregnancy help center requirement is "a substantial obstacle to a woman's decision to obtain an abortion," and more

27

than a mechanism by which the state may express its profound respect for life. Docket 39 at 21. "A statute which, while furthering [a] valid state interest has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Whole Woman's Health*, 136 S. Ct. at 2306 (quoting *Casey*, 505 U.S. at 877). Changes in the law have not altered the court's conclusion in the 2011 injunction order that the pregnancy help center requirement places an undue burden on a woman seeking abortion in a large fraction of cases where it is relevant. Planned Parenthood is likely to succeed on the merits of its undue burden claim.

### d.    Threat of irreparable harm

In 2011, the court found that the threat of irreparable harm weighed in favor of granting the injunction. Docket 39 at 58-59. PHC intervenors' sole argument relating to the threat of irreparable harm is that the injunction being lifted as to the *other* provisions of the act means that no harm would result from it being lifted as to *this* provision. Docket 205 at 34. The court disagrees. The factors that led to the parties stipulating to dissolve the other provisions of the 2011 injunction do not apply here.

The state defendants argue that there is no risk of irreparable harm, because *no* harm would befall a woman considering an abortion who was forced into "receiving objective, non-judgmental counseling designed to . . . inform her decision of whether to preserve her relationship with her unborn child." Docket 271 at 13. But as the court noted in 2011, "Constitutional

28

violations, however brief, are unquestionably irreparable." Docket 39 at 58 (citing *Kirkeby v. Furness*, 52 F.3d 772, 775 (8th Cir. 1995) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")). The threat of irreparable harm weighs in favor of continuing the preliminary injunction.

### e.    Balance of the harms

In the 2011 injunction order, the court found that if the preliminary injunction was improperly denied, "many women will have been denied their right to free speech and effectively forced against their will to remain pregnant until they give birth." Docket 39 at 59. If the preliminary injunction turned out to have been improperly granted, "defendants will have been wrongly prevented from carrying out their official duties." *Id.* at 60. The court found, after balancing the harm, that the balance of the harms weighed in favor of granting the preliminary injunction. *Id.* at 60. Because the court has found that Planned Parenthood remains likely to succeed on the merits of its First Amendment claim, the balance of the harms has not changed.

### f.    Public Interest

The court remains convinced that the pregnancy help center requirement is likely unconstitutional. There remains a public interest in protecting women's constitutional rights to access abortion and to free speech. This factor continues to weigh in favor of maintaining the preliminary injunction.

**CONCLUSION**

No legal or factual change since the court's preliminary injunction in 2011 warrants dissolution of the preliminary injunction of the pregnancy help center requirement. It continues to likely infringe on women's right to free speech secured in the First Amendment, and it presents an undue burden on a woman's right to access abortion. The remaining *Dataphase* factors continue to weigh in favor of injunction.

Thus, it is

ORDERED that the motion to dissolve what remains of the preliminary injunction is denied. The injunction as laid out in the court's order at Docket 129 remains in effect. It is further

ORDERED that the motion to expedite (Docket 300) is denied as moot. DATED August 20, 2021.

BY THE COURT:


*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE